UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division
www.flsb.uscourts.gov

In re:

QOC I LLC,

Case No. 10-
Chapter 11

Debtor.
_____/

# CHAPTER 11 CASE MANAGEMENT SUMMARY
## OF QOC I LLC

In compliance with Administrative Order 05-1 and Local Rule 2081-1(B), QOC I LLC ("QOC") (the "Debtor" or the "Company"), by and through undersigned proposed counsel, files this Chapter 11 Case Management Summary for QOC I LLC and states:

1.  Date of Order for Relief under chapter 11 (filing date of petition if voluntary chapter 11 petition):

    **October 1, 2010**

2.  Names, case numbers and dates of filing of related Debtors:

    *None*

3.  Description of debtor's business:

    **QOC was formed and exists to own and hold previously issued life insurance policies (the "Policies") purchased in the life settlement market. The Debtor's acquisition of the Policies, and their contractual and other rights of payment related thereto, are based upon, among other things, a series of agreements providing for the purchase, financing, servicing and management of the Policies.**

    **The Policies were issued by leading insurance companies upon individuals who are at least 60 years of age (the "Insureds"). The owners of the policies ("Owners"), who may or may not be the Insureds, desired to sell their Policies and the related benefits rather than surrender them to the issuing insurance company for less value. The Policies were purchased from the Owners by QOC. The Debtor purchased the Policies at prices expected to yield a profit to the Debtor's investors upon the payment of the death benefit to the Company.**

    **Life insurance settlement policy transactions represent a secondary market within**

the life insurance sector that involves acquiring life insurance policies from Owners. As a result, consumers that no longer require the death benefit under a life insurance policy can now realize significantly more than cash surrender value for unneeded or underperforming policies.

In a life insurance settlement policy transaction, a life insurance contract is purchased by an investor at a discount to the ultimate death benefit to be paid upon the death of the Insured, but at a higher price than the corresponding surrender value of the policy (the price the original life insurance company would pay the Owner to terminate coverage). Upon purchasing a policy, the investor maintains such policy, by paying the premiums and any related costs (collectively, the "Premiums") until the Insured individual dies (or, in the case of a joint and survivorship policy, until both Insureds die). When the Insured dies, the investor, as the owner of the policy, is entitled to the death benefit proceeds.

The Policies, which are most of the significant assets of the Debtor in this case, typically insure individuals 60 years of age and older, where the Owners have determined that they prefer an immediate, lump-sum payment to the ongoing expense of premium payments and postponement of payment on the asset. In a typical situation, an Owner or the Insured's heirs are financially independent or the policy was purchased by a corporation on the life of an executive for which corporation the Insured no longer works.

The Debtor's business activities have consisted of the purchase of approximately 295 life insurance settlement policies and other activities related to the holding and management of the Polices. Contemporaneously with the initial acquisition of the Policies, the Debtor entered into a comprehensive Servicing and Tracking Agreement dated as of October 25, 2007 (the "Servicing Agreement") with non-debtor Strategies for the provision of management, administrative and operational services.

In connection with the provisions of the Servicing Agreement, Strategies provides corporate administrative, accounting and related services to QOC. Strategies maintains certain corporate records of the Debtor, assists in the preparation of the Debtor's financial statements and provides certain other related services in exchange for a "Servicer's Fee" in the amount of $1,500 per Policy per annum, payable monthly in advance on the first business day of each month. These services include: providing monthly budgets to the Lender; the daily management of communications with third parties, including the Insureds and each of the insurance companies regarding the maintenance and servicing of the Policies; banking and related services regarding the amounts due and received with regard to the Policies and any proceeds thereof, including the payment of Premiums and the distribution of any proceeds received upon maturation of the Policies; and analysis and advice regarding the Debtor's investments in and management of the Policies, including their value.

QOC currently owns 283 policies on 223 lives with a face value of nearly $550 million. The discounted current value of the policies is at least $164,465,812 as of August 31, 2010. The Policies comprising QOC's life settlement portfolio are the Company's primary asset and the principal collateral securing the obligations to QOC's senior secured lender, Wells Fargo Bank, National Association ("Wells Fargo"), as successor to Wachovia Bank, National Association.

4.      Locations of Debtor's operations and whether the business premises are leased or owned:

**The Debtor operates from its corporate headquarters in Boca Raton, Florida. The business premises are located at 5901 Broken Sound Parkway, NW, Suite 200, Boca Raton, Florida 33487. The business premises are leased by Q Capital Strategies, LLC, the servicer and manager of the Debtor.**

5.      Reasons for filing chapter 11:

**As a financial services business in a highly competitive environment, QOC is materially impacted by both the financial markets and worldwide economic conditions. Since 2009, QOC has operated in an extremely unfavorable global business environment, which included, among other things, a lack of liquidity in the credit markets and declining asset values.**

**As a result, during the course of the last year, the Debtor has had no real ability to recapitalize or reduce its debt burdens. Limited access to capital is particularly significant in light of the Debtor's large debt service obligations. Alternatives that the Debtor might have previously employed to extend maturities and maintain liquidity are no longer available. These adverse market changes have severely limited the Debtor's ability to satisfy its obligations as they come due.**

**At the same time that the rapid softening of the economy and tightening of the financial markets was limiting the Debtor's financial flexibility, then there have been less frequent Policy maturities in Debtor's portfolio than had been projected, and thus the portfolio has so far failed to yield forecasted revenue. As a result, QOC is unable to generate sufficient cash to service its debt and fund ongoing operations. QOC's liquidity constraints have been (or will be) exacerbated by the passage of the Facility Termination Date and the potential termination of the Hedging Agreement.**

**Against this backdrop, QOC began to weigh its options with respect to a broad financial restructuring that would provide QOC with the flexibility necessary to continue its business on a going forward basis until Policy maturities provided the revenue necessary to satisfy its obligations on a current basis. To that end, throughout 2010, QOC actively pursued third party financing and evaluated related strategic alternatives, including sales of all or a portion of the Policies and comparable transactions.**

**Moreover, commencing in early 2010, QOC initiated discussions with Wells Fargo as successor to Wachovia, regarding a consensual restructuring of the Company's outstanding indebtedness. Despite good faith efforts, those discussions have yet to materialize in a resolution.**

**Given QOC's current liquidity position and projected ongoing liquidity needs, QOC determined that it would not have sufficient liquidity to continue to service its debt and fund ongoing operations -- i.e., the payment of the Premiums, the servicing charges and interest payments to the Lender-- in the upcoming months.**

**Accordingly, because of the inability to obtain alternative financing or reach an**

3

**agreement with Wells Fargo on a consensual restructuring, the immediate issues caused by the maturity of the Loan, and the Debtor's inability to satisfy its debt service and Premium obligations as they came due, it became clear, after exhausting all other strategic options, that a Chapter 11 proceeding would be the most effective option available in order to maximize value for the benefit of all of the Debtor's stakeholders.**

**Thus, the Debtor has determined that filing for Chapter 11 relief is in the best option available to preserve and effectuate value for all the Debtor's stakeholders. In the context of its Chapter 11 case, the Debtor intends to explore a number of restructuring alternatives for emerging from Chapter 11 pursuant to a plan of reorganization, including a possible sale of the portfolio.**

6. List of officers and directors, if applicable, and their salaries and benefits at the time of filing and during the 1 year prior to filing:

**NONE**

7. The Debtor's fiscal or calendar year to date gross income and the Debtor's gross income for the calendar or fiscal year prior to the filing of this petition:

**2009 gross income – $18,075,171.00**
**2010 YTD gross income - (15,424,383.35) LOSS**

8. Amounts owed to various creditors:

a. Obligations owed to priority creditors including priority tax obligations:

**The Debtor does not believe there are any priority creditors or priority tax obligations.**

b. With respect to creditors holding secured claims, the name of and amounts owed to such creditors and a description and estimated value of all collateral of the Debtor securing such claims:

**As of the Filing Date, the Debtor owed Wells Fargo, as successor to Wachovia Bank N.A., $120 million on account of a Loan and Security Agreement entered into on or about May 9, 2008 and approximately an additional $15.2 million (as of August 31, 2010) on account of the "Hedge Breakage Costs" should the Hedging Agreement entered into with Wells Fargo be terminated and unwound.**

**The Term Loan and Hedge Breakage Costs are secured by a lien on the Policies which comprise the Debtor's life settlement portfolio along with cash and related assets. The Policies have a face value of approximately $550 million and a current value of $164,465,812 as of August 31, 2010 as computed using the model and formula developed by Strategies and as verified by Towers Watson Risk Consulting, Inc., the actuarial consultant jointly retained by the Debtor and Wells Fargo. Cash on hand as of the Petition Date is $2,383,598.47.**

        c.      Amount of unsecured claims/other secured claims:

**Approximately $52,000, including approximately $35,000 in debt to Q Capital Strategies, LLC.**

    9.      General description and approximate value of the debtor's assets:

**See above.**

    10.     List of all insurance policies, the property covered under the policy, the name of the insurer, the policy number, amount of coverage, whether the premium is current, the date the next premium is due and date the policy expires;

**None**

    11.     Number of employees and amounts of wages owed as of petition date:

**None**

    12.     Status of Debtor's payroll and sales tax obligations, if applicable. This does not eliminate the obligation of chapter 11 debtors (other than individuals not engaged in business) to provide the more detailed payroll tax information required by Local Rule 2081-1(A):

**The Debtor does not have any payroll or sales tax obligations.**

    13.     Anticipated emergency/expedited relief to be requested within 14 days from the petition date:

    a. Emergency Motion to Use Cash Collateral and Provide Adequate Protection
    b. Emergency Application to Retain Paul J. Battista and Genovese Joblove & Battista, P.A. as Bankruptcy Co-Counsel to Debtor-in-Possession and Request for Interim Relief
    c. Emergency Application to Retain Gerald H. Gline and Cole, Schotz, Meisel, Forman & Leonard, P.A. as Bankruptcy Co-Counsel to Debtor-in-Possession and Request for Interim Relief
    d. Motion to Establish Procedures for Interim Compensation for Professionals

**QOC I LLC**

By: Q Opportunity Company LLC, its sole member

By: Q Capital Strategies, LLC, its Managing Member

By: _____/s/_____
    Name:    Steven M. Shapiro
    Title:     President

Dated: October 1, 2010

        Respectfully Submitted,

        GENOVESE JOBLOVE & BATTISTA, P.A.
        4400 Miami Tower
        100 Southeast Second Street
        Miami, Florida 33131
        Telephone: (305) 349-2300
        Facsimile: (305) 349-2310

        By:     /s/ Glenn D. Moses
           Glenn D. Moses, Esq.
           Florida Bar No. 174556
           gmoses@gjb-law.com
           Heather L. Harmon, Esq.
           Florida Bar No. 013192
           hharmon@gjb-law.com

           And

        Gerald H. Gline, Esq.
        ggline@coleschotz.com
        David M. Bass, Esq.
        dbass@coleschotz.com
        COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
        25 Main Street
        Hackensack, New Jersey 07601
        Telephone:  (201) 489-3000
        Facsimile:  (201) 678-6240

## CERTIFICATE OF SERVICE AND ADMISSION

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualification to practice in this Court set forth in Local Rule 2090-1(A).

**I HEREBY CERTIFY** that a true copy of the foregoing Motion was served via Notice of Electronic Filing to all creditors and interest parties registered to receive such CM/ECF electronic notification from the Bankruptcy Court on this 1st day of October 2010.

        By: /s/ Glenn D. Moses
           Glenn D. Moses