UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division
www.flsb.uscourts.gov

In re:

                                        Case No. 10-40153-BKC-PGH

QOC I LLC                                     Chapter 11

      Debtor.
_____/

***EMERGENCY* VERIFIED MOTION OF DEBTOR-IN-POSSESSION IN SUPPORT OF MOTION FOR AN ORDER (A) AUTHORIZING THE DEBTOR'S INTERIM AND FINAL USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 361 AND 363 AND GRANTING ADEQUATE PROTECTION (B) SCHEDULING FINAL HEARING PURSUANT TO 11 U.S.C. § 363(c)(2) AND FED. R. BANKR. P. 4001 AND (C) OTHER RELATED RELIEF**

**(Emergency Hearing Requested)**

<u>**BASIS FOR EMERGENCY RELIEF**</u>

> The Debtor needs immediate use of cash collateral to preserve its business operations and the value of its bankruptcy estate for the benefit of its stakeholders. The Debtor reasonably believes that a hearing to consider the relief requested must be held as soon as the Court's calendar will permit to avoid immediate and irreparable harm. The Debtor requests that the Court waive the provisions of Local Rule 9075-1(B) requiring an affirmative statement that a bona fide effort was made to resolve the issues raised in this Motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.

QOC I LLC ("QOC" or the "Debtor"), as debtor and debtor-in-possession herein, by and through its proposed counsel, Genovese, Joblove & Battista, P.A. and Cole, Schotz, Meisel, Forman & Leonard, P.A., hereby submits this motion (the "Motion") pursuant to 11 U.S.C. §§ 105, 361 and 363 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure for entry of an interim order (the "Interim Cash Collateral Order")[1] and, ultimately, a final order:

---

[1] A copy of the proposed Interim Cash Collateral Order is attached hereto as **Exhibit A**.

(A) authorizing the Debtor's interim and, ultimately, final use of the cash collateral of Wells Fargo Bank, National Association ("Wells Fargo"); (B) authorizing the debtor to withdraw funds in its prepetition bank accounts maintained with Wells Fargo and deposit these funds into newly opened debtor-in-possession accounts (collectively, the "DIP Accounts"); and (C) scheduling a final hearing (the "Final Hearing") on the Debtor's application for use of cash collateral pursuant to 11 U.S.C. § 363(c)(2) and Federal Rule of Bankruptcy Procedure 4001.  In support of this Motion, the Debtor submits the Declaration of Steven M. Shapiro (the "Shapiro Declaration")[2] filed contemporaneously herewith.  In further support of this Motion, the Debtor respectfully states as follows:

### I.     SUMMARY STATEMENT OF INTERIM RELIEF REQUESTED

1.     This Application seeks entry of an Order (A) authorizing the Debtor's interim and, ultimately, final use of the Cash Collateral (as defined below) of Wells Fargo Bank; (B) authorizing the Debtor to withdraw funds in its prepetition bank accounts maintained with Wells Fargo and deposit these funds into the DIP Accounts; and (C) scheduling the Final Hearing.

2.     As set forth in the Shapiro Declaration and as discussed below, QOC was formed and exists to own and hold previously issued life insurance policies (the "Policies") issued by leading insurance companies upon individuals (the "Insureds") and sold in the life settlement market.  QOC currently owns 283 policies on 223 lives with a face value of approximately $550 million.  The discounted current value of the policies is at least $164,465,812 as of August 31, 2010.  The Policies comprising QOC's life settlement portfolio are QOC's primary asset and the principal collateral securing the obligations to Wells Fargo.

---

[2] Capitalized terms not otherwise defined herein shall be given the meaning ascribed to them in the Shapiro Declaration.

3. It is essential that the Debtor obtains immediate authority to use the Cash Collateral. QOC's value as a going concern, and to its stakeholders, is dependent upon the use of the Cash Collateral to ensure that QOC, through its servicer, Q Capital Strategies, LLC ("Strategies"), is able to pay pending premiums and any related costs (collectively, the "Premiums") and servicing charges to Strategies in relation to the Policies. If the Premiums are not paid, the Policies will lapse and the portfolio will become virtually worthless. Thus, failure to obtain use of the Cash Collateral will completely erode the value of the Debtor's assets and substantially impair the operation of QOC's business.

4. As set forth on the budget attached hereto as **Exhibit B** (the "Cash Collateral Budget"), during the interim period, the Debtor seeks to use approximately $1,112,766 of Cash Collateral, to satisfy the Premiums of approximately $1.06 million that are due to be paid on or about October 1, 2010, and to pay the October monthly servicing charges to Strategies of $35,375 and other obligations relating to the preservation/monitoring of the Collateral.[3]

---

[3] While the payment due dates of the policy premiums fluctuate, they are generally due on or about the first of each month. Thus, if the Debtor is permitted to use Cash Collateral during the interim period, the next Premium payments will not come due until after the Final Hearing. As reflected in the Cash Collateral Budget, the Debtor has funds on hand sufficient to pay the Premiums and the servicing fees for October and November. The Debtor also projects that it will generate revenues over the budget period in the amount of approximately $1.5 million per month. Revenue projections for the Debtor are, for obvious reasons, difficult to predict with any reasonable certainty. That point is particularly true when trying to project over short-term periods, as is the challenge required for the Cash Collateral Budget. Nevertheless, the projections are based on recent historical maturities. However, the forecasted maturities are significantly less than would be projected consistent with third-party life expectancy reports (created by actuarial and medical experts of ISC Services) that calculate an insured's probable mortality based on probability theory, actuarial methodology, and medical analysis. Under the ISC projected monthly inflow, the Debtor estimates that it should recover maturities totaling approximately $2 million per month. Thus, while the Debtor has been conservative and anticipates that the maturities will exceed the modest cash forecast, as mentioned above, the maturities by their nature cannot be predicted with precise accuracy. Of course, to the extent that (continued…)

3

5. As set forth below, Wells Fargo is adequately protected by, among other protections, an equity cushion of over $32,000,000, or nearly 30%.

6. Accordingly, in order to preserve QOC's business and assets for the benefit of the Debtor's estate, the Debtor should be permitted to use Wells Fargo's Cash Collateral consistent with the Cash Collateral Budget.

## II. BACKGROUND

7. On the date hereof (the "Filing Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

8. The Debtor has remained in possession of its assets and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9. No request has been made for the appointment of a trustee or examiner, and no official committee(s) has been appointed in this case.

10. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Debtor's Chapter 11 case and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M) and (O).

11. The statutory predicates for the relief sought herein are sections 105(a), 361 and 363 of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

(…continued)
maturities do not materialize in a particular month, they ultimately will occur in subsequent months, provided the Policies do not lapse.

**A.     QOC's Business and Chapter 11 Filing**

12.     QOC is a Delaware limited liability company, formed pursuant to the Delaware Limited Liability Company Act on or about October 24, 2007, as a special purpose vehicle to invest in previously issued life insurance policies (*i.e.*, the Policies) purchased in the life settlement market.

13.     The Debtor's acquisition of the Policies, and its contractual and other rights of payment related thereto, are based upon, among other things, a series of agreements providing for the purchase, financing, servicing and management of the Policies.

14.     The Policies were issued by leading insurance companies insuring the lives of individuals, who may or may not be the Policy owner, and who, at the time of such purchase in the life settlement market, are at least 60 years of age. The Insured (or the Policy's owner) desired to sell their Policies and the related benefits rather than surrender them to the issuing insurance company for less value. The Policies were purchased from the Policy owner by QOC.[4] The Debtor purchased the Policies at prices expected to yield a profit to the Debtor's investors upon the payment of the death benefit to QOC.

15.     The Debtor reports for financial purposes on a calendar year. For the year ended December 31, 2009, the Debtor reported $18,075,171 in total revenue against $5,791,953 in operating expenses. As a result, the Debtor had a gain from operations of $12,283,218 and a net gain of $7,294,331 (after interest expenses of $5,029,149). For the calendar year to date (through August 2010), the Debtor has generated $6,380,930 in revenue from matured Policies.

---

[4] Policies are often held not by individuals but by a trust, *e.g.*, an Irrevocable Life Insurance Trust, or by business entities seeking to dispose of unneeded "key-man" insurance or other business-owned insurance.

16.     A more detailed description of the Debtor's business, background, capital structure and the circumstances leading to the Chapter 11 filing is included in the Shapiro Declaration.

**B.      The Debtor's Pre-Petition Relationship With Wells Fargo.**

17.     On or about May 9, 2008, the Debtor, as Borrower, along with its parent, Q Opportunity Corp. ("Q Opportunity"), as "Equity Contributor," and Strategies, as the "Servicer" and "Loan Manager," entered into that certain Loan and Security Agreement (as amended, the "Loan and Security Agreement"), with Wachovia Capital Markets, Inc., as administrative agent, and Wells Fargo, as custodian, pursuant to which Wells Fargo's predecessor, Wachovia Bank, National Association ("Wachovia"), agreed to advance $120 million to QOC for the purchase of the Policies (the "Loan"). A copy of the Loan and Security Agreement is annexed hereto as **Exhibit C**.[5]

18.     The Loan, though cloaked with a three hundred and sixty-four (364)-day term, was to have a three-year term. As set forth in section 2.1(c) of the Loan and Security Agreement, the "Facility Termination Date" (defined in the Loan and Security Agreement as "May 8, 2009, or such later date as the Administrative Agent shall notify the Borrower of in writing in accordance with Section 2.1(c)") could be extended for two successive three hundred and sixty-four (364)-day periods. That is precisely why the "Termination Date" (as defined in

---

[5] The Loan and Security has been amended from time. Through the Filing Date, the parties entered into six amendments to the Loan and Security Agreement, which, among other provisions, extended the Facility Termination Date. The Second Amendment to Loan and Security Agreement, dated as of May 8, 2009, initially extended the Facility Termination Date to May 7, 2010. In accordance with the last of the amendments, the Sixth Amendment to Loan and Security Agreement, dated as of July 8, 2010, the Facility Termination Date was extended to July 15, 2010. The amendments to the Loan and Security Agreement are attached hereto collectively as **Exhibit D**.

the Loan and Security Agreement) included an outside date of May 6, 2011 (*i.e.*, a date that is 728 days beyond the May 8, 2009 Facility Termination Date).

19. Indeed, despite the fact that section 2.1(c) of the Loan and Security Agreement provided that "each Committed Lender, in its sole and absolute discretion, without regard to the value or performance of the Assets or any other factor, may elect not to extend the Facility Termination Date," Wachovia represented to QOC that the extensions, if sought, would be granted. Although Wachovia did, in fact, permit one extension (*i.e.*, through May 7, 2010, pursuant to the Second Amendment to Loan and Security Agreement), it took the opportunity to extract additional consideration from QOC for that extension (in the form of fees and higher interest rates).[6]

20. Prior to entering into the Loan and Security Agreement, in or about October 2007, LSE Holdings LLC f/k/a Q Cap Holdings LLC ("LSE") and Strategies, through a combination of debt and equity, provided $31 million to Q Opportunity to capitalize QOC.[7] The $31 million equity investment, contributed by Q Opportunity (*i.e.*, the "Equity Contributor" under the Loan and Security Agreement) to QOC, was an express requirement under the Loan and Security Agreement. QOC was required to expend the entire $31 million equity investment before drawing upon any "Advances" under the Loan and Security Agreement. Between March 2008

---

[6] In accordance with the Sixth Amendment to Loan and Security Agreement, the Facility Termination Date was extended through July 15, 2010. Despite QOC's timely request consistent with section 2.1(c) of the Loan and Security Agreement, Wells Fargo would not extend the term of the Loan without additional significant concessions from QOC and its investors. In this regard, the Debtor had been negotiating the terms of amended and restated loan documents with Wells Fargo as successor to Wachovia. However, given the Company's inability to comply with certain of the requirements of the proposed terms thereof, the Debtor filed this Chapter 11 case to restructure the terms of the loan on terms with which it can comply.

[7] An LSE affiliate, Fourth Third, LLC, provided Q Opportunity with a $17,566,667.67 junior loan, which is expressly subordinated to the obligations of Wells Fargo.

7

and January 2010, QOC purchased 295 Policies, using a portion of the proceeds from the $31 million equity contribution and the $120 million advanced under the Loan and Security Agreement. The balance of the equity contribution and the advances under the Loan and Security Agreement were utilized for fees in connection with the initial financing transactions and other qualified and authorized expenses of QOC.

21.     Under the Loan and Security Agreement, Wells Fargo has a security interest in all of the Policies (and, together with any ancillary collateral relating to the Polices, the "Collateral"). Pursuant to the terms of the Loan and Security Agreement, and as set forth in that certain Custodian Agreement dated May 9, 2008, Wells Fargo, as Custodian, holds the original Policies, which have been collaterally assigned to the Custodian to secure the Indebtedness (as defined below).[8]

22.     QOC and Wells Fargo (as successor to Wachovia) are also parties to that certain Hedging Agreement (as defined in the Loan and Security Agreement) dated as of May 9, 2008, consistent with the terms of a "Master Agreement" in a form published by the International Swaps and Derivatives Association, Inc., together with a "Schedule" thereto, and each "Confirmation" thereunder confirming the specific terms of a Hedge Transaction (as defined in the Loan and Security Agreement), pursuant to which QOC sought to hedge against variable interest rates.[9]

---

[8] At the inception of the Loan, Wells Fargo and Wachovia were not affiliated. Upon information and belief, Wells Fargo did not acquire Wachovia until the end of 2008 or beginning of 2009. Wells Fargo's dual role in this regard is a matter of happenstance. The parties originally contemplated that the Policies would be held by a third-party Custodian.

[9] QOC entered into interest rate swap transactions with Wachovia under reference numbers 2678252, 2696278, 2737537, 2808136, 2859192, 2899574 and 2949890, as evidenced and confirmed by letter agreements between Wachovia and QOC dated August 7, 2009. Copies of the respective confirmation letters are attached hereto, collectively, as **Exhibit E**.

23. Wells Fargo, as the Hedge Counterparty, also has a lien on the Collateral. Wells Fargo's interests in the Collateral securing QOC's obligations under the Hedging Agreement are on a *pari passu* basis with the Collateral securing QOC's obligations under the Loan and Security Agreement.[10]

## C. The Outstanding Balance Under The Loan and the Value of the Collateral.

24. As of the Filing Date, the Debtor owed Wells Fargo $120 million on account of the Loan and Security Agreement and approximately an additional $15.2 million (as of August 31, 2010) on account of the "Hedge Breakage Costs" should the Hedging Agreement with Wells Fargo be terminated and unwound (collectively, the "Indebtedness").

25. The initial purchase price for the Policies and the determination of ongoing value of the life settlement portfolio, was and is determined based upon a computer model developed by Strategies (and approved by Wachovia), taking into account such factors, including the face amount of a Policy, the actuarial life expectancy of an Insured, the amount of any cash value in a Policy and the Premiums required to keep that Policy in force. The Loan and Security Agreement requires the independent actuarial validation of the model and methodology used to determine the value of the Collateral. QOC and Wells Fargo retained Watson & Wyatt, which is now Towers Watson Risk Consulting, Inc. ("Towers Watson"), as independent actuaries to validate the methodology and to verify the Company's valuation of the life settlement portfolio on a monthly basis as required by the Loan and Security Agreement. In addition, Strategies is required to provide on a monthly basis a "Loan Manager's Certificate," which, among other

---

[10] The Debtor and its professionals are still reviewing the loan documents and have ordered UCC searches to determine the validity and extent of Wells Fargo's liens. Nothing herein shall constitute an agreement as to the validity and extent of Wells Fargo's liens and security interests in the Collateral or the relative rights in and to the Collateral.

9

things, incorporates the monthly "Loan Manager Report."  The Loan Manager Report also values the settlement portfolio on a monthly basis and calculates the "Asset Coverage Ratio" (as defined in the Loan and Security Agreement).[11]

26. Under the terms of the Loan and Security Agreement, the Company is required to maintain a "Minimum Asset Coverage Ratio" equal to 122%.

27. According to Towers Watson's Life Settlement Portfolio Valuation Report, dated September 9, 2010, the "portfolio value," as of August 31, 2010, is $164,465,812.00, a figure entirely consistent with the value ascribed to the life settlement portfolio in the most recent Loan Manager Report dated September 10, 2010 (reflecting the Company's valuation of the life settlement portfolio, *i.e.*, the Collateral, at $167,448,359.00).  Copies of Towers Watson's Life Settlement Portfolio Valuation Report, dated September 9, 2010, and the Loan Manager Report, dated September 10, 2010, are attached hereto as **Exhibits F and G**, respectively.[12]

---

[11] "Asset Coverage Ratio" is defined in the Loan and Security Agreement as: "The ratio (i) of the Aggregate Asset Value divided by (ii) the amount (including accrued interest) of all Advances Outstanding."

[12] The Towers Watson Life Settlement Portfolio Valuation Report, dated September 9, 2010, also ascribes a value to the portfolio without the "reinstatement" of certain life insurance policies issued by Phoenix Life Insurance Company ("Phoenix") acquired by QOC in its normal course of business and owned by QOC on May 8, 2009 (the "Relevant Phoenix Policies").  The Relevant Phoenix Policies continue to secure the repayment of the Wells Fargo obligations.  However, because Wells Fargo questioned Phoenix's financial condition and Phoenix's ability to pay, Medley Opportunity Fund, LP and Medley Opportunity Fund, Ltd., affiliates of LSE, executed a Policy Purchase Agreement, dated September 14, 2009, which serves as a "backstop" that requires the Medley entities to purchase the Relevant Phoenix Policies in the event that Phoenix does not pay upon death of an applicable Insured.  At the time of the Policy Purchase Agreement, there were eight (8) Relevant Phoenix Policies.  Due to the maturity of two (2) of the Relevant Phoenix Policies, where QOC received the full death benefit from Phoenix, only six (6) Relevant Phoenix Policies remain.  According to the Towers Watson Life Settlement Portfolio Valuation Report, dated September 9, 2010, the "portfolio value" without the "reinstatement" of the Relevant Phoenix Policies is $160,244,075.

28. Thus, and as set forth on Schedule A to the Loan Manager Report, the "Asset Coverage Ratio" as of August 31, 2010, even *after* subtracting Hedge Breakage Costs if the Hedges were terminated, was 127% (calculated in accordance with the requirements of the Loan and Security Agreement), a ratio well in excess of the required "Minimum Asset Coverage Ratio."

29. Even utilizing the Hedge Breakage Costs provided by Wells Fargo if the Hedges were terminated, the Aggregate Asset Value (*i.e.*, the Collateral) still exceeds the amount of the Debtor's outstanding obligations to Wells Fargo by no less than $32,910,779.09, representing an "equity cushion" of at least 27.43%.

30. Indeed, this "equity cushion" well exceeds the Minimum Asset Coverage Ratio, which Wells Fargo acknowledged would adequately protect it.

### III.  RELIEF REQUESTED AND BASIS THEREFOR

31. By this Motion, the Debtor also requests authority to use cash collateral as defined in Section 363(a) of the Bankruptcy Code (the "Cash Collateral").

32. A Chapter 11 debtor-in-possession has the statutory right to use cash collateral to operate its business. The standards governing a debtor's use of cash collateral are set forth in Section 363(c)(2) of the Bankruptcy Code, which provides:

> The trustee [or debtor-in-possession] may not use, sell, or lease cash collateral under paragraph 1 of this subsection, unless -
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

33. The "provisions of this section" referenced in Section 363(c)(2) include Section 363(e), which provides:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e). As set forth below, Wells Fargo's interests are adequately protected through: (a) a substantial equity cushion in connection with its Collateral; (b) the use of the Cash Collateral to pay Premiums and servicing which must be paid to keep the Policies in effect; (c) a replacement lien on QOC's post-petition assets; and (d) its statutory entitlements under Section 507(b) of the Bankruptcy Code to the extent QOC's use of Cash Collateral results in a diminution of Wells Fargo's Collateral, rendering it undersecured.

34. The principal purpose of adequate protection "is to assure that the lender's economic position is not worsened because of the bankruptcy case." In re DeSardi, 340 B.R. 790, 803 (Bankr. S.D. Tex. 2006). A secured creditor is "not entitled to adequate protection payments without a showing of economic depreciation." In re Immenhausen Corp., 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994) (citing United Savings Ass'n v. Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365, 369-73 (1988)). The interest in property that is entitled to protection is value of the collateral securing such claim. Id. It follows therefore that where a secured creditor's interest and the value of the collateral is not diminishing by its use, sale or lease, the secured creditor's interest is adequately protected. Id.

35. The Bankruptcy Code does not explicitly define adequate protection, but does provide a non-exclusive list of the means by which a debtor may provide adequate protection, including other relief resulting in the indubitable equivalent of the secured creditors interest in

such property. See 11 U.S.C. 361. Because the term "adequate protection" is not defined in the Bankruptcy Code, the precise contours of the concept are necessarily determined on a case-by-case basis. In re Swedeland Dev. Group Inc., 16 F.3d 552, 564 (3d Cir. 1994) (citing In re O'Connor, 808 F.2d 1393, 1396-97 (10th Cir. 1987); In re Martin, 761 F.2d 472, 474 (8th Cir. 1995) (same); In re Senior Care Props., Inc. 137 B.R. 527, 528 (Bankr. N.D. Fla. 1992) (same); Matter of Family Place P'ship, 95 B.R. 166, (Bankr. E.D. Cal. 1989); In re Miller, 734 F.2d 1396 (9th Cir. 1984). See also S. Rep. No. 95-989, 95th Cong., 2nd Sess. 54 (1978) and H.R. Rep. No. 595, 95th Cong. 2d Sess. 339 (1978) (acknowledging that the statute confers upon "the parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its interest in the property involved."). Preserving the value of the collateral against the decline in value that would result from a precipitous liquidation is a crucial factor to consider in making an adequate protection determination. In re Snowshoe Co. Inc., 787 F.2d 1085, 87 (4th Cir. 1986) (a 364(d) financing order was affirmed where trustee reported that the collateral would lose from 50% to 90% of its value if operations ceased; In re Rela Distribs, Inc., 166 B.R. 3, 6 (Bankr. D. Mass. 1994), aff'd 182 B.R. 81 (D. Mass.), aff'd 69 F.3d 1200 (1st Cir. 1995).

36.  Courts have held that the existence of an equity cushion can itself provide adequate protection. In re Gallegos Research Group Corp., 193 B.R. 577, 584 (Bankr. D. Col. 1995) (oversecured creditors may not be entitled to cash payments or postpetition liens because they are adequately protected through the existence of a value cushion); see also In re Elmira Litho, Inc., 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994); In re Dunes Casino Hotel, 69 B.R. 784, 794 (Bankr. D.N.J. 1986); In re Realty SW. Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992). An "equity cushion" has been defined as the value of the property above the secured creditor's claim

"that will shield the interest from loss due to any decrease in the value of the property during the time the automatic stay remains in effect." Dunes Casino Hotel, 69 B.R. at 794 (citing In re Mellor, 734 F.2d at 1400; In re Roane, 8 B.R. 997, 1000 (Bankr. E.D. Pa. 1981), aff'd 14 B.R. 542 (Bankr. E.D. Pa. 1981)).[13]

37.     The concept of adequate protection, however, does not mean that an equity cushion in the collateral must be preserved, whether the decline in the equity cushion is a result of a decline in the value of the collateral or an increase in the secured creditor's claim due to the accrual of interest or fees. See In re Lane, 108 B.R. 6 (Bankr. D. Mass. 1989). Moreover, adequate protection does not require the maintenance of a loan to collateral value ratio in the context of an over secured creditor. See In re Delta Resources, Inc., 54 F.3d 722, 730 (11th Cir. 1995). Lastly, a debtor is only required to provide adequate protection for the value of a creditor's secured claim that exists as of the petition date. See In re Nice, 355 B.R. 554, 561-562 (Bankr. N.D. W. Va 2006) (citing In re Farmer, 257 B.R. 556, 561-62 (Bankr. D. Mont. 2000) (valuing collateral as of the petition date for adequate protection purposes)).

38.     As detailed above, Wells Fargo is adequately protected by an equity cushion of nearly $33 million. The equity cushion is, indeed, larger than the "Minimum Coverage Ratio" required by Wells Fargo under the Loan and Security Agreement, a "cushion" that Wells Fargo already determined adequately protected its interest. That equity cushion is based on a valuation

---

[13] The Dunes Casino Hotel case addressed a motion for relief from the automatic stay and not a motion for use of cash collateral. The Bankruptcy Code does not distinguish between those types of motions with regard to the adequate protection analysis. Courts also agree that the standard for adequate protection to be applied is the same under either a Section 362, 363 or 364 analysis. See In re McCombs Property VI, Ltd., 88 B.R. 261 (Bankr. C.D. Cal. 1988). But see In re Grant Broad. of Philadelphia, Inc., 71 B.R. 376, 385 (Bankr. E.D. Pa. 1987) (the debtor's burden is more stringent in a Section 363 motion than it is for a Section 362 motion.) The court in Grant Broadcasting, however, did not explain how that standard is stricter in the Section 363 context.

of QOC's assets by Towers Watson, an independent actuarial firm, and is based on the value of the assets at their going concern value, rather than their forced sale or orderly liquidation values. The Debtor submits the going concern valuation of Wells Fargo's Collateral is the appropriate valuation method for determining the extent of Wells Fargo's equity cushion in this context.

39. In determining whether there is an excess of security so as to constitute an equity cushion, courts first must determine whether the collateral should be valued on a going concern or liquidation basis. See In re Keystone Camera, 126 B.R. 177, 184 (Bankr. D.N.J. 1991). The legislative history of Section 361 of the Bankruptcy Code reveals a clear intent to not utilize liquidation value for all purposes in bankruptcy proceedings. See In re Helionetics, Inc., 70 B.R. 433, 439 (Bankr. C.D. Cal. 1987). Instead, Congress intended a flexible, case-by-case approach.

> [Section 361] does not specify how value is to be determined nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development … It is expected that the courts will apply the concept in light of the facts of each case and general equitable principles.

Helionetics, 70 B.R. at 439 (quoting H.R.Rep. No. 595 at 339, 1978 U.S. Code Cong. & Ad. News at 5787, 6295).

40. In reviewing an application to use cash collateral at the outset of a Chapter 11 case "going concern" value is the appropriate method for determining whether an equity cushion exists. In re Dynaco Corp., 162 B.R. 389 (Bankr. D. N.H. 1993).[14] In Dynaco, the debtor sought to use cash collateral over the secured lender's objection. The bankruptcy court recognized that

---

[14] Going concern value also has been used: (a) to value an apartment complex the debtor proposed to retain and operate under its Chapter 11 plan (see Matter of Savannah Gardens-Oaktree, 146 B.R. 306, 310 (Bankr. S.D. Ga. 1992)); (b) valuing the assets of a Chapter 11 debtor with prospects for reorganization in the context of creditor's motion for relief from the automatic stay (Matter of QPL Components, Inc., 20 B.R. 342 (Bankr. E.D. N.Y. 1982)); and (c) to determine the value of a residence a Chapter 13 debtor proposed to retain under the Chapter 13 plan (see In re McClurkin, 31 F.3d 401, 405 (6th Cir. 1994)).

requests for cash collateral use require courts to navigate the inherent conflict between: (a) protecting the interests of a secured creditor from being harmed by a debtor's unrestricted use of cash collateral, and (b) the general rehabilitative purpose of Chapter 11, which requires that debtors have the ability to access their cash to operate. Based on its finding of a 17% equity cushion as a going concern valuation, the court in Dynaco held that the debtor should be authorized to use cash collateral. Id. at 399.

41.   In this case, Wells Fargo similarly is adequately protected by the substantial cushion between the going concern value of the Collateral and the amount outstanding under the Loan and Security Agreement.[15]  Accordingly, to meet the general rehabilitative purpose of Chapter 11, which requires that debtors have the ability to access their cash to operate, the Debtor requests authority to use Wells Fargo's Cash Collateral.[16]

---

[15] The Budget does not provide for payment of post-petition interest on an ongoing basis. Courts have held that the interest to an overcollateralized secured lender need not be paid periodically but rather post-petition interest should accrue and "not paid to an oversecured creditor until the plan's confirmation or its effective date." Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship, 116 F.3d 790, 799 (5th Cir. 1997) (citing United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd. , 793 F.2d 1380, 1381, 1407 (5th Cir. 1986), on reh'g, 808 F.2d 363 (5th Cir. 1987 (en banc court reinstating panel opinion)), aff'd, 108 S.Ct. 626 (1988)). See also Key Bank Nat'l Ass'n v. Milham, 141 F.3d 420, 423 (2d Cir. 1998) (citing Orix Credit Alliance, Inc. v. Delta Res., Inc., 54 F.3d 722, 730 (11th Cir. 1995); In re Nat'l Computer Commc'n Corp., 85 B.R. 6 (Bankr. D. Conn. 1988) (interim compensation of attorney's fees pursuant to section 506(b) is inappropriate and determination of the extent of the equity cushion can only be made at the conclusion of the reorganization phase of a Chapter 11 case).

[16] In this regard, and pursuant to the United States Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Chapter 11 Trustees, the Debtor will close its accounts at Wells Fargo and open the new DIP Accounts at an authorized depository (which the Debtor anticipates will be HSBC). The Debtor specifically requests that the Court authorize and direct that Wells Fargo transfer any funds in accounts it controls to the DIP Accounts.

## IV. CONCLUSION

42. Without the use of Cash Collateral, it is extremely unlikely that the Company can remain in business or that it will be able to successfully reorganize. If the Premiums are not paid, the Policies will lapse and the Collateral will evaporate.

43. Based on the foregoing, the Debtor respectfully submits that entry of an Order authorizing the interim use of Cash Collateral and scheduling a Final Hearing to approve the use of Cash Collateral is necessary and appropriate.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

WHEREFORE, the Debtor respectfully requests entry of the accompanying Interim Cash Collateral Order: (a) (i) authorizing the Debtor's interim use of Cash Collateral in accordance with the Cash Collateral Budget and (ii) scheduling a Final Hearing for the Debtor's Motion for further use of Cash Collateral; (b) authorizing the Debtor to withdraw funds in its prepetition bank accounts maintained with Wells Fargo and deposit these funds into the DIP Accounts; and (c) granting such other and further relief as the Court deems just and proper.

DATED:  October 1, 2010

              Respectfully Submitted,

              GENOVESE JOBLOVE & BATTISTA, P.A.
              4400 Miami Tower
              100 Southeast Second Street
              Miami, Florida 33131
              Telephone: (305) 349-2300
              Facsimile : (305) 349-2310

              By:   /s/ Glenn D. Moses
                    Glenn D. Moses, Esq.
                    Florida Bar No. 174556
                    gmoses@gjb-law.com
                    Heather L. Harmon, Esq.
                    Florida Bar No. 013192
                    hharmon@gjb-law.com

              and

              Gerald H. Gline, Esq.
              ggline@coleschotz.com
              David M. Bass, Esq.
              dbass@coleschotz.com
              COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
              25 Main Street
              Hackensack, New Jersey 07601
              Telephone:  (201) 489-3000
              Facsimile:  (201) 489-1536

              Proposed Attorneys for QOC I LLC, Debtor and
              Debtor-in-Possession

## VERIFICATION

Steven M. Shapiro, of full age, certifies as follows:

1. I am the President of Q Capital Strategies, LLC, the Servicer and Loan Manager under the Loan and Security Agreement dated May 9, 2008. As such, I have full knowledge of the facts set forth in, and am duly authorized to verify this Application on QOC's behalf.

2. I have read the Verified Application and certify that the statements contained therein are true based upon my personal knowledge, information and belief.

3. I am aware that if any of the factual statements contained in the Verified Application are willfully false, I am subject to punishment.

_____
STEVEN M. SHAPIRO

DATED: October 1, 2010

48478/0001-7022853v1