UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division
www.flsb.uscourts.gov

In re:

QOC I LLC,

       Debtor.
_____/

Case No. 10-40153-BKC-PGH
Chapter 11

### DECLARATION OF STEVEN M. SHAPIRO

I, Steven M. Shapiro, hereby declare under penalty of perjury:

1. On the date hereof (the "Petition Date"), QOC I LLC ("QOC" or the "Debtor"), as debtor and debtor-in possession herein, commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code") in this Court.

2. I am the President of non-debtor Q Capital Strategies, LLC ("Strategies"), the "Servicer" and the "Loan Manager" under the Loan and Security Agreement (as defined below). I have continuously served as President of Strategies since the Debtor's inception. I am familiar with the Debtor's operations, business and financial affairs.

3. I submit this declaration (the "Declaration") to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of this Chapter 11 case and in support of the Debtor's voluntary Chapter 11 petition. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtor's investors, professionals and senior management of the Servicer and Loan Manager, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and financial affairs. If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration.

48478/0001-7020134v1

## BACKGROUND

**A.     General**

4.     QOC is a Delaware limited liability company, formed pursuant to the Delaware Limited Liability Company Act on or about October 24, 2007. QOC is a single member limited liability company. QOC's sole member is Q Opportunity Company LLC ("Q Opportunity").

5.     The Debtor's offices are located 5901 Broken Sound Parkway, NW, Boca Raton, FL 33487 Attention: Q Capital Strategies, LLC.

6.     QOC was formed and exists to own and hold previously issued life insurance policies (the "Policies") purchased in the life settlement market. The Debtor's acquisition of the Policies, and their contractual and other rights of payment related thereto, are based upon, among other things, a series of agreements providing for the purchase, financing, servicing and management of the Policies.

7.     The Policies were issued by leading insurance companies insuring the lives of individuals, who may or may not be the Policy owner, and who, at the time of such purchase in the life settlement market, are at least 60 years of age (the "Insureds"). The Insured (or the Policy's owner) desired to sell their Policies and the related benefits rather than surrender them to the issuing insurance company for less value. The Policies were purchased from the Policy owner by QOC.[1] The Debtor purchased the Policies at prices expected to yield a profit to the Debtor's investors upon the payment of the death benefit to QOC.

---

[1] Policies are often held not by individuals but by a trust, *e.g.*, an Irrevocable Life Insurance Trust, or by business entities seeking to dispose of unneeded "key-man" insurance or other business-owned insurance.

48478/0001-7020134v1

**B.    Life Insurance Settlement Policy Transactions**

8.    Life insurance settlement policy transactions represent a secondary market within the life insurance sector that involves acquiring life insurance policies from the Policy owners. As a result, consumers that no longer require the death benefit under a life insurance policy can now, in many cases, realize significantly more than cash surrender value for unneeded or underperforming policies.

9.    In a life insurance settlement policy transaction, a life insurance contract is purchased by an investor at a discount to the ultimate death benefit to be paid upon the death of the Insured, but at a higher price than the corresponding surrender value of the policy (the price the original life insurance company would pay the Policy owner to terminate coverage). Upon purchasing a policy, the investor maintains such policy, by paying the premiums and any related costs (collectively, the "Premiums") until the Insured individual dies (or, in the case of a joint survivorship policy, until both Insureds die). When the Insured dies, the investor, as the owner of the policy, is entitled to the death benefit proceeds.

10.    The Policies, which are the most significant of the assets of the Debtor in this case, insure individuals 60 years of age and older (at the time they are purchased), where the Policy owner has determined that they prefer an immediate, lump-sum payment to the ongoing expense of premium payments and postponement of payment on the asset. In a typical situation, a policy owner is financially independent or the policy was purchased by a business on the life of an executive for which entity the Insured no longer works.

**C.    History of the Debtor's Prepetition Operations and Management of the Debtors**

11.    The Debtor's business activities have consisted of the purchase of approximately 295 life insurance settlement policies and other activities related to the holding and management of the Polices. The Debtor does not conduct any other significant business activities. Based

3

upon these limited business objectives, contemporaneously with the initial acquisition of the Policies, the Debtor entered into a comprehensive Servicing and Tracking Agreement dated as of October 25, 2007 (the "Servicing Agreement") with non-debtor Strategies for the provision of management, administrative and operational services.[2]

12. In connection with the provisions of the Servicing Agreement and the Loan and Security Agreement, Strategies provides corporate administrative, accounting and related services to QOC. Strategies maintains certain corporate records of the Debtor, assists in the preparation of the Debtor's financial statements and provides certain other related services in exchange for a "Servicer's Fee" in the amount of $1,500 per Policy per annum, payable monthly in advance on the first business day of each month, consistent with the terms of the Loan and Security Agreement.

13. The Debtor's operations are undertaken at the direction of the Servicer and include: providing monthly budgets to Wells Fargo; the daily management of communications with third parties, including the Insureds and each of the insurance companies regarding the maintenance and servicing of the Policies; banking and related services regarding the amounts due and received with regard to the Policies and any proceeds thereof, including the payment of Premiums and the distribution of any proceeds received upon maturation of the Policies; and analysis and advice regarding the Debtor's investments in and management of the Policies, including their value.

14. QOC currently owns 283 policies on 223 lives with total face values aggregating approximately $550 million. The discounted current value of the policies is at least $164,465,812 as of August 31, 2010. The Policies comprising QOC's life settlement portfolio

---

[2] As noted below, Strategies serves as the "Servicer" and the "Loan Manager" under the Loan and Security Agreement.

are the Company's primary asset and the principal collateral securing the obligations to QOC's senior secured lender, Wells Fargo Bank, National Association ("Wells Fargo"), as successor to Wachovia Bank, National Association ("Wachovia").

15.   The chart below sets forth the Debtor's unaudited statement of operations for the year ended December 31, 2009.

| | |
|---|---:|
| REVENUE: | |
| Change in fair value life settlement contracts – net of life insurance premiums of $11,483,432 | 1,035,530 |
| Gain on matured life insurance contracts | 2,367,101 |
| Derivative gain | 14,672,540 |
| Total revenue (expense) | 18,075,171 |
| | |
| OPERATING EXPENSES | |
| Amortization, deferred finance costs | 1,046,626 |
| Interest rate swap fee | 3,788,220 |
| Fees, other | 667,830 |
| Professional services | 251,688 |
| Other | 37,589 |
| Total operating expenses | 5,791,953 |
| | |
| GAIN (LOSS) FROM OPERATIONS | 12,838,218 |
| | |
| OTHER INCOME (EXPENSES): | |
| Interest Expense, net | (5,029,149) |
| Other Income (Loss): | 40,262 |
| Total other income (Expense) | (4,988,887) |
| | |
| NET GAIN (LOSS) | 7,294,331 |

48478/0001-7020134v1

16. The Debtor's "P&L," year to date, is as follows:

|  | Jan-Aug 2010 |
|---|---:|
| **Ordinary Income/Expense** | |
|   Income | |
|     Change in Fair Value – LS Constr. | 12,274,483 |
|     Loss/Gain on Chg in FV of Derivatives | -14,332,851.03 |
|     Revenue Matured Contracts | 6,380,930.00 |
|   Total Income | 4,322,562.54 |
| | |
|   Expense | |
|     Amortization Deferred Financing Costs | 697,750.80 |
|     Cost of Matured Policies | 2,489,821.00 |
|     Fee | |
|       Backup Servicer | 28,775.00 |
|       Hedging | 2,755,962.29 |
|       Other | 179,632.99 |
|       Servicing | 288,125.00 |
|       Fee-Other | 1,640.40 |
|     Total Fee | 3,254,135.89 |
|     Insurance | |
|       Liability | 3,347.94 |
|       Other | 5,598.94 |
|       Insurance - Other | 6,041.31 |
|     Total Insurance | 15,348.19 |
|     Interest Expense | 4,408,705.69 |
|     Life Insurance Premium | 8,606,740.38 |
|     Professional Fees | |
|       Audit | 32,000.00 |
|       Legal | 269,210.14 |
|       Tax | 10,000.00 |
|     Total Professional Fees | 311,210.14 |
|     Taxes & Licenses | 887.40 |
|     Valuation Agent Fees | 32,493.75 |
|   Total Expense | 19,817,093.24 |
| | |
| Net Ordinary Income | -15,494,530.70 |
| | |
| **Other Income/Expense** | |
|   Other Income | |
|     Interest Income | 70,147.35 |
|   Total Other Income | 70,147.35 |
| Net Other Income | 70,147.35 |
| **Net Income** | **-15,424,383.35** |

6

**D.     Indebtedness**

17.     On or about May 9, 2008, the Debtor, as Borrower, along with its sole member, Q Opportunity, as "Equity Contributor," and Strategies, as the "Servicer" and "Loan Manager," entered into that certain Loan and Security Agreement (as amended, the "Loan and Security Agreement"), with Wachovia Capital Markets, Inc., as administrative agent, and Wells Fargo, as custodian, pursuant to which Wells Fargo's predecessor, Wachovia, agreed to advance $120 million to QOC for the purchase and maintenance of the Policies and certain loan related costs such as interest.

18.     The Loan, though cloaked with a three hundred and sixty-four (364)-day term, was to have a three-year term.  As set forth in section 2.1(c) of the Loan and Security Agreement, the "Facility Termination Date" (defined in the Loan and Security Agreement as "May 8, 2009, or such later date as the Administrative Agent shall notify the Borrower of in writing in accordance with Section 2.1(c)") could be extended for two successive three hundred and sixty-four (364)-day periods.  That is precisely why the "Termination Date" (as defined in the Loan and Security Agreement) included an outside date of May 6, 2011 (*i.e.*, a date that is 728 days beyond the May 8, 2009 Facility Termination Date).

19.     Indeed, despite the fact that section 2.1(c) of the Loan and Security Agreement provided that "each Committed Lender, in its sole and absolute discretion, without regard to the value or performance of the Assets or any other factor, may elect not to extend the Facility Termination Date," Wachovia represented to QOC that the extensions, if sought, would be granted.  Although Wachovia did, in fact, permit one extension (*i.e.*, through May 7, 2010, pursuant to the Second Amendment to Loan and Security Agreement), it took the opportunity to

extract additional consideration from QOC for that extension (in the form of fees and higher interest rates).[3]

20. Prior to entering into the Loan and Security Agreement, in or about October 2007, LSE Holdings LLC f/k/a Q Cap Holdings LLC ("LSE") and Strategies, through a combination of debt and equity, provided $31 million to Q Opportunity to capitalize QOC.[4] The $31 million equity investment, contributed by Q Opportunity (*i.e.*, the "Equity Contributor" under the Loan and Security Agreement) to QOC, was an express requirement under the Loan and Security Agreement. QOC was required to expend the entire $31 million equity investment before drawing upon any "Advances" under the Loan and Security Agreement. Between March 2008 and January 2010, the Company purchased 295 Policies, using a portion of the proceeds from the $31 million equity contribution and the $120 million advanced under the Loan and Security Agreement. The balance of the equity contribution and the advances under the Loan and Security Agreement were utilized for fees in connection with the initial financing transactions and other qualified and authorized expenses of QOC.

21. Under the Loan and Security Agreement, Wells Fargo has a security interest in all of the Policies (and, together with any ancillary collateral relating to the Polices, the "Collateral"). Pursuant to the terms of the Loan and Security Agreement, and as set forth in that

---

[3] In accordance with the Sixth Amendment to Loan and Security Agreement, the Facility Termination Date was extended through July 15, 2010. Despite QOC's timely request consistent with section 2.1(c) of the Loan and Security Agreement, Wells Fargo would not extend the term of the Loan without additional significant concessions from QOC and its investors. In this regard, the Debtor had been negotiating the terms of amended and restated loan documents with Wells Fargo as successor to Wachovia. However, given the Company's inability to comply with certain of the requirements of the proposed terms thereof, the Debtor filed this Chapter 11 case to restructure the terms of the loan on terms with which it can comply.

[4] An LSE affiliate, Fourth Third, LLC, provided Q Opportunity with a $17,566,667.67 junior loan, which is expressly subordinated to the obligations of Wells Fargo.

certain Custodian Agreement dated May 9, 2008, Wells Fargo holds the original Policies as Custodian.[5]

22.     QOC and Wells Fargo (as successor to Wachovia) are also parties to that certain Hedging Agreement (as defined in the Loan and Security Agreement) dated as of May 9, 2008, consistent with the terms of a "Master Agreement" in a form published by the International Swaps and Derivatives Association, Inc., together with a "Schedule" thereto, and each "Confirmation" thereunder confirming the specific terms of a Hedge Transaction (as defined in the Loan and Security Agreement), pursuant to which QOC hedges against variable interest rates.[6] Pursuant to the Loan and Security Agreement, Wachovia required QOC to enter into these hedging arrangements.

23.     Wells Fargo, as the Hedge Counterparty, also has a lien on the Collateral. Wells Fargo's interests in the Collateral securing QOC's obligations under the Hedging Agreement are on a *pari passu* basis with the Collateral securing QOC's obligations under the Loan and Security Agreement.[7]

24.     The Debtor's ongoing expenses are paid on a monthly basis as directed by the Servicer based upon amounts available from the proceeds of the Policies upon maturation and

---

[5] At the inception of the Loan, Wells Fargo and Wachovia were not affiliated. Upon information and belief, Wells Fargo did not acquire Wachovia until the end of 2008 or beginning of 2009. Wells Fargo's dual role in this regard is a matter of happenstance. The parties originally contemplated that the Policies would be held by a third-party Custodian.

[6] QOC entered into interest rate swap transactions with Wachovia under reference numbers 2678252, 2696278, 2737537, 2808136, 2859192, 2899574 and 2949890, as evidenced and confirmed by letter agreements between Wachovia and QOC dated August 7, 2009.

[7] The Debtor and its professionals are still reviewing the loan documents and have ordered UCC searches to determine the validity and extent of Wells Fargo's liens. Nothing herein shall constitute an agreement as to the validity and extent of Wells Fargo's liens and security interests in the Collateral or the relative rights in and to the Collateral.

9

any liquidity authorized by Wells Fargo.  Further, the Debtor has received advances (the "Policy Advances") of a portion of the death benefits due upon maturation of certain of the Policies from various insurance companies, utilized to pay Premiums where available.  Upon information and belief, these insurance companies, however, are not creditors of the Debtor because the Debtor is not obligated to repay the Policy Advances or Premiums and, in the event of termination of the Policies before maturation, the Policies would simply lapse and become worthless.  There are no other significant known creditors.

### E.     The Outstanding Balance to Wells Fargo and the Value of the Collateral.

25.     As of the Filing Date, the Debtor owed Wells Fargo $120 million on account of the Loan and Security Agreement and approximately an additional $15.2 million (as of August 31, 2010) on account of the "Hedge Breakage Costs" should the Hedging Agreement with Wells Fargo be terminated and unwound.

26.     The initial purchase price for the Policies and the determination of ongoing value of the life settlement portfolio, was and is determined based upon a computer model developed by Strategies (and approved by Wachovia), taking into account various factors, including the face amount of a Policy, the actuarial life expectancy of an Insured, the amount of any cash value in a Policy and the Premiums required to keep that Policy in force.  The Loan and Security Agreement requires the independent actuarial validation of the model and methodology used to determine the value of the Collateral.  QOC and Wells Fargo retained Watson & Wyatt, which is now Towers Watson Risk Consulting, Inc. ("Towers Watson"), as independent actuaries to validate the methodology and to verify the Company's valuation of the life settlement portfolio on a monthly basis as required by the Loan and Security Agreement.  In addition, Strategies is required to provide on a monthly basis a "Loan Manager's Certificate," which, among other things, incorporates the monthly "Loan Manager Report."  The Loan Manager Report also values

the settlement portfolio on a monthly basis and calculates the "Asset Coverage Ratio" (as defined in the Loan and Security Agreement).[8]

27.     Under the terms of the Loan and Security Agreement, the Company is required to maintain a "Minimum Asset Coverage Ratio" equal to 122%.

28.     According to Towers Watson's Life Settlement Portfolio Valuation Report, dated September 9, 2010, the "portfolio value," as of August 31, 2010, is $164,465,812.00, a figure entirely consistent with the value ascribed to the life settlement portfolio in the most recent Loan Manager Report dated September 10, 2010 (reflecting the Company's valuation of the life settlement portfolio, *i.e.*, the Collateral, at $167,448,359.00).[9]

29.     Thus, and as set forth on Schedule A to the Loan Manager Report, the "Asset Coverage Ratio" as of August 31, 2010, even *after* subtracting Hedge Breakage Costs if the Hedges were terminated, was 127% (calculated in accordance with the requirements of the Loan

---

[8] "Asset Coverage Ratio" is defined in the Loan and Security Agreement as: "The ratio (i) of the Aggregate Asset Value divided by (ii) the amount (including accrued interest) of all Advances Outstanding."

[9] The Towers Watson Life Settlement Portfolio Valuation Report, dated September 9, 2010, also ascribes a value to the portfolio without the "reinstatement" of certain life insurance policies issued by Phoenix Life Insurance Company ("Phoenix") acquired by QOC in its normal course of business and owned by QOC on May 8, 2009 (the "Relevant Phoenix Policies"). The Relevant Phoenix Policies continue to secure the repayment of the Wells Fargo obligations. However, because Wells Fargo questioned Phoenix's financial condition and Phoenix's ability to pay, Medley Opportunity Fund, LP and Medley Opportunity Fund, Ltd., affiliates of LSE, executed a Policy Purchase Agreement, dated September 14, 2009, which serves as a "backstop" that requires the Medley entities to purchase the Relevant Phoenix Policies in the event that Phoenix does not pay upon death of an applicable Insured. At the time of the Policy Purchase Agreement, there were eight (8) Relevant Phoenix Policies. Due to the maturity of two (2) of the Relevant Phoenix Policies, where QOC received the full death benefit from Phoenix, only six (6) Relevant Phoenix Policies remain. According to the Towers Watson Life Settlement Portfolio Valuation Report, dated September 9, 2010, the "portfolio value" without the "reinstatement" of the Relevant Phoenix Policies is $160,244,075.

11

and Security Agreement), a ratio well in excess of the required "Minimum Asset Coverage Ratio."

## EVENTS LEADING TO RESTRUCTURING AND CHAPTER 11 FILING

30. As a financial services business in a highly competitive environment, QOC is materially impacted by both the financial markets and worldwide economic conditions. Since 2009, QOC has operated in an extremely unfavorable global business environment, which included, among other things, a lack of liquidity in the credit markets and declining asset values.

31. As a result, during the course of the last year, the Debtor has had no real ability to recapitalize or reduce its debt burdens. Limited access to capital is particularly significant in light of the Debtor's large debt service obligations. Alternatives that the Debtor might have previously employed to extend maturities and maintain liquidity are no longer available. These adverse market changes have severely limited the Debtor's ability to satisfy its obligations as they come due.

32. At the same time that the rapid softening of the economy and tightening of the financial markets was limiting the Debtor's financial flexibility, there have been less frequent Policy maturations in the Debtor's portfolio than had been projected and, thus, the portfolio has so far failed to yield forecasted revenues.

33. The limited availability of alternative financing coupled with the lack of liquidity adversely impacted QOC's revenues and the current market value of the assets. As a result, QOC is highly levered and is unable to generate sufficient cash to service its debt and fund ongoing operations. QOC's liquidity constraints have been (or will be) exacerbated by the passage of the Facility Termination Date and the potential termination of the Hedging Agreement.

48478/0001-7020134v1

34. Against this backdrop, QOC began to weigh its options with respect to a broad financial restructuring that would provide QOC with the flexibility necessary to continue its business on a going forward basis until Policy maturations provided the revenue necessary to satisfy its obligations on a current basis. To that end, throughout 2010, QOC actively pursued third party financing and evaluated related strategic alternatives, including sales of all or a portion of the Policies and comparable transactions.

35. Moreover, commencing in early 2010, QOC initiated discussions with Wells Fargo as successor to Wachovia, regarding a consensual restructuring of the Company's outstanding indebtedness. Despite good faith efforts, those discussions have yet to materialize in a resolution.

36. Given QOC's current liquidity position and projected ongoing liquidity needs, QOC determined that it would not have sufficient liquidity to continue to service its debt and fund ongoing operations – *i.e.*, the payment of the Premiums, the servicing charges and interest payments to Wells Fargo – in the upcoming months.

37. Accordingly, because of high levels of debt, the immediate issues caused by the maturity of the Loan, and the Debtor's liquidity constraints, it became clear, after exhausting all other strategic options, that a Chapter 11 proceeding would be the most effective option available in order to maximize value for the benefit of all of the Debtor's stakeholders.

38. Thus, the Debtor has determined that filing for Chapter 11 relief is in the best interests of its estate and creditors. In the context of its Chapter 11 case, the Debtor intends to explore a number of restructuring alternatives for emerging from Chapter 11 pursuant to a plan of reorganization, including a possible sale of the portfolio.

13

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 1, 2010

_____
Steven M. Shapiro

48478/0001-7020134v1