# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QOC I LLC, | ) | Case No. 10-40153 |
| | ) | |
| | ) | Hon. Paul G. Hyman |
| Debtor. | ) | |

## MOTION OF WELLS FARGO SECURITIES LLC AND
## WELLS FARGO BANK, N.A. FOR RELIEF FROM THE AUTOMATIC STAY

Wells Fargo Securities, LLC ("Agent") and Wells Fargo Bank, N.A. (in its individual capacity, the "Lender" and, collectively with Agent, "Wells Fargo"), by and through their undersigned attorneys, respectfully move the Court for entry of an order granting relief from the automatic stay pursuant to Sections 362(d)(1) and 362(d)(2) of the Bankruptcy Code because: (i) QOC I LLC, the above-captioned debtor and debtor-in-possession ("Debtor"), filed this Chapter 11 Case in bad faith and to delay and frustrate Wells Fargo's legitimate efforts to enforce its rights as a secured creditor; (ii) the Debtor has not offered, and cannot provide, Wells Fargo with adequate protection of its interests in the Debtor's life insurance policies and other related collateral securing payment of the more than $138.4 million that is due and owing to Wells Fargo; and (iii) the Debtor has no equity in such property and has no reasonable prospects for consummating a successful plan of reorganization in a reasonable period of time.  In support of this motion, Wells Fargo states as follows[1]:

---

[1]    In accordance with Local Bankruptcy Rule 4001-1(B) and the Court's published "Guidelines for Motions for Relief from Automatic Stay", Wells Fargo also is filing concurrently herewith affidavits from its authorized representatives.

# I.    PRELIMINARY STATEMENT

1.    The Debtor owes Wells Fargo at least $122.4 million in principal, interest, and fees on account of loan advances, plus an additional $15.5 million under terminated interest rate swap agreements, plus attorneys' fees and expenses (totaling at least $450,000) and other out-of-pocket expenses.  That indebtedness is secured by senior and perfected liens and security interests in substantially all of the Debtor's assets, which primarily consist of its ownership of 283 life insurance policies that insure the lives of 223 individuals under which the Debtor is the beneficiary (collectively, the "Policies").

2.    As a threshold matter, the filing of this chapter 11 case is yet another delay tactic that the Debtor chose to prevent Wells Fargo from exercising its rights in the Policies as a secured creditor.  For the past six months, both before and after its indebtedness to Wells Fargo matured, the Debtor gave Wells Fargo every indication that the parties could reach (and, on two occasions, led Wells Fargo to believe they had reached) a consensual restructuring of the indebtedness and the potential salvaging of the Debtor's otherwise failed business.  However, despite Wells Fargo's belief that the Debtor genuinely desired to reach a mutually acceptable solution to its long-standing liquidity and capital crisis, the Debtor chose—after six months of negotiations and twice reneging on accepted proposals—to file this chapter 11 case without any advance notice to Wells Fargo or any indication that it was abandoning an out-of-court consensual restructuring.  In fact, a week before it filed its petition, the Debtor had communicated to Wells Fargo that it had accepted and would enter into a restructured loan with Wells Fargo that would have kept the Debtor out of the Bankruptcy Court.[2]

---

[2]    Two days before the petition date, the Debtor also advised Wells Fargo representatives that it would comment on nearly final documents for this facility by October 1st.  On that day, instead of comments, Wells Fargo received telephone notice that the Debtor had filed this case.

3.      When the facts of this case (many of them admitted by the Debtor in its very own papers) are compared against the circumstantial indicators of a "bad faith" filing set forth in the seminal case of *Phoenix Piccadilly*, infra, and its progeny, this chapter 11 case reveals itself to be nothing less than a textbook example of a bad faith filing.  As set forth in further detail below, the Debtor admits that it: (i) is a special purpose entity formed solely to hold the Policies; (ii) conducts no actual business operations other than holding the Policies; (iii) has no employees; and (iv) owes Wells Fargo, the Debtor's only secured creditor, in excess of $135 million, while the Debtor's non-insider aggregate unsecured debt barely totals $16,900 and the Debtor's aggregate unsecured indebtedness (***including*** insider debts) is not more than $52,000.   It is clear that this chapter 11 case is nothing more than a two-party dispute between the Debtor and Wells Fargo over the disposition of collateral securing payment of $138.4 million in matured indebtedness.

4.      While the Debtor's bad faith motivations for filing this case should result in its dismissal,[3] such bad faith, in and of itself, is sufficient cause to lift the stay pursuant to Section 362(d)(1).  Moreover, the Debtor has not (and simply cannot) offer Wells Fargo any meaningful adequate protection for the imminent diminution of the value of its collateral.  Instead, the Debtor asserts that Wells Fargo's purported "equity cushion" in the Policies provides Wells Fargo with adequate protection of its interest in its collateral, including the Policies.  To that end, the Debtor asks the Court to believe that the Policies hold a present value in the range of $160,244,075-$164,465,812 and to then conclude that, because Wells Fargo is allegedly "oversecured", its interests are adequately protected by such alleged "equity cushion." Unfortunately for both parties in this two-party dispute, that is simply not the case.   More

---

[3]     Contemporaneously with the filing of this Motion, Wells Fargo has filed a Motion seeking alternative relief in the form of the dismissal of the Debtor's Chapter 11 Case.

accurately, Wells Fargo is substantially undersecured by at least $40 million.[4]  However, even if the Debtor's valuation of the Policies in the $160-$165 million range were accurate (which it clearly is not), Wells Fargo still would not be adequately protected by any purported "equity cushion," as the very existence of the Policies are actually in immediate jeopardy because of the Debtor's lack of a committed and predictable source of liquidity with which to keep the Policies viable—which, as set forth below, the Debtor has readily acknowledged. See In re Certified Mortg. Corp., 19 B.R. 369, 370-71 (Bankr. M.D. Fla. 1982) (lifting the automatic stay because, "where the sole hope of the Debtor to effectuate the reorganization is to salvage the equities in its properties, the success of which depends on economic factors over which the Debtor has no control . . . [i]t would be a gross abuse of discretion to continue to protect the Debtor indefinitely just because it has equity in its encumbered properties.  The argument that secured creditors are not harmed by delays if there is an equity cushion . . . is merely telling one-half of the story.").

5.      Here, it is entirely undisputed that the very existence of the Policies is entirely dependent upon keeping the Policies in force through the required and continued payment of substantial aggregate premium amounts (not to mention significant servicing fees and other expenses).  See Cash Collateral Motion,[5] ¶ 3 ("If the Premiums are not paid, the Policies will lapse and the portfolio will become virtually worthless.").  Simply put, if such premium

---

[4]     As applied by the Debtor, the Debtor's valuation model does not produce an accurate present fair market valuation of the Policies for a number of reasons, including that (i) the Debtor's model applies a discount rate to the valuation of the Policies that is simply not representative of the current life settlement market and (ii) the life expectancy figures ascribed to the Policies at closing were nearly all revised by the medical underwriters to reflect detrimental material adjustments aggregating more than $20 million shortly after the Debtor had purchased its portfolio.  Thus, when these inputs are corrected, and even assuming the Debtor's valuation model otherwise represents a reliable indicator of fair market value, the Policies have a present market value of not more than $100 million, not nearly the $160-$165 million range the Debtor suggests and well below the $138.4 million in indebtedness they secure.

[5]     The Emergency Verified Motion of Debtor-in-Possession In Support of Motion For an Order (A) Authorizing the Debtors' Interim and Final Use of Cash Collateral Pursuant to 11 U.S.C. §§ 361 and 363 and Granting Adequate Protection (B) Scheduling Final Hearing Pursuant to 11 U.S.C. §363(c)(2) and Fed. R. Bankr. P. 4001 and (C) Other Related Relief is herein referred to as the "Cash Collateral Motion".

obligations are not funded per the terms of the Policies, the Policies will terminate, thereby obliterating whatever market value they might otherwise have and rendering Wells Fargo's collateral valueless.  Thus, because of the Policies' very nature, no amount of equity cushion (even if one existed, which it does not) can protect Wells Fargo's interests in the Policies from their total loss if the Debtor lacks the minimal liquidity of funds necessary to pay the required premiums and maintain their viability.

6.    However, the Debtor has no existing means of continuing to pay such premiums and preserve the existence and value of the Policies.  The Debtor already acknowledges that it lacks any present ability to fund its monthly premium obligations other than by using existing funds in a premium reserve account (the "Reserve Fund"), which funds constitute Wells Fargo's cash collateral and which Reserve Fund, *at most*, currently holds only enough money to fund premiums on the Policies for the next *two* months.  See Cash Collateral Motion, FN3 ("As reflected in the Cash Collateral Budget, the Debtor has funds on hand sufficient to pay the Premiums and the servicing fees for October and November.").  Moreover, except for:  (a) the possible happenstance of one or more of the original insured individuals dying sooner than expected (and the pertinent insurance company paying out the related policy benefits faster than normal), which the Debtor admits simply cannot be predicted with sufficient probability from an actuarial perspective to ensure the timely payment of required premiums; or (b) pursuing "fire-sales" of one or more of the Policies at substantially discounted rates, the Debtor will have no other source of funds (or other assets) to meet its substantial, accruing premium obligations or satisfy its continuing, contractual obligation of maintaining a sufficient Reserve Fund.  Id. (Debtor unequivocally states that "Revenue projections for the Debtor are, for obvious reasons,

difficult to predict with any reasonable certainty" and reiterates that "the maturities by their nature cannot be predicted with precise accuracy.").

7.     The Debtor acknowledges the inherent uncertainty of knowing exactly when a maturity will occur and the proceeds on the pertinent Policy actually will be received.  However, notably absent from any papers the Debtor has filed to date in this case is any discussion of the Debtor's "Plan B" if maturities do not occur and proceeds are not collected as projected.  Instead, the Debtor chooses to ignore that (by its own admission) its actuarial model has proven wholly inaccurate to date (*e.g.*, "there have been less frequent Policy maturations in Debtor's portfolio than had been projected, and thus the portfolio has so far failed to yield forecasted revenue" (Chapter 11 Case Management Summary of QOC I LLC ("Summary"), ¶ 5)).  However, even more disconcerting for the preservation of Wells Fargo's collateral are the Debtor's projections that it will suddenly yield monthly policy maturations of over $1.5 million, despite the fact that, for the past 12 months leading up to the Petition Date, the Debtor's Policy maturations only averaged less than half that amount on a monthly basis (*i.e.*, approximately $700,000).  In reality, the slightest miscue in the recovery of any given month's projected maturations will render the Debtor unable to meet its premium obligations and severely impact Wells Fargo's collateral.

8.     If the automatic stay is not immediately terminated, then, in order to avoid the termination of the Policies once the Reserve Fund is exhausted (which even the Debtor's projections contemplate, absent a maturity and prompt payment by the pertinent insurance company, will be within two months), Wells Fargo will be confronted with a Hobson's choice of either advancing more of its money to the Debtor to fund the payment of premiums and servicing fees or accepting the potential disposition of Policies on a piecemeal basis at fire-sale prices.  Under these circumstances, it is clear that the Debtor, with no unencumbered assets, is unable to

protect Wells Fargo from an imminent erosion of the value of the Policies and that Wells Fargo's interest in the Policies is not adequately protected.  Accordingly, Wells Fargo is entitled to immediate relief from the automatic stay under Section 362(d)(1) of the Bankruptcy Code.  See, e.g., In re O'Quinn, 98 B.R. 86, 88 (M.D. Fla. 1989) (stating that "whether a secured creditor is adequately protected involves a valuation of both the indebtedness owed to the creditor and the property securing the indebtedness" and, accordingly, the "'true state of protection' depends largely upon such factors as the nature of the debtors' business, general prospects for reorganization . . . and the existence, or lack of, an equity cushion."); accord In re Balco Equities Ltd., 312 B.R. 734, 751 (Bankr. S.D.N.Y. 2004) (stay lifted based on the debtor's inability to pay for the regular maintenance needed to preserve the value of the secured creditor's collateral and the resulting likelihood that the secured creditor will be compelled to make advances in order to preserve the value of its collateral).

9.     Alternatively, Wells Fargo is entitled to immediate relief from the automatic stay under Section 362(d)(2) of the Bankruptcy Code because the Debtor has no equity in the collateral and the collateral is not necessary for an effective reorganization of the Debtor since there is "no reasonable possibility of the successful reorganization within a reasonable period of time."  United States Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365 (1988); accord In re Discount Wallpaper Ctr., Inc., 19 B.R. 221, 222 (Bankr. M.D. Fla 1982).

10.     The Debtor clearly has no equity in the Policies.  Although the Policies may payout up to $550.5 million in aggregate benefits over time, this amount can only be realized by paying the premiums accruing on such Policies, which could exceed several hundred millions of dollars in the aggregate and, at a minimum, require tens of millions of dollars to be paid in regular installments over many years.  Even assuming the Debtor's valuation model otherwise

represents a reliable indicator of fair market value (which Wells Fargo does not concede), and after accounting for the substantial premiums and servicing fees necessary to keep such Policies in place and applying a current market discount rate that a buyer would apply to the projected net cash flow of the Policies, the present market value of the Policies does not exceed $100 million, significantly less than the amount of outstanding indebtedness owing to Wells Fargo.

11.     Not having any equity in the Policies, the Debtor has the burden to prove that there is a "reasonable possibility of a successful reorganization within a reasonable period of time" within the meaning of Timbers.  The Debtor does not conduct any business other than its passive ownership of an existing portfolio of Policies; it has no capacity to acquire new policies; it does not have any employees; its day-to-day business activities are managed and performed by a related-party servicer; and, other than Wells Fargo, it has no non-insider creditors of any consequence.  Thus, even putting aside the insurmountable plan feasibility issues caused by the Debtor's present financial condition, which alone would render any plan proposed by the Debtor non-confirmable under section 1129(a)(9) of the Bankruptcy Code, the likelihood that any plan of reorganization could be confirmed over Wells Fargo's objection is remote at best and, given the extent to which Wells Fargo is undersecured and the absence of other, significant non-insider creditors, effectively non-existent. See, e.g., John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 157 (3d Cir. 1993) (stating that effective reorganization requirement enunciated by the Supreme Court in Timbers decision requires "showing by a debtor ... that a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed"), quoting In re 266 Washington Associates, 141 B.R. 275, 281 (Bankr. E.D.N.Y. 1992); In re Nw. Timberline Enters., Inc., 348 B.R. 412, 436 (Bankr. N.D. Tex. 2006) (lifting automatic stay where secured creditor's deficiency claim would "dominate the voting results of

the unsecured creditors" because "the court sees no way that the Debtor . . . could ever have a legitimate impaired accepting class of creditors to go cram down, so long as [the secured creditor] . . . is opposing its plan."); In re Baxter & Baxter, Inc., 172 B.R. 198, 202 (Bankr. S.D.N.Y. 1994) (lifting automatic stay where undersecured creditor's deficiency claim accounted for 97 percent of eligible unsecured claims to approve plan, and as "no plan can be proposed that can be confirmed over [the secured creditor's] opposition, it follows that the automatic stay should be lifted.").

12.    In effect, the Debtor is gambling with Wells Fargo's money – not its own – to see whether the market for life settlement agreements turns around in the future, prevailing discount rates fall dramatically and/or a statistically improbable volume of policy benefits are collected before the Debtor exhausts all of Wells Fargo's remaining cash collateral.  However, that is not a gamble that the Bankruptcy Code permits the Debtor, over Wells Fargo's objections, to make to the detriment of Wells Fargo's interest in its collateral.  Thus, for the reasons set forth herein and as supported by the well-established authority discussed below, Wells Fargo is entitled to immediate relief from the automatic stay.

## II.    PROCEDURAL AND JURISDICTIONAL BACKGROUND

13.    On October 1, 2010 (the "Petition Date"), the Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code in this Court.  The Debtor is in possession of its assets as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No official committee of unsecured creditors has been appointed in this case.

14.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 4001-1.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (G).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409.  The statutory predicates for the relief requested in the Motion is Section 362(d) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 4001 and 9014.

### III.    FACTUAL BACKGROUND

#### A.    Description of the Debtor

15.    The Debtor is a Delaware limited liability company with a relatively simple capital structure.  The Debtor has only one member, Q Opportunity Company LLC (the "Equity Contributor").  The Equity Contributor itself has only two members: Q Capital Strategies, LLC ("Q Capital") and LSE Holdings LLC, a Delaware limited liability company ("LSE").  LSE is owned by private investment funds.  Q Capital is the servicer of the Policies and managing member of the Equity Contributor.  The Debtor does not engage in any business other than related to the ownership of the Policies; it neither manufactures nor sells anything; it has no employees and no place of business open to the public.  In sum, the Debtor is a special purpose, "bankruptcy remote" investment vehicle whose business and assets are solely limited to ownership of the Policies and other related collateral.  See Cash Collateral Motion, ¶ 12; Summary, ¶ 3.

16.    The Debtor's ownership of the Policies includes the right to receive all payments accruing thereunder, including receipt of a Policy's cash surrender value and collection of any accruing benefits at maturity.  The Policies were acquired by the Debtor under the terms of purchase agreements entered into between the Debtor and either Q Capital or certain third parties (each, an "Initial Purchaser"), which, in turn, had initially acquired the Policies from individuals.[6]  See Declaration of Steven M. Shapiro ( "Shapiro Decl."), ¶¶ 6, 7.

---

[6]    In particular, in exchange for receiving an upfront payment of cash per the terms of a life settlement agreement (collectively referred to hereinafter as the "Life Settlement Agreements"), an insured individual sold to an Initial Purchaser all of that person's rights under his or her life insurance policy, including, most importantly, the right to receive the benefits payable upon such person's death.

17.     As noted above, the Debtor contracted with one of its indirect owners, Q Capital, to be the servicer and loan manager with respect to the Policies.  It is Q Capital, as servicer, ***not*** the Debtor, that handles all aspects regarding the day-to-day management of the Policies, including, among other things, (a) confirming arrangements for the payment of any premiums due with respect to the Policies, (b) tracking insureds and obtaining updated medical information, life expectancy reports, and other information, (c) preparing and submitting claims to, and acting as a liaison with, the issuing insurance company on each Policy and (d) optimizing premiums, tracking premium payment activity, identifying potential Policy lapses, and other related matters.  See Shapiro Decl., ¶¶ 12, 13.

## B.     Facts Regarding Wells Fargo's Secured Claim

18.     Agent and Lender are successors in interest, respectively, to Wachovia Capital Markets, LLC and Wachovia Bank, N.A. (collectively, "Wachovia").  The Debtor, Q Capital, the Equity Contributor, and Wachovia (n/k/a Wells Fargo) entered into a Loan and Security Agreement dated as of May 9, 2008 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan and Security Agreement").  A true and correct copy of the Loan and Security Agreement is attached hereto as Exhibit A.  Pursuant to the Loan and Security Agreement, Lender made certain advances and provided other financial accommodations to the Debtor in the aggregate principal amount of $120,000,000 (the "Advances").  The Advances are evidenced by, among other things, that certain Variable Funding Note dated as of May 9, 2008 (as amended, restated, supplemented or otherwise modified from time to time, the "Funding Note").  A true and correct copy of the Funding Note is attached hereto as Exhibit B.

19.     In conjunction with the Advances, the Debtor and Wachovia (n/k/a Wells Fargo), in its capacity as hedge counterparty (in such capacity referred to at times herein as the "Hedge

Counterparty"), entered into an ISDA Master Agreement and Schedule dated as of May 9, 2008 (including confirmations issued from time to time thereunder, collectively, the "Hedging Agreement").  A true and correct copy of the Hedging Agreement is attached hereto as Exhibit C.  Pursuant to the terms of such Hedging Agreement, the parties entered into interest rate swap transactions (the "Swaps"), and the Debtor became obligated to make certain termination payments to the Hedge Counterparty in the event, among other things, Debtor failed to repay the Advances due upon maturity of the Loan and Security Agreement.  As of October 5, 2010, and by virtue of the termination event consisting of the commencement of this Chapter 11 Case (and pursuant to applicable Bankruptcy Code authority), the Hedge Counterparty exercised its rights to terminate (and, in fact, has terminated) the Swaps, thereby resulting in termination payments in the amount of $15,476,250 becoming due and owing by the Debtor to the Hedge Counterparty (the "Hedge Breakage Costs").

20.    In order to secure Debtor's performance under the Loan and Security Agreement and the Hedging Agreement, including, but not limited to, repayment of all Advances and the Hedge Breakage Costs, together with interest accruing thereon and all fees, costs and expenses incurred by Wells Fargo with respect thereto, the Debtor granted the Agent a lien upon and security interest in and to all of its assets (as more particularly defined in the Loan and Security Agreement, the "Collateral"), including, without limitation: (a) the Policies; (b) all amounts payable to Policy beneficiaries and other collections on the Policies; (c) the Life Settlement Agreements pursuant to which the Policies were acquired; (d) the Swaps; (e) all of the Debtor's accounts and investments therein (including, but not limited to, the Reserve Fund); and (f) all proceeds of the foregoing.  See Loan and Security Agreement, Section 8.1, p. 68; see also both the Account Control Agreement dated May 9, 2008, a true and correct copy of which is attached

hereto as <u>Exhibit D</u>, and the UCC-1 Financing Statements attached hereto collectively as <u>Exhibit</u>
<u>E</u>.  Wells Fargo has taken all appropriate steps to perfect and has perfected its security interests
and liens in, on, and to the Collateral.

21.    In addition, pursuant to that certain Custodian Agreement dated as of May 9, 2008
(the "<u>Custodian Agreement</u>"), the Debtor appointed Wells Fargo Bank, N.A. to be the custodian
for the Policies and the Life Settlement Agreements (in such capacity, Wells Fargo Bank, N.A. is
hereinafter referred to at times as the "<u>Custodian</u>").  A true and correct copy of the Custodian
Agreement is attached hereto as <u>Exhibit F</u>.  To evidence the lien of the Agent on the Policies in
the records of the insurance carriers that issued the Policies, the Debtor submitted collateral
assignments to the insurance carriers reflecting the collateral assignment to the Custodian, in its
capacity as the representative of the Agent.  As of the Petition Date, the Custodian was (and
remains) in possession of all of the Policies, Life Settlement Agreements and certain other
documents relating thereto.

22.    As of the Petition Date, the total indebtedness due and owing by the Debtor with
respect to its obligations under the Loan and Security Agreement, Funding Note and Hedging
Agreement was at least $138,381,710.60 consisting of: (a) $120,000,000.00 in outstanding
principal; (b) $2,455,460.60 of accrued but unpaid interest; (c) $15,476,250.00 in Hedge
Breakage Costs; and (d) more than $450,000.00 in attorneys' fees and expenses and other actual
out-of-pocket expenses (collectively, together with any other amounts that now or hereafter
become owing to Wells Fargo under the terms of the loan documents and applicable law, the
"<u>Indebtedness</u>").  <u>See</u> Affidavit of Justin M. Dardani at ¶ 2 and Affidavit of Kim M. Farr at ¶ 2.
Payment of such Indebtedness is secured by Agent's lien on the Collateral.

**C.    The Collateral is Subject to Imminent Erosion (if not Complete Destruction) of Its**
**Value**

23. Actuarial modeling demonstrates the precarious condition the Collateral is in and the great risk that it will significantly diminish in value if left in the Debtor's hands. Specifically, it is projected that it will take many years before sufficient net benefits are realized from the maturation of Policies to pay off the Indebtedness in full—assuming all premium obligations and other payment obligations are kept current during that time by the Debtor. Yet, the Debtor, even if it is permitted to access the Reserve Fund, is going to run out of cash in a matter of months, if not sooner. This conundrum is not resolved by permitting the Debtor to access the Reserve Fund.

24. As a threshold matter, the Reserve Fund constitutes part of the Collateral that secures payment of the Indebtedness, and, therefore, any consumption of the cash in the Reserve Fund by the Debtor necessarily diminishes (indeed, it effectively eliminates) the value of Wells Fargo's interest in such cash Collateral. Second, even if the Debtor were permitted to use cash in the Reserve Fund for the purpose of paying premium on the Policies, the Reserve Fund will become exhausted within a couple of months. At that point, there will be no other source of available cash to keep premiums current other than by selling Policies at highly distressed, fire-sale levels or relying on the occurrence of statistically unlikely numbers of Policies maturing and benefits therefore being paid within the next three months. Thus, Wells Fargo is subject to the imminent erosion (if not complete destruction) of the value of its Collateral.[7]

---

[7] To obtain market value for the Policies, prospective buyers will expect months to engage in substantial due diligence into the life expectancy rates, actuarial and other, complex statistical modeling associated with the Policies to discern their present value, as well as legal due diligence with respect to the life settlement documents. However, as demonstrated above, providing the time necessary to adequately market the Policies is likely to result in exhausting the Reserve Fund before a sale is achieved. Thus, Wells Fargo will be compelled to advance additional funds to avoid termination during the marketing or accept a fire-sale of its Collateral. Accordingly, depletion by the Debtor of the Reserve Fund not only diminishes the value of Wells Fargo's interest in such cash Collateral, but also imperils the overall value of the Policies. As a result, the threat of the erosion of Wells Fargo's collateral exists now and thus, is imminent. It does not arise only after the exhaustion of the Reserve Fund.

D.    **The Debtor Lacks Any Equity in the Collateral**

25.    The Debtor does not have any equity in the Collateral that secures payment of the Indebtedness due to Wells Fargo.  Even assuming that a discounted cash flow methodology is appropriate for determining the present fair market value of the Policies, the present fair market value for the Collateral under any reasonable and market-based application of that methodology is not more than $100 million.[8]  Plainly, the market value of the Policies (even based on an orderly disposition, including spending ample time and effort marketing the Policies and providing prospective buyers with adequate means to perform due diligence) demonstrates that there is no equity in the Collateral and that Wells Fargo's claim on the Indebtedness, therefore, is substantially undersecured.

IV.    **REQUEST FOR RELIEF FROM THE AUTOMATIC STAY**

26.    The Bankruptcy Code provides that the automatic stay shall be lifted for "cause," including a Debtor's bad faith in filing its petition for relief and/or a lack of adequate protection of the moving creditor's interest in the debtor's property.  See 11 U.S.C. § 362(d)(1). Alternatively, Section 362(d)(2) provides that a court must grant relief from the stay with respect to property if: (A) the debtor does not have any equity in such property; and (B) such property is not necessary to an effective reorganization.  See 11 U.S.C. § 362(d)(2); Acquisition Corp. of Amer. v. Fed. Sav. & Loan Ins. Co., 96 B.R. 380, 383 (S.D. Fla. 1988).  This relief is mandatory; upon satisfaction of the elements under either (d)(1) or (d)(2), the court is required to grant relief

---

[8]    The valuation posited by the Debtor also uses a "discounted cash flow" methodology.  However, in purporting to discount the estimated future net cash flow to a present value based on the expected discount rate (or, as it is also known, the internal rate of return ("IRR")) an investor likely would require in order to invest in the Policies, the Debtor clearly is  not using an IRR that would be required by investors today.  Instead, it is assuming that investors today would settle for an IRR that does not take into account the effects of the recent credit crisis and that yields a return that would be simply unacceptable to post-crisis investors by a wide margin. Also, as set forth in note 4 supra, the life expectancy figures ascribed to the Policies at closing were nearly all subsequently revised by underwriters to reflect detrimental material adjustments aggregating more than $20 million shortly after the Debtor had purchased its portfolio.

from the stay.  See, e.g., In re New Era Co., 125 B.R. 725, 729 (S.D.N.Y. 1991).  Here, there are

ample and compelling grounds for granting Wells Fargo stay relief.

A.      **Cause Exists to Lift the Stay Pursuant to Section 362(d)(1)**

27.     Section 362(d)(1) of the Bankruptcy Code provides that a secured party is entitled

to relief from the automatic stay "for cause, including the lack of adequate protection of an

interest in property."  See 11 U.S.C. § 362(d)(1).  Most frequently, cause is shown by a debtor's

failure to afford adequate protection of a secured creditor's interest in its security.  E.g., In re

Lilyerd, 49 B.R. 109, 116 (Bankr. D. Minn. 1985); In re South Village, Inc., 25 B.R. 987, 1002

(Bankr. D. Utah 1982) ("Adequate protection is the fulcrum upon which the rights of debtors and

creditors are balanced in a reorganization case").  In this case, cause clearly exists to modify the

automatic stay, not only because Wells Fargo is inadequately protected given the Debtor's

precarious liquidity crisis, but because this case was instituted by the Debtor in bad faith.

28.     As set forth in greater detail in Wells Fargo's Motion for Entry of Order

Dismissing Case, filed contemporaneously with this Motion and incorporated herein by this

reference, the Debtor clearly has filed this case in bad faith under the standards the Eleventh

Circuit has enunciated in Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va., 849 F.2d 1393, 1394

(11th Cir. 1988); In re Natural Land Corp., 825 F.2d 296, 298 (11th Cir. 1987); and related

decisions.

29.     Aside from the Debtor's bad faith, additional and independent cause also exists to

modify the automatic stay pursuant to Section 362(d)(1) because the Debtor simply cannot

provide Wells Fargo with any meaningful adequate protection.  As noted above, the Debtor itself

concedes that, if premiums on the Policies are  not paid, "the Policies will lapse and the portfolio

will become virtually worthless."  Cash Collateral Motion, ¶ 3 at 3.  The Debtor also concedes

that existing Cash Collateral, at best, will be sufficient to cover only two months' worth of premiums and, accordingly, will be dependent upon future maturities under the Policies in order to pay such premiums.  However, the Debtor admits that, because of the uncertainty as to when policy benefits will mature and then be received, "[r]evenue projections for the Debtor are, for obvious reasons, difficult to predict with any reasonable certainty." Id.[9]  And, of course, as a single-purpose entity, all of whose assets are encumbered in favor of its secured creditors, the Debtor has no other unencumbered assets from which to provide or otherwise facilitate such liquidity.  Thus, without a significant equity contribution (for which the Debtor has made no offer and demonstrated no prospect of securing), the Debtor's only hope of preserving the value of the Polices relies almost entirely on whether significant numbers of Policies mature and so that their corresponding benefits quickly become available to it.

30.    As a result, the value of Wells Fargo's collateral is subject to imminent erosion, and, accordingly, the continued imposition of the stay cannot be justified.  See In re Wrecclesham Grange, Inc., 221 B.R. 978, 982 (Bankr. M.D. Fla. 1997) ("Without adequate protection, a creditor is *entitled* to relief from the automatic stay to pursue its remedies against the property.") (emphasis supplied); In re Strug-Division LLC, 380 B.R. 505, 514 (Bankr. N.D. Ill. 2008) (stating that the "important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized").  Balco Equities, supra, 312 B.R. at 751 (granting stay relief and noting that the debtors' inability to pay for the constant maintenance needed to sustain the

---

[9]    The Debtor goes on to confidently state in the same footnote, "[o]f course, to the extent that maturities do not materialize in a particular month, they ultimately will occur in subsequent months, *provided the policies do not lapse*" (emphasis supplied).  Of course, the Debtor cannot say with certainty in *which* subsequent months the maturities will occur, and the Debtor's confidence that these maturities eventually will occur is of no comfort if the Debtor should exhaust all of Wells Fargo's Cash Collateral and, as a result, the Policies should, in fact, lapse in the interim.

collateral, to include providing funding for the services necessary to operate the collateral was a "hallmark" of a lack of adequate protection and rendered it likely that the secured creditor would be required to make advances in order to preserve its collateral); In re Kruger Properties, LLC, No. 09-10336, 2009 WL 1490569, at *7 (Bankr. N.D. Okla. May 27, 2009) (sharing the secured creditor's concern that the debtor was unable or unwilling to take appropriate measures to protect and preserve the creditor's collateral where the creditor was required to pay delinquent taxes to avoid foreclosure); In re Pawtuxet Valley Prescription & Surgical Ctr., Inc., No. 07-11767, 2008 WL 1990887, at *5 (Bankr. D.R.I. Mar. 10, 2008) (recognizing adequate protection lacking where the debtor's continued operations would result in $400,000 in collateral being depleted and not replaced based only on the vague hope of the debtor becoming profitable).  Stay relief is particularly warranted where, as here, "there is not a potentially viable business in place worthy of protection and rehabilitation [and] the Chapter 11 effort has lost its *raison d'etre*."  In re Ironsides, Inc., 34 B.R. 337, 339 (Bankr. W.D. Ky. 1983); In re Union-Go Dairy Leasing, LLC, No. 10-01703, 2010 WL 1848485, at *3 (Bankr. S.D. Ind. May 6, 2010) (lifting the stay where the Debtor was merely a "pass through" entity with no employees who merely passed lease payments to a parent and, therefore, (1) could not make periodic payments because it had insufficient income for operations, (2) could only grant a worthless administrative expense because it lacked sufficient cash to operate postpetition, and (3) had no unencumbered property to grant a replacement lien on); In re XB-1 Assocs., 27 B.R. 827, 832-34 (Bankr. S.D.N.Y. 1983).

**B.**    **The Debtor Has No Equity in the Property and the Property Is Not Necessary For An Effective Reorganization**

31.     Wells Fargo is further entitled to stay relief here under Section 362(d)(2) of the Bankruptcy Code since (A) the Debtor lacks equity in the Collateral and (B) the Collateral is not necessary for an effective reorganization. 11 U.S.C. § 362(d)(2).

### 1.      The Debtor lacks equity in the Collateral

32.     As indicated above and as will be shown, the present market value for the Policies does not exceed $100,000,000, significantly less than Wells Fargo's claim, which was at least $138,400,000 as of the Petition Date.  Accordingly, the Debtor has no equity in the Collateral. E.g., In re Leonard, 151 B.R. 639, 643 (Bankr. N.D.N.Y. 1992) (stating that, for purposes of Section 362(d)(2)(A), a "debtor lacks equity in a particular piece of property when the sum total of the claims secured by the property exceed its value").

### 2.      The Collateral is not necessary for an effective reorganization

33.     Under Section 362(d)(2), the property is necessary for an effective reorganization only if there is a "reasonable possibility of a successful reorganization within a reasonable period of time." Timbers, supra, 484 U.S. at 375.  Moreover, pursuant to 11 U.S.C. § 362(g), once it is established that a debtor has no equity in its property (as is clearly the situation here), the debtor bears the burden of proving that the property is necessary to an effective reorganization. Id. (emphasizing that Section 362(d)(2) was intended in part to avoid "inordinate and extortionate delay" faced by undersecured creditors who are not compensated during the pending bankruptcy case and to protect the undersecured creditor from the debtor's incentive to delay in the hope of a change in fortune); accord Acquisition Corp. of Amer., 96 B.R. at 383 (citing Timbers).[10]  A

---

[10]    Further, "[i]t is insufficient for the debtor to show merely that the reorganization is impossible without the property.  That much is obvious to all concerned.  The debtor must also show that reorganization is feasible within a reasonable period of time." In re Century Inv. Fund VII Ltd. Partnership, 96 B.R. 884, 888 (Bankr. E.D. Wis. 1989); see also In re 8th St. Village Ltd. Partnership, 88 B.R. 853, 856 (Bankr. N.D. Ill. 1988) (finding that, although the loss of the property in question will make reorganization of the debtor "absolutely impossible . . . this is not enough to prevent the lifting of the stay").

combination of a lack of equity in the collateral and the inability of the debtor to show any likelihood of effective reorganization *requires* a court to grant an undersecured creditor relief from the automatic stay.  In the Matter of MCM, Inc., 95 B.R. 307, 310 (Bankr. D. Del. 1988) (emphasis added).

34.     Here, the Collateral is not necessary to an effective reorganization because  the Debtor has no reasonable prospects of being able to confirm a plan of reorganization over the objection of Wells Fargo.  As demonstrated above, the Debtor does not have a reasonably certain cash flow stream to fund even the minimum level of expenditures necessary to ensure that the Policies remain in effect. See In re Loco Realty Corp., No. 09-11785, 2009 WL 2883050, at *7 (Bankr. S.D.N.Y. 2009) (finding that the uncertainty of a Debtor's cash flow, combined with its questionable ability to make required debt servicing payments, "makes any prospect of a successful plan speculative at best").  There is only the remotest of possibilities, premised upon a statistically improbable number of Policies maturing quickly, that the Debtor can offer any prospect of being able to fund its post-confirmation obligations.  Accordingly, the Debtor will not be able to satisfy its burden under Section 1129(a) to show that any such plan would be feasible. See New Era, supra, 125 B.R. at 730 (affirming relief from stay under Section 362(d)(2) where no reorganization was in prospect; all the court had before it were "pipe dreams" of an insider unsupported by any expert testimony and stating that "unrealistic hypotheticals such as these are the precise reason why the statute requires that property be necessary to an effective reorganization").

35.     In addition, the Debtor does not conduct any business other than the ownership of the Policies; it does not have any employees; its day-to-day business activities are managed and performed by a related-party servicer; and other than Wells Fargo, it has no non-insider creditors

of any consequence.  Thus, even putting aside the plan feasibility issues caused by the Debtor's present financial condition, the likelihood that any plan of reorganization could be confirmed over Wells Fargo's objection is remote, given the extent to which Wells Fargo is undersecured and the absence of any other significant non-insider creditors.[11] E.g., Resolution Trust Corp. v. Swedeland Development Group, Inc. (In re Swedeland Development Group, Inc.), 16 F.3d 552, 567-68 (3d Cir. 1994) ("for this reason alone, an effective reorganization of [the debtor] is not realistically possible" and, holding that, as a result, "the Debtor cannot meet its burden to prove that the property is necessary to an effective reorganization in prospect").

36.    Since, because the record demonstrates that the Debtor has no equity in the Collateral and has no reasonable prospect of confirming a plan within a reasonable period of time over Wells Fargo's objection, Wells Fargo respectfully submits that it is entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2). E.g., Timbers, supra, 484 U.S. at 476; Diplomat Electronics, supra, 82 B.R. at 693 (granting stay relief and finding that property was not necessary for an effective reorganization since the debtor had ceased business operations and only filed for chapter 11 relief in order to preserve net operating loss carry forwards and granting relief from stay to permit creditor to foreclose on account receivables and inventory).

## V.    WAIVER OF STAY OF ORDER

37.    Wells Fargo submits that waiver of the 4001(a)(3) requirement is appropriate in this case and requests that, upon the granting of stay relief, Rule 4001(a)(3) be waived.

---

[11]    The plan confirmation objections discussed in the text are illustrative only and are not intended to be a complete listing of the potential impediments to confirmation under Section 1129 of the Bankruptcy Code likely to be faced by any plan proposed by the Debtor.

## VI.    CONCLUSION

WHEREFORE, Wells Fargo respectfully requests that the Court enter an order lifting the automatic stay to allow Wells Fargo to exercise whatever rights it may have under the Loan and Security Agreement and related loan documents with respect to the Collateral (including any existing Cash Collateral), including, but not limited to, its right to foreclose upon its security interest in the Policies, waiving the stay of such Order under Bankruptcy Rule 4001(a)(3), and grant such other or further relief as may be necessary under the circumstances.

Dated:  October 7, 2010                   Respectfully submitted,

WELLS FARGO SECURITIES LLC, as Agent and
WELLS FARGO BANK, N.A., as Lender

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rules 2090-1(A) and 9011-4(A)(1).

*/s/ Franck D. Chantayan*
Franck D. Chantayan
Florida Bar No.:  878731
Robert N. Gilbert
Florida Bar No.:  310662
CARLTON FIELDS, P.A.
525 Okeechobee Blvd., Suite 1200
West Palm Beach, Florida 33401
Telephone:  (561) 659-7070
Facsimile:  (561) 659-7368
e-Mail:  rgilbert@carltonfields.com
*Counsel to Wells Fargo Securities LLC*
*and Wells Fargo Bank, N.A.*

and

Thomas S. Kiriakos, Esq. (admission *pro hac vice* pending)
Craig E. Reimer, Esq. (admission *pro hac vice* pending)
Joshua M. Grenard, Esq. (admission *pro hac vice* pending)
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
*Co-Counsel to Wells Fargo Securities LLC*
*and Wells Fargo Bank, N.A.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the foregoing *Motion of Wells Fargo Securities LLC and Wells Fargo Bank, N.A. for Relief from the Automatic Stay* has been furnished via electronic CM/ECF transmission this 7th day of October, 2010 to all parties thereby serving all parties registered to receive pleadings in this case and by U.S. Mail to all parties on the attached service list.


*/s/ Franck D. Chantayan*
Franck D. Chantayan
Attorney

```
Label Matrix for local noticing          QOC 1 LLC                              Wells Fargo Bank, N.A.
113C-9                                    5901 Broken Sound Parkway, NW          Attn: R. Gilbert/F. Chantayan Esqs
Case 10-40153-PGH                         Suite 200                             525 Okeechobee Blvd #1200
Southern District of Florida              Boca Raton, FL 33487-2725             West Palm Beach, FL 33401-6350
West Palm Beach
Thu Oct  7 07:41:20 EDT 2010

Wells Fargo Securities, LLC               Delaware Division of Revenue           Deloitte Tax LLP
Attn: R. Gilbert & F. Chantayan Esqs      8th Floor                             Deloitte Tax LLP 200 South Biscayne Blvd
525 Okeechobee Blvd #1200                 820 N. French Street                  Miami, FL 33131-2310
West Palm Beach, FL 33401-6350            Wilmington, DE 19801-3509

Habersham Funding, LLC                    Internal Revenue Service               Mayer Brown LLP
Building 11, Piedmont Center              7850 Sw 6th Ct                        230 South LaSalle Street
3495 Piedmont Road NE, Suite 910          Plantation, FL 33324-3210            Chicago, IL 60604-1404
Atlanta, GE 30305

Office of the US Trustee                  Q Capital Strategies, LLC              Securities And Exchange Commission
51 S.W. 1st Ave.                          5901 Broken Sound Parkway, NW         3475 Lenox Road N.E. # 1000
Suite 1204                                Suite 200                             Atlanta, GA 30326-3235
Miami, FL 33130-1614                      Boca Raton, FL 33487-2725

State Of Florida Department Of Revenue    Towers Watson Risk Consulting, Inc     United States Trustee - Miami
Po Box 6668                               901 North Glebe Road                  51 SW 1st Ave # 1204
Tallahassee, FL 32314-6668               Arlington, VA 22203-1853              Miami, FL 33130-1614

Wells Fargo Bank NorthWest NA             David M Bass                          Gerald H Gline
One Wachovia Center                       25 Main St                           25 Main St
301 South College Street                  Hackensack, NJ 07601-7015            Court Plaza N
Charlotte, NC 28202-6002                                                       Hackensack, NJ 07601-7015

Glenn D Moses Esq                         Heather L Harmon Esq
100 SE 2 St #4400                         100 S.E 2 St #4400
Miami, FL 33131-2118                      Miami, FL 33131-2118
```

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

```
(u)West Palm Beach                        End of Label Matrix
                                          Mailable recipients    19
                                          Bypassed recipients     1
                                          Total                  20
```