UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division
www.flsb.uscourts.gov

In re:

                                         Case No. 10-40153-BKC-PGH

QOC I LLC,                                  Chapter 11

        Debtor.

_____/

### MOTION TO APPROVE (A) SETTLEMENT AGREEMENT, (B) SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (C) ASSUMPTION AND ASSIGNMENT OF CONTRACTS, (D) REJECTION OF SERVICING AND TRACKING AGREEMENT, (E) DISMISSAL OF THE DEBTOR'S CHAPTER 11 CASE AND (F) RELATED RELIEF

QOC I LLC ("QOC" or the "Debtor"), as debtor and debtor-in-possession herein, by and through its counsel, hereby submits this motion (the "Motion") pursuant to 11 U.S.C. §§ 105(a), 305(a), 349, 363, 365 and 1112(b) and Rules 9019, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure for entry of an order: (A) approving a global settlement agreement by and between the Debtor, Wells Fargo Securities, LLC and Wells Fargo Bank, N.A. (collectively, "Wells Fargo") and certain related parties, (B) approving the sale of substantially all of the Debtor's assets, (C) authorizing the assumption and assignment of contracts, (D) authorizing the rejection of the current servicing and tracking agreement, (E) authorizing the dismissal of the Debtor's chapter 11 case, and (F) for related relief. In support of this Motion, the Debtor respectfully states as follows:

### BACKGROUND

1.      On October 1, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

2.      Since that time, the Debtor has remained in possession of its assets and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner, and no official committee(s) has been appointed in this case.

**A.      QOC's Business and Chapter 11 Filing**

4.      QOC is a Delaware limited liability company, and was formed and exists to own and hold previously issued life insurance policies (the "Policies") issued by leading insurance companies (the "Issuing Insurance Companies") upon individuals (the "Insureds") and sold in the life settlement market.  QOC currently owns 283 policies on 223 lives with a face value of approximately $550 million.[1]   The Policies comprising QOC's life settlement portfolio are QOC's primary asset and the principal collateral securing the obligations to Wells Fargo.

5.      The Debtor's acquisition of the Policies, and its contractual and other rights of payment related thereto, are based upon, among other things, a series of agreements providing for the purchase, financing, servicing and management of the Policies.

6.      The Policies insure the lives of individuals, who may or may not be the original Policy owner, and who, at the time of the purchase of each such Policy in the life settlement market, was at least 60 years of age.  The Insured (or the Policy's owner) desired to sell their Policies and the related benefits in the life settlement market rather than surrender them to the Issuing Insurance Company for less value.  The Policies were purchased from the Policy owner

---

[1] Upon information and belief, since the Petition Date, two maturities have occurred. However, the Debtor has not yet received the benefit under those Policies.

2

by QOC, or on behalf of QOC and subsequently assigned to QOC.[2]  The Debtor purchased the Policies at prices expected to yield a profit to the Debtor's investors upon the payment of the death benefit to QOC.

7.      A more detailed description of the Debtor's business, background, capital structure and the circumstances leading to the chapter 11 filing is set forth in Declaration of Steven M. Shapiro dated October 1, 2010 (the "Shapiro Declaration") [D.E.8].  The Shapiro Declaration is incorporated by reference herein.

**B.      The Debtor's Pre-Petition Relationship With Wells Fargo**

8.      On or about May 9, 2008, the Debtor, as "Borrower," along with its parent, Q Opportunity Company LLC, as "Equity Contributor," and Q Capital Strategies, LLC, as the "Servicer" and "Loan Manager," entered into that certain Loan and Security Agreement (as amended, the "Loan and Security Agreement"), with Wachovia Capital Markets, Inc., as administrative agent, and Wells Fargo, as custodian, pursuant to which Wells Fargo's predecessor, Wachovia Bank, National Association ("Wachovia"), agreed to advance $120 million to QOC for the purchase of the Policies (the "Loan").

9.      Under the Loan and Security Agreement, Wells Fargo has a security interest in all of the Policies (and, together with any ancillary collateral relating to the Polices and all cash proceeds generated thereby or derived therefrom, the "Collateral").  Pursuant to the terms of the Loan and Security Agreement, and as set forth in that certain Custodian Agreement dated May 9, 2008, Wells Fargo, as Custodian, holds the original Policies, which have been collaterally assigned to the Custodian to secure the indebtedness due Wells Fargo.

---

[2] Policies are often held not by individuals but by a trust, *e.g.*, an Irrevocable Life Insurance Trust, or by business entities seeking to dispose of unneeded "key-man" insurance or other business-owned insurance.

10.     QOC and Wells Fargo (as successor to Wachovia) were also parties to that certain Hedging Agreement (as defined in the Loan and Security Agreement) dated as of May 9, 2008, consistent with the terms of a "Master Agreement" in a form published by the International Swaps and Derivatives Association, Inc., together with a "Schedule" thereto, and each "Confirmation" thereunder confirming the specific terms of a Hedge Transaction (as defined in the Loan and Security Agreement), pursuant to which QOC sought to hedge against variable interest rates.[3]  The Hedging Agreement was terminated shortly after the Petition Date.

11.     Wells Fargo, as the Hedge Counterparty, also is a beneficiary of a lien on the Collateral.  Wells Fargo's interests in the Collateral securing QOC's obligations under the Hedging Agreement are on a *pari passu* basis with the Collateral securing QOC's obligations under the Loan and Security Agreement.

12.     As of the Petition Date, the Debtor was indebted to Wells Fargo in the total amount of at least $138,381,710.60.  Currently, the Debtor is indebted to Wells Fargo in the total amount of at least $140,205,454.03, consisting of (i) $120,000,000.00 in principal, (ii) $15,476,250.00 in Hedge Breakage Costs, (iii) $3,581,611.50 in accrued and unpaid interest (consisting of $3,563,793.93 attributable to the $120,000,000.00 in principal through the date hereof and $17,817.57 attributable to Hedge Breakage Costs since termination), and (iv) $1,147,592.53 in out-of-pocket expenses.

13.     Other than the substantial indebtedness due and owing to Wells Fargo (and certain obligations the Debtor may have with respect to its insiders), the Debtor has no known pre-petition creditors.   The   only   claims   that   remain   against   the   Debtor   consist   of   accrued

---

[3] QOC entered into interest rate swap transactions with Wachovia under reference numbers 2678252, 2696278, 2737537, 2808136, 2859192, 2899574 and 2949890, as evidenced and confirmed by letter agreements between Wachovia and QOC dated August 7, 2009.

restructuring and other fees owed to professionals and other entities, which shall be satisfied through the retainers on hand or pursuant to the Settlement (as defined below). The Debtor has no other creditors or outstanding claims against it.[4]

## C. Significant Filings in the Bankruptcy Case

14.     On the Petition Date, the Debtor filed its Emergency Motion for an Order (A) Authorizing the Debtor's Interim and Final Use of Cash Collateral Pursuant to 11 U.S.C. § 361 and 363 and Granting Adequate Protection, (B) Scheduling a Final Hearing and (C) for Other Related Relief (the "Cash Collateral Motion") [D.E. 7].

15.     Thereafter, Wells Fargo filed an Objection to the Cash Collateral Motion [D.E. 6]. Upon the agreement of Wells Fargo, on October 8, 2010 this Court entered the Interim Cash Collateral Order, granting the Cash Collateral Motion on an interim basis and setting a final hearing for November 10, 2010.

16.     On October 6, 2010, Wells Fargo filed a Motion for an Order Dismissing Case (the "Dismissal Motion") [D.E. 25]. On the next day, Wells Fargo filed a Motion for Relief from the Automatic Stay (the "Stay Relief Motion") [D.E. 7].

17.     Pursuant to this Court's Order dated October 12, 2010, a final evidentiary hearing on the Dismissal Motion and the Stay Relief Motion was initially set for November 8, 2010 [D.E

---

[4] As reflected on the Debtor's schedules of liabilities filed with the Court on October 15, 2010 [D.E. 49], the Debtor, a single-purpose entity, listed few non-insider unsecured creditors with obligations due as of the Petition Date. But for the bankruptcy filing, each of the obligations thereon would have been budgeted and paid in the ordinary course in October 2010, with Wells Fargo's consent. The payment of each of the obligations was necessary in order to assure protection and proper administration of the Portfolio during the post-Petition Date period. Payment of these obligations was made pursuant to the Interim Order Authorizing the Debtor's Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2) and Fed. R. Bankr. P. 4001 and Scheduling Final Hearing Date, entered October 8, 2010 [D.E. 39] (the "Interim Cash Collateral Order").

43].  The hearing on each of the Dismissal Motion and the Stay Relief Motion, along with the

final hearing on the Cash Collateral Motion, have been continued to December 7, 2010.

## SETTLEMENT AGREEMENT

18.    After extensive negotiations, the Debtor, Wells Fargo and certain related parties

have entered into a settlement (the "Settlement"), subject to this Court's approval, which is

embodied in a Settlement and Sale Agreement (the "Settlement Agreement"), a copy of which is

attached hereto as <u>Exhibit 1</u>.  The following is a summary of the salient terms of the Settlement:[5]

- •  The Debtor will unconditionally and absolutely transfer all of the Collateral to the person (*i.e.*, the Acquirer) designated by Wells Fargo (such transfer being the "Debtor Transfer") pursuant to sections 363(b) and (f) of the Bankruptcy Code;  provided, however, that such transfer will <u>not</u> be free and clear of the liens and security interests held by Wells Fargo in and to the Collateral securing payment of the indebtedness due and owing by the Debtor to Wells Fargo.

- •  The Debtor and its direct and indirect investors (the "Related Parties") will provide releases and covenants not to sue Wells Fargo.  The only release Wells Fargo will provide in exchange will be to release Medley Opportunity Fund, LP and Medley Opportunity Fund, LTD. from their obligations under the September 14, 2009 Policy Purchase Agreement among them, the Debtor and Wells Fargo pertaining to certain Policies issued by Phoenix Life Insurance Company.

- •  A contingent payment (the "Contingent Payment") will be payable to a designee of the Debtor if various conditions are satisfied as required by the terms of the Settlement Agreement, including:

  - -  The Collateral is sold to a Third Party Buyer (*i.e.*, not a Wells Fargo affiliate) within 24 months of the Debtor Transfer (a sale within such time being a "Subsequent Sale" and the end of such 24th month being the "End Date").

---

[5]  The description of salient terms in paragraph 18 of this Motion is provided for ease of reference only and in no way is intended to modify, amend, alter or otherwise change in any way the Settlement Agreement.  The reader is urged to consult the Settlement Agreement for a complete and accurate description of its terms and conditions.  Any capitalized terms used but not otherwise defined in  the summary or hereinafter in this Motion shall have the meanings ascribed to them in the Settlement Agreement.

- The Contingent Payment will be 25% of the aggregate Net Proceeds of all Subsequent Sales, provided that such Net Proceeds constitute a positive number.

- "Net Proceeds" means the excess, if any, of (i) the aggregate net cash proceeds of all Subsequent Sales, to the extent actually received by Wells Fargo prior to the date of the last Subsequent Sale, minus (ii) the sum of (A) Wells Claims, plus (B) Wells Expenses, plus (C) Wells Yield, as reduced by the aggregate death benefits for maturing Policies in the Collateral, in each case to the extent actually received by Wells Fargo prior to the date of the last Subsequent Sale.

- "Wells Claims" means all amounts owed by the Debtor or its affiliates to Wells Fargo as of the closing of the Debtor Transfer, whether for principal, interest, hedge payments and termination amounts, expense reimbursements, indemnities or otherwise.

- "Wells Expenses" means all reasonable costs and expenses of any nature incurred by Wells Fargo in connection with the Debtor, its bankruptcy proceeding, the loan facility, the Settlement and/or the Collateral, whenever incurred (including prior to the Petition Date), to the extent not previously reimbursed by the Debtor.  Without limitation, such expenses include premiums, fees, expenses and indemnities paid to servicers, consultants, valuation agents, life expectancy providers, custodians, accountants, attorneys, brokers, advisors, investment bankers and others, taxes, capital charges, financing costs, and damages in any proceeding.

- "Wells Yield" means yield on all Wells Claims and Wells Expenses, commencing as of the Petition Date and determined at the rate of 14% per annum on the basis of actual days and a 360-day year compounded quarterly.

- Wells Claims, Wells Expenses and Wells Yield will be determined by Wells Fargo in its sole discretion and such determination will be conclusive absent manifest error.  Any objection by the Debtor Designee to such calculation for any calendar quarter must be delivered to Wells Fargo in writing within 30 days of receipt by the Debtor Designee of the Quarterly Report (as defined below) for such quarter.

- Wells Fargo shall be entitled in all respects to evaluate and pursue or not pursue (as the case may be) any potential Subsequent Sale solely from the perspective of its own

economic self-interest and shall otherwise have complete discretion and control over every aspect of any Subsequent Sale, including, without limitation, timing, terms, and conditions of such sale. Without limiting the generality of the foregoing, Wells Fargo shall not be obligated in any respect to pursue or not pursue any potential subsequent sale from the perspective as to whether it would result in any Contingent Payment. If a Subsequent Sale occurs by the End Date, but does not result in a Contingent Payment, or if no Subsequent Sale occurs by the End Date, any obligation with respect to a Contingent Payment shall be deemed satisfied and otherwise terminated. If a third party shall have entered into a binding agreement with the Lender Parties to effect a Subsequent Sale prior to the End Date, subject only to completion of due diligence (a "Binding Sale Commitment"), and such Subsequent Sale is consummated within 90 days of the End Date, such Subsequent Sale will be deemed to have occurred prior to the End Date.

•        Within 30 days after the end of each calendar quarter, the Lender Parties shall provide a report (the "Quarterly Report") to the Debtor's Designee showing (i) the aggregate amount of death benefits received during such quarter, (ii) the aggregate Wells Expenses, the aggregate Wells Yield and the sum of the Wells Expenses, the Wells Yield and Wells Claims as of the end of such quarter, (iii) a summary of Wells Expenses incurred during such quarter, showing (A) aggregate premiums, (B) aggregate Wells Yield, (C) aggregate servicing fees and (D) aggregate other expenses in excess of $10,000 if all other expenses for such quarter exceed $200,000, and (iv) whether the Lender Parties have completed any Subsequent Sales during such quarter and, if so, the number of Policies included in such disposition and net cash sales price paid to the Lender Parties therefor. In addition, if the Lender Parties enter into a Binding Sale Commitment at any time, the Lender Parties will notify the Debtor Designee of the existence of such commitment, the number of Policies to be sold and the proposed cash sales price therefor within 30 days of entering into such Binding Sale Commitment. For the avoidance of doubt, the Lender Parties are not required to disclose the buyers of any such Policies, the form or terms of any documents or other details regarding a Binding Sale Commitment.

•        The Settlement, including the Debtor Transfer, the releases and all related matters shall be approved by an order of the bankruptcy court satisfactory to Wells Fargo, and after notice and opportunity for hearing satisfactory to Wells Fargo, no later than December 10, 2010. The proposed form of such Order is attached as Exhibit C to the Settlement Agreement.

•        The Debtor Transfer shall be consummated no later than December 20, 2010.

8

• The Debtor's chapter 11 case shall be dismissed no later than 30 days after the closing of the Debtor Transfer. In connection therewith, the bankruptcy court shall enter an order enjoining the Debtor and the Related Parties from commencing any subsequent bankruptcy proceedings involving the Debtor under any chapter of the Bankruptcy Code without the prior, express written consent of Wells Fargo for a period of at least twelve (12) months following the date of the dismissal of the Debtor's chapter 11 case.

• Pending consummation of the Debtor Transfer, the Debtor and the Borrowing Parties shall perform all of their obligations under the Loan Agreement and related documents with respect to the servicing, maintenance and protection of the Collateral and with respect to the delivery of reports and information. If death benefits on the Policies are insufficient to pay premiums and ordinary course servicing fees due in December, 2010, Wells Fargo, upon receipt of court authorization satisfactory to it, will make a protective advance to pay such premiums and fees.

• Pending consummation of the Debtor Transfer, no Related Party shall enter into bankruptcy proceedings.

• Promptly upon the request of Wells Fargo, all servicing functions, data and records will be transferred to a qualified servicer designated by it in a fully cooperative and efficient manner at the expense of the Borrowing Parties. Subject to the foregoing, costs thereof payable to persons other than the Related Parties shall be borne by Wells and be a Wells Expense.

• Subject to the calculation of Wells Expenses above, each party will pay all of its own expenses in connection with the Debtor's bankruptcy and the matters contemplated in the Settlement Agreement.

## RELIEF REQUESTED AND BASIS THEREFOR

19. By this Motion, the Debtor seeks approval of the Settlement Agreement and the transactions contemplated therein.

### A. Approval of Settlement Agreement

20. Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides that, after notice and a hearing, a court may approve a proposed settlement of a claim. The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored in bankruptcy." *In re World Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see also In re Penn Central Transp. Co.*, 596 F.2d 1102 (3d Cir. 1979)

9

("[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims …") (quoting *In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson*, 300 U.S. 414, 424 (1968)).

21.    In deciding whether to approve a proposed settlement, the Court is required to exercise its sound discretion in assessing the reasonableness of a proposed settlement.  *See In re Honeywell*, 93 B.R. 291, 294 (Bankr. S.D. Fla. 1988); *In re Jackson Brewing Co.*, 624 F.2d 599 (5th Cir.1980); *In re Teltronics Services, Inc.*, 762 F.2d 185 (2d Cir.1985).

22.    The standards for approval of settlements under Bankruptcy Rule 9019 are well settled.  In passing on proposed settlements, the standard that courts applied under the former Bankruptcy Act is the same standard as courts should apply under the Bankruptcy Code.  *In re Carla Leather, Inc.*, 44 B.R. 457, 466 (Bankr. S.D.N.Y. 1984), *aff'd* 50 B.R. 764 (S.D.N.Y. 1985).  As stated by the Supreme Court in *Protective Committee v. Anderson*, *supra*, under the Act, in order to approve a proposed settlement, a court must have found that the settlement was "fair and equitable" based on an educated estimate of the complexity, expense and likely duration of the litigation, the possible difficulties of collecting on any judgment which might be obtained and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.  *Id.* at 424.

23.    This test was adopted by the Eleventh Circuit in *In re Justice Oaks II, Ltd.*, 898 F.2nd 1544, 1549 (11th Cir. 1990).  In *Justice Oaks*, the Eleventh Circuit established a four part test for the approval of settlements, which test was as follows:  (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved and the expense, inconvenience and delay necessarily

attending it, and (d) the paramount interest of the creditors and a proper deference to their reasonable views.

24.     The decision to approve a settlement "is within the sound discretion of the bankruptcy court."  *World Health Alternatives*, 344 B.R. at 296; *see also In re Neshaminy Office Building Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986).  The bankruptcy court should not, however, substitute its judgment for that of the parties.  *See Neshaminy Office*, 62 B.R. at 803.

25.     In that regard, the court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.  *See In re W.T. Grant and Co.*, 699 F.2d 599, 608 (2d Cir. 1983), *cert denied*, 464 U.S. 22 (1983); *see also World Health Alternatives*, 344 B.R. at 296 (stating that "the court does not have to be convinced that the settlement is the best possible compromise.  Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted).  *See also In re Arrow Air, Inc.*, 85 B.R. 886 (Bankr. S.D. Fla. 1988); *Meyers v. Martin (In re Martin)*, 91 F.3d 389 (3d Cir. 1996).

26.     Additionally, authorizing the Debtor to effectuate the terms of the Settlement is well within the equitable powers of this Court.  *See* 11 U.S.C. § 105(a) ("The court may issue any order, process or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]."); *see also Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that a bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of

its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.")

27.    Applying the foregoing standards, the Debtor submits that the Settlement Agreement is in the best interest of the estate and should be approved.  The Settlement Agreement resolves the Cash Collateral Motion, the Dismissal Motion and the Stay Relief Motion.  The Debtor believes that if the disputes with Wells Fargo are not resolved now, future proceedings would be protracted and expensive, involve complex issues, and subject the Debtor, its estate, and its creditors to substantial uncertainties and risk.  Indeed, in anticipation of contested hearings on all of the foregoing motions, the parties retained expert witnesses, exchanged extensive written discovery requests, made voluminous document demands, served several third party subpoenas and were in the process of scheduling more than a dozen depositions of various fact and expert witnesses.  Due to the complexity and range of disputed issues, the litigation risk attendant to the merits of legal issues in dispute and the absence of any unencumbered estate funds that could be utilized by the Debtor to fund its continued prosecution of such litigation with Wells Fargo, the Debtor sought to find a means for resolving the litigation consensually with Wells Fargo.

28.    The Debtor has thus, in its business judgment, considered the benefit – and certainty – to the Debtor's estate and creditors that will be received as a result of the Settlement, particularly in light of the costs, uncertainties, delay and risks of further litigation, and has concluded that the Settlement is fair and equitable and in the best interest of the Debtor, its estate, stakeholders and other parties-in-interest.  The Settlement provides not only for a prompt, effective resolution of all matters in controversy between it and its primary secured creditor – Wells Fargo – but also enables a potential recovery for the Debtor's stakeholders.  In addition,

the Settlement, if authorized by the Court, enables an efficient resolution of this case with a definitive outcome, thereby avoiding the uncertainties, and possible harsh realities, that would result if instead further litigation with Wells Fargo became necessary.

29.     Accordingly, the Debtor, in the exercise of its business judgment, submits that the Settlement is: (a) fair, reasonable and equitable under the circumstances; (b) falls well within the range of reasonableness with respect to potential litigation outcomes; (c) obviates the expense, delay, inconvenience and uncertainty that would attend the litigation of these disputed issues; and (d) advances the paramount interests of the Debtor's estate by adding potential value, as a matter of certainty, while simultaneously providing a critical element of finality to the estate's largest creditor, Wells Fargo.  Accordingly, the Settlement satisfies Bankruptcy Rule 9019 and the Debtor requests that the Court approves the Settlement embodied in the Settlement Agreement.

**B.      Sale of Assets to Pursuant to Section 363(b)**

30.     As noted above, the Settlement Agreement calls for the transfer of the Collateral to a designee of Wells Fargo, free and clear of all liens, claims and encumbrances with the exception of Wells Fargo's liens pursuant to sections 363(b) and (f) of the Bankruptcy Code.

31.     Courts generally require debtors to establish "sound business judgment" prior to approving the sale of property of the estate, prior to confirmation of a plan, pursuant to section 363(b) of the Bankruptcy Code.  *In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 653 (S.D.N.Y. 1995); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 175-176 (D. Del. 1991); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).  The "sound business judgment" test requires a debtor to establish: (a) that a sound business reason justifies the sale outside the ordinary course of business, (b) that accurate and reasonable notice has been provided to interested parties, (c) that the debtor has obtained a fair and reasonable price, and (d)

good faith.  *Id.*; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335 (Bankr. D. Del. 1987); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983).

32.    The Debtor submits that it has established sound business judgment which justifies the proposed sale, *i.e.*, the Debtor Transfer, outside of a plan of reorganization and without the need for any further marketing of the Collateral or additional sale procedures.  As set forth above, the sale contemplated by the Settlement Agreement resolves the Debtor's dispute with Wells Fargo, which is by far the largest, if not sole non-insider stakeholder in this bankruptcy proceeding, and avoids litigation fraught with risk, delay and significant expense. Further, by creating a Contingent Payment right in the event various conditions are met as set forth in the Settlement Agreement, the Settlement enables the Debtor (through the Debtor Designee) to realize fair and adequate consideration from the sale of its assets.

33.    Further, good, sufficient and ample notice of the Settlement has been provided under the circumstances.  As set forth in counsel's certificate of service, notice of the Settlement and the proposed Debtor Transfer thereunder has been provided to: (i) the Office of the United States Trustee, (ii) each Issuing Insurance Company, (iii) counsel for Wells Fargo, (iv) all persons who are known to possess or assert a Lien against any of the Sale Assets, (v) the Internal Revenue Service, (vi) all applicable state and local governmental entities with taxing authority, (vii) all persons who have filed a notice of appearance in this Case, and (viii) all other persons required by any order of the Bankruptcy Court to receive notice of any matter in the Case, including all known creditors of the Debtor.

34.    Lastly, the Settlement Agreement and the transactions contemplated therein were the product of good faith, arms' length negotiations between the Debtor and Wells Fargo.  Wells Fargo is not an insider of the Debtor within the meaning of section 101(31) of the Bankruptcy

Code, and does not control or act on behalf of any insider of the Debtor. Therefore, the sale, *i.e.*, the Debtor Transfer, has been proposed in good faith. *See In re After Six, Inc.*, 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986).

**C.**     **Sale of Assets Free and Clear of Liens Pursuant to Section 363(f)**

35.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell property of the estate free and clear of any liens, claims or encumbrances if one of the following is met: (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents, (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, (4) such interest is in bona fide dispute or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. The language of section 363(f) is in the disjunctive, so that a sale free and clear of interests can be approved if any of the aforementioned conditions is met. *In re Heine*, 141 B.R. 185, 189 (Bankr. D.S.D. 1992); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

36.     The Debtor Transfer of the Collateral to the Acquirer is to be free and clear of any liens, claims or encumbrances, with the exception of Wells Fargo's liens. Other than Wells Fargo, the Debtor is unaware of any party asserting any lien, claim or encumbrance in respect of the Collateral. Accordingly, at a minimum, the Debtor Transfer can be approved pursuant to section 363(f)(2) of the Bankruptcy Code.

**D.**     **Good Faith Under Section 363(m) of the Bankruptcy Code; the Debtor Transfer is Not In Violation of Section 363(n) of the Bankruptcy Code**

37.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property

> does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(n) of the Bankruptcy Code, among other things, provides that a trustee may avoid a sale under such section if the sale price was controlled by an agreement among potential bidders at the sale.  As discussed above, the Third Circuit in *Abbotts Dairies* noted the kind of misconduct that would destroy a buyer's good faith.  *Abbotts Dairies*, 788 F.2d at 147.

38.    Here, the Settlement Agreement represents a zealously negotiated, arms'-length transaction, in which Wells Fargo has acted in good faith, without collusion or fraud of any kind. Therefore, the Debtor respectfully requests that the Court find that the Acquirer has purchased the assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and is entitled to the protections of sections 363(m) and 363(n) of the Bankruptcy Code.

**E.    Assumption and Assignment of the Policies; Rejection of Servicing Agreement**

39.    Pursuant to the Settlement Agreement, the Debtor is to assume and assign the Policies[6] and other pre-petition contracts included in the Servicing Files to the Acquirer.

---

[6] Because the Debtor has no duty under the Policies other than payment of money, *i.e.*, the premiums, the Debtor does not believe the Policies are executory contracts.  *See, e.g.*, *In re Wisconsin Barge Line, Inc.*, 76 B.R. 695 (Bankr. E.D. Mo. 1987) ("insurance contracts ... are not executory in nature because Debtors have no duty under them to [insurer], other than the payment of money ... [and], therefore, ... they need not be either assumed or rejected by Debtors."); *In re Placid Oil Co.*, 72 B.R. 135, 137-38 (Bankr. N.D. Tex. 1987) (citing cases) (denying the insurer's motion to compel the debtor to either assume or reject the agreement after finding that the agreement in question providing for the payment of retrospective premiums was not an executory contract because the debtor therein had no duty of future performance under the contract, other than the payment of money).  *Id.* at 139-40.  However, to avoid any argument after closing that the Acquirer has no rights in the Policies because the Debtor failed to properly assign such Policies to it, the Debtor has treated the Policies as executory contracts for purposes (continued...)

40.     Prior to assigning the Policies, and assuming the Policies are executory contracts, the Debtor must assume the Policies pursuant to section 365(a) of the Bankruptcy Code.  In determining whether to approve the assumption or rejection of a contract or lease, Courts employ the "business judgment" standard.  *In re Country Club Estates at Aventura Maintenance Association, Inc.*, 227 B.R. 565, 568 (Bankr. S.D. Fla. 1998).  Under this standard, assumption or rejection is appropriate if the debtor can demonstrate that it will benefit the estate.  *Westship, Inc. v. Trident Shipworks, Inc.,* 247 B.R. 856, 865 (M.D. Fla. 2000).

41.     Section 365(b) of the Bankruptcy Code provides that if there is a default in an executory contract or unexpired lease, a debtor may not assume such agreement unless, at the time of assumption, the debtor: (a) cures, or provide adequate assurance that it will cure, such default; (b) compensates, or provide adequate assurance that it will promptly compensate, the other party to the contract or lease for any actual pecuniary loss to such party resulting from the default; and (c) provides adequate assurance of future performance under such contract or lease. *In re Airlift Int'l, Inc.*, 761 F.2d 1503, 1508 (11th Cir. 1985).

42.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord*

---

(…continued)
of this Motion.  The Debtor reserves all rights, however, to challenge any position by any party, including any insurance company, that the Policies are indeed executory contracts.

*In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

43.     The Debtor has exercised sound business judgment in moving to assume the Policies, and such assumption will clearly benefit the estate as it is part of the consideration of the Settlement Agreement.  Moreover, the Debtor is not in default under any of the Policies and there is no "cure" due with respect to any of the Policies or any of the Servicing Files.[7]

44.     Following assumption, the Debtor seeks to assign the Policies to the Acquirer pursuant to section 365(f) of the Bankruptcy Code, which allows a debtor to assign an executory contract or unexpired lease if (a) the debtor assumes such contract or lease in accordance with section 365 and (b) adequate assurance of future performance by the assignee is provided, whether or not there is a default in such contract or lease.

45.     The Acquirer, an affiliate of Wells Fargo, is expected to have the financial health and wherewithal to perform under the existing agreements and, with the retention of an appropriate servicing agent, will be quite capable of owning and managing the Portfolio, including performing any obligations that may exist with respect to any of the Policies or any of the Servicing Files.  Accordingly, the Debtor submits that its request to assume and assign the Policies and Servicing Files to the Acquirer should be approved.

---

[7] Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtor, a waiver of the Debtor's rights to dispute any claim, or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code.  The Debtor expressly reserves its rights to contest any claims or objections in accordance with applicable non-bankruptcy law.

46.    The Debtor and Q Capital Strategies, LLC ("Q Capital") are parties to that certain Servicing and Tracking Agreement dated as of October 25, 2007, pursuant to which Q Capital manages and services the Policies (the "Servicing Agreement").  In connection with the Debtor Transfer and Wells Fargo's decision not to take assignment of the Servicing Agreement, but rather have the Acquirer enter into a new servicing agreement directly with Q Capital at Closing, good and sufficient cause exists under the circumstances to reject the Servicing Agreement pursuant to section 365(a) of the Bankruptcy Code effective as of the Closing Date.  Further, in connection with entering into a new servicing agreement with Acquirer, Q Capital has agreed to waive and release any and all claims it may have that arise from the rejection of the Servicing Agreement or otherwise in the chapter 11 case.

## F.    The Debtor Transfer Will Not Require the Appointment of a Consumer Privacy Ombudsman

47.    The Debtor Transfer will not necessitate the appointment of a consumer privacy ombudsman in accordance with section 332 of the Bankruptcy Code.  Section 363(b)(l) of the Bankruptcy Code provides that:

> if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless … such sale or such lease is consistent with such policy.

11 U.S.C. § 363(b)(l).

48.    Section 101(41A) defines "personally identifiable information" to include an individual's name, residence address, email address, telephone number, social security number or credit card number, as well as an individual's birth date or other information that, if associated

with the information described previously, would permit the identification or contacting of the individual.  See 11 U.S.C. § 101(41A).

49.     Because the information obtained by the Debtor that may be considered "personally identifiable information" was not provided to the Debtor "in connection with [any individual] obtaining a product or service from the debtor for personal, family, or household purposes" as required by 11 U.S.C. § 101(41A), the Debtor does not believe that section 363(b)(1) even applies.  Nevertheless, in light of the sensitivity of the information associated with the transfer of the Policies (though much of it already known to Wells Fargo), the Debtor and Wells Fargo have proceeded, out of an abundance of caution (but without waiving any rights or claims to contend that such section does not apply) as if section 363(b)(1) of the Bankruptcy Code may apply to the sale and other transactions contemplated by the Settlement.

50.     With the understanding that the Existing Privacy Policies are not intended to limit the possible marketing of the Sale Assets after the Closing Date by the Acquirer to potential Third Party Buyers, financing sources, or joint venture members pursuant to confidentiality agreements, Wells Fargo, after the Closing Date, has agreed in the Settlement Agreement to undertake to cause the Acquirer to implement and adhere to privacy policies with respect to the Sale Assets substantially similar to the Existing Privacy Policies.

51.     Thus, to the extent that the information being transferred includes "personally identifiable information" within the meaning in section 101(41A), Wells Fargo will continue to utilize any such "personally identifiable information" in exactly the same fashion as the Debtor may under its Existing Privacy Policy.  Accordingly, pursuant to section 363(b)(1)(B), this Court may authorize the proposed sale, *i.e.*, the Debtor Transfer, without the appointment of a consumer privacy ombudsman.

20

**G.**    **Dismissal of this Case is Warranted Under Section 1112(b) of the Bankruptcy Code**

52.    Wells Fargo has moved for dismissal of the Debtor's chapter 11 case.  Further, the Settlement Agreement obligates Debtor to request entry of an order dismissing the case by December 20, 2011 (and further enjoining the Debtor from refiling for bankruptcy for at least another year thereafter).  Pursuant to § 1112(b)(1) of the Bankruptcy Code, absent unusual circumstances, a court shall dismiss a bankruptcy case "for cause."[8]  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") changed the statutory language with respect to conversion and dismissal from permissive to mandatory.[9]  *See* H.R. Rep. 109-31 (I), 2005 U.S.C.C.A.N. 88, 94 (stating that BAPCPA "mandate[s] that the court convert or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, if the movant establishes cause, absent unusual circumstances."); *see also In re Gateway Access*

---

[8] Section 1112(b)(1) states, in pertinent part:

> on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court **shall** convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1) (emphasis added).

[9] Prior to BAPCPA, a bankruptcy court had wide discretion to use its equitable powers to dispose of a debtor's case but was not mandated to dismiss a case if cause were shown. H.R.Rep. No. 595, 95th Cong., 1st Sess. 405 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787; see also Small Business Admin. v. Preferred Door Co. (In re Preferred Door Co.), 990 F.2d 547, 549 (10th Cir. 1993) (a court has broad discretion to dismiss a bankruptcy case); In re Sullivan Cent. Plaza I, Ltd., 935 F.2d 723, 728 (5th Cir. 1991) (determination of whether cause exists under § 1112(b) "rests in the sound discretion" of the bankruptcy court); In re Koerner, 800 F.2d 1358, 1367 & n. 7 (5th Cir. 1986) (bankruptcy court is afforded "wide discretion" under § 1112(b)).

*Solutions, Inc.*, 374 B.R. 556 (Bankr. M.D. Pa. 2007) (stating that the amendments to § 1112 limit the court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause); *accord In re TCR of Denver, LLC*, 338 B.R. 494, 498 (Bankr. D. Colo. 2006) ("Congress has purposefully limited the role of this Court in deciding issues of conversion or dismissal such that this Court has no choice, and no discretion in that it 'shall' dismiss or convert a case under Chapter 11 if the elements for 'cause' are shown under 11 U.S.C. § 1112(b)(4)") (emphasis added); *In re 3 Ram, Inc.*, 343 B.R. 113, 119 (Bankr. E.D. Pa. 2006) ("Under new § 1112 when cause is found, the court shall dismiss or convert unless special circumstances exist that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate."); *see also In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D.S.C. 2007).

53.    Thus, as amended in 2005, section 1112(b) mandates dismissal if cause is established unless "unusual circumstances" exist to suggest that dismissal would not be in the best interests of the estate and the creditors. *See* 11 U.S.C. § 1112(b)(1). Although "unusual circumstances" are not defined in the Bankruptcy Code, "they are not thought to be conditions that are common in most chapter 11 cases." *Kholyavka*, 2008 WL 3887653 at *6 (citing 7 *Collier on Bankruptcy* § 1112.04[3] at 1112-27 (15th ed. rev. 2005)).

54.    For reasons more fully explained below, this Court should dismiss the Debtor's chapter 11 case because cause exists and dismissal is in the best interests of the Debtor, the Debtor's estate and its creditors.

**H.    Cause Exists to Dismiss the Debtor's Bankruptcy Case**

55.    Section 1112(b)(4) of the Bankruptcy Code provides a nonexclusive list of 16 grounds for dismissal. 11 U.S.C. § 1112(b)(4)(A)-(P). *See Gateway Access Solutions*, 374 B.R. at 561 ("Generally, such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise.'") (quoting *In re Brown*, 951 F.2d 564, 572 (3d Cir.

1991)); *3 Ram, Inc.*, 343 B.R. at 117 ("While the enumerated examples of 'cause' to convert or dismiss a chapter 11 case now listed in § 1112(b)(4) have changed under BAPCPA, the fact that they are illustrative, not exhaustive has not."); accord *In re Frieouf*, 938 F.2d 1099, 1102 (10th Cir. 1991) (Section 1112(b)'s list is nonexhaustive).[10]

56.　　"[I]n determining 'cause' for dismissal the court may consider other factors as they arise and use its powers to reach appropriate results in individual cases." *In re Gonic Realty Trust*, 909 F.2d 624, 626 (1st Cir. 1990).

57.　　The Debtor submits that "cause" to dismiss the chapter 11 case consistent with the Settlement Agreement, *i.e.*, within thirty (30) days of the Closing on Debtor Transfer, exists.

58.　　As set forth above, upon the consummation of the Debtor Transfer, the Debtor will have transferred all of its assets to the Acquirer, Wells Fargo's designee. Moreover, as noted above, there are no material, non-insider claims remaining against the Debtor. Indeed, besides Wells Fargo, the Debtor is not aware of there being any other claims in this bankruptcy besides, at most, one potential, disputed *de minimis* claim for $293.[11] Therefore, no prejudice to third parties will result from dismissing the Debtor's chapter 11 case after Closing in accordance with the terms of the Settlement Agreement.

---

[10] In In re TCR of Denver, the court recognized the apparent typographical error in § 1112(b)(4) of the Bankruptcy Code. The sixteen illustrative examples of "cause" set forth in that section are linked by the word "and" after subsection (O). Accordingly, strict construction of the statute would require that a debtor establish all of the items constituting "cause" before a case can be dismissed by the court. The TCR court held that Congress could not have intended to require a "perfect storm" of all sixteen circumstances listed before a case be converted or dismissed. See In re TCR of Denver, 338 B.R. at 498.

[11] Although an entity known as American Infosource Lp As Agent for T Mobile/T-Mobile USA Inc. has filed a claim against the Debtor (in the amount of $293.03), the Debtor has no record of ever doing business with such entity and observes that its claim is allegedly based upon an account that according to the claimant was opened on December 24, 2006, which was **before** the Debtor was even formed.

59.     Indeed, failure to dismiss may impair Debtor's ability to consummate the transactions contemplated by the Settlement, which Settlement the Debtor submits, as set forth above, is in the best interests of its estate and stakeholders.

60.     Courts have granted debtors relief similar to that requested herein where an asset or other sale resulted in resolution of all claims against a debtor entity. *See*, *e.g.*, *In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Sept. 6, 2007) [Docket No. 5786] (order upon motion of debtors dismissing chapter 11 case of related debtor entity Towantic Energy L.L.C.).

61.     In sum, the Debtor has met its burden of proof that the Debtor's case should be dismissed under § 1112(b).

## I.      Dismissal is in the Best Interests of the Creditors and of this Estate

62.     Once a court determines that cause exists to dismiss a debtor's chapter 11 case, the court evaluates whether dismissal is in the best interests of the creditors and of the estate. *See*, *e.g.*, *Rollex Corp. v. Associated Materials (In re Superior Siding & Window)*, 14 F.3d 240, 242 (4th Cir. 1994) ("Once 'cause' is established, a court is required to consider this second question of whether to dismiss or convert"); *see also In re Warner*, 83 B.R. 807, 809 (Bankr. M.D. Fla. 1988).  A variety of factors demonstrate that, after the closing on the Debtor Transfer, it will be in the best interest of the Debtor's estate and its creditors to dismiss the Debtor's chapter 11 case.

63.     First, as noted above, upon the Debtor Transfer, the Debtor will have no creditors and there would be no purpose served in converting this case.

64.     Moreover, even if the Debtor did have a creditor or creditors, a dismissal of a chapter 11 bankruptcy case meets the best interests of the creditors test where a debtor has nothing to reorganize, and the debtor's assets have already become fully fixed and liquidated.

*See Camden Ordnance Mfg. Co. of Ark., Inc. v. U.S. Trustee (In re Camden Ordnance Mfg. Co. of Ark., Inc.)*, 245 B.R. 794, 799 (E.D. Pa. 2000) (reorganization to salvage business which ceased operating was unfeasible); *In re Brogdon Inv. Co.*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (court dismissed chapter 11 proceeding in part where there was "simply nothing to reorganize" and no reason to continue the reorganization). Upon the Debtor Transfer, the assets of the Debtor's estate will be fixed and liquidated.  As explained above, upon the consummation of the Debtor Transfer, the Debtor will have nothing left with which to pursue reorganization nor any material, non-insider claims in need of administration.  Thus, it is in the best interests of the Debtor's estate to dismiss the Debtor's chapter 11 proceeding because, upon the consummation of the Settlement, the Debtor's operations will cease and there will be no funds available to finance a plan.

65.    The best interests of the creditors test is also met where an interested party, other than the debtor, feels that dismissal is a proper disposition of the case.  *See Camden Ordnance Arkansas*, 245 B.R. at 798; *In re Mazzocone*, 183 B.R. 402, 414 (Bankr. ED. Pa. 1995) (Factors weighed more heavily in favor of dismissal of chapter 11 case rather than conversion to chapter 7, where debtor and United States Trustee both favored dismissal).  Significantly, Wells Fargo, by far the estate's largest (if not only) non-insider creditor, supports (and has requested by motion) the dismissal of this case – indeed, it is a requirement of the Settlement.  In addition, all of the Debtor's direct and indirect equity holders support dismissal.

66.    Moreover, in light of the Settlement, the Debtor no longer needs to utilize the bankruptcy process for any of its intended purposes.  Thus, the Debtor's bankruptcy proceeding should be dismissed because the major players in the Debtor's bankruptcy proceeding concur that dismissal is warranted and there is simply no benefit to continuing the case.

67.     Here, through the Debtor Transfer, the Debtor will have maximized the value of the Debtor's assets.  The Debtor is confident that the most significant assets have been liquidated, and that there is nothing further to pursue.

68.     While there were payments made to creditors within 90 days of the Petition Date, many of these potential preferential transfers appear to be subject to substantial defenses, including the ordinary course of business defense, and the Debtor believes that it would not be prudent to expend any amounts to pursue these contingent claims as there is limited cost benefit to the estate.[12]

69.     The best interest of the "estate" test focuses upon whether the economic value of the estate is greater inside or outside of bankruptcy.  *See In re Clark*, 1995 WL 495951, at *5 (N.D. Ill. 1995); *In re Staff Inv. Co.*, 146 B.R. 256, 261 (Bankr. E.D. Cal. 1993).  The prime criterion for assessing the interests of the estate is the maximization of its value as an economic enterprise.  *See id.* There is nothing left to administer because the Debtor, upon the Debtor Transfer, will have completed the sale of substantially all of its assets.  In other words, the liquidation of the Debtor's estate is a present reality.  The Settlement serves to maximize the value of the Debtor's estate.  In contrast, a conversion to chapter 7 would only impose substantial and unnecessary additional administrative costs, require the immediate entry of an order granting stay relief to Wells Fargo and failing to provide any meaningful prospect (let alone guarantee) to the estate and creditors that they would receive more consideration than provided under the Settlement.

---

[12] In addition, the Debtor is unaware of any fraudulent transfer or other possible avoidance actions that may exist.

70.     It is black letter law that the bankruptcy court maintains the power to monitor the tenor of reorganization proceedings. *See In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315 (1st Cir. 1993).  The Court, by granting the Motion will acknowledge and affirm the parties' cooperative efforts at reaching a solution that benefits all creditors within the confines of the Bankruptcy Code.  Allowing dismissal of the Debtor's bankruptcy case now simply furthers the Bankruptcy Code's goal of the efficient administration of the Debtor's estate that maximizes the return to the estate's stakeholders.

71.     In a balance of the equities, the Debtor submits that it has demonstrated that the Debtor's creditors and estate will be better served if the Debtor's case is dismissed.  Further, there are no unusual circumstances present that necessitate maintaining the chapter 11 case.  In order to maximize the potential return to stakeholders, this Court should dismiss the Debtor's chapter 11 case.  Further, in light of the fact that the Debtor will remain current on all its post-petition trade obligations through Closing on the Debtor Transfer, the Debtor submits that no prejudice to third parties will result from dismissing this chapter 11 case after the Closing Date as contemplated by the Settlement Agreement.

## J.     Dismissal is Also Warranted Under Section 305(a)(1) of the Bankruptcy Code

72.     Alternatively, cause exists to dismiss this chapter 11 case pursuant to section 305(a) of the Bankruptcy Code, which provides, in pertinent part:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if -
>
> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension;

11 U.S.C. § 305(a).

73.     In applying section 305(a), courts have considered a wide range of factors, including, but not limited to:

a.      economy and efficiency of administration;

b.      whether federal proceedings are necessary to reach a just and equitable solution;

c.      whether there is an alternative means of achieving an equitable distribution of assets; and

d.      whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves the interests in the case.

See In re Crown Village Farm, LLC, Case No. 09-11522 (KG), U.S. Bankr. LEXIS at *24 (Bankr. D. Del. June 12, 2009) (enumerating 305(a) factors and denying motion only because dismissal or abstention would have a deleterious effect on the administration of the debtor's chapter 11 case "which would languish while core issues were tried elsewhere"); see also In re Mazzocone, 200 B.R. 568, 575 (E.D. Pa. 1996).  However, "the exact factors to be considered and the weight to be given to each of them is highly sensitive to the facts of each individual case." Mazzocone, 200 B.R. at 575.

74.     Dismissal of this case is warranted under section 305(a)(1) for the same reasons that "cause" exists to dismiss this case pursuant to section 1112(b) – approval of the Settlement and dismissal of the case will effectuate an efficient administration of this estate and represent the least expensive and most equitable alternative for distribution of the Debtor's assets.

75.     The Settlement and dismissal of this case represents the parties' negotiated resolution of this chapter 11 case.  Authorizing the terms of the Settlement contemplated herein and allowing the dismissal of this chapter 11 case furthers the efficient administration of the Debtor's estate and the maximization of value for stakeholders.   Once the transactions

contemplated by the Settlement are consummated, there is no reason for these proceedings to continue.

76.     In sum, the Debtor submits that it has demonstrated that the Debtor's creditors and estate will be better served if the Debtor's case is dismissed.

**K.**     **Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

77.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease … is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

78.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.   See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).   Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, the leading Bankruptcy treatise suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."   10 *Collier on Bankruptcy* ¶ 6004.10 at 6004-18 (L. King, 15th rev. ed. 2008).   The treatise further provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

79.     As described above, a prompt closing of the Debtor Transfer is required under the Settlement Agreement and the Debtor requests that any Order approving the Settlement Agreement, the Debtor Transfer or the assumption and assignment of the Policies and Servicing

Files be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## **CONCLUSION**

80.    Based on the foregoing, the Debtor respectfully requests entry of the order in the form appended hereto as <u>Exhibit 2</u>, including authorizing the Debtor Transfer and assignment of the Policies and the Servicing Files to the Acquirer, rejecting the Servicing Agreement, authorizing the dismissal of this case, and providing such other relief as may be just and necessary under the circumstances.

DATED:  November 12, 2010

Respectfully Submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
4400 Miami Tower
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310

By:    /s/ Glenn D. Moses
        Glenn D. Moses, Esq.
        Florida Bar No. 174556
        gmoses@gjb-law.com
        Heather L. Harmon, Esq.
        Florida Bar No. 013192
        hharmon@gjb-law.com

        and

Gerald H. Gline, Esq. (admission *pro hac vice*)
ggline@coleschotz.com
David M. Bass, Esq. (admission *pro hac vice*)
dbass@coleschotz.com
COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Facsimile:  (201) 489-1536
Co-Counsel for QOC I LLC, Debtor and Debtor-in-Possession

## <u>CERTIFICATE OF SERVICE AND ADMISSION</u>

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualification to practice in this Court set forth in Local Rule 2090-1(A).  **I FURTHER CERTIFY** that a true copy of the foregoing Motion was served upon all creditors and interest parties set forth on the attached service list on this 12th day of November, 2010.

By:___/s/ Glenn D. Moses_____
　　　Glenn D. Moses, Esq.

```
Label Matrix for local noticing        QOC 1 LLC                              Wells Fargo Bank, N.A.
113C-9                                  5901 Broken Sound Parkway, NW         Attn: R. Gilbert/F. Chantayan Esqs
Case 10-40153-PGH                       Suite 200                            525 Okeechobee Blvd #1200
Southern District of Florida            Boca Raton, FL 33487-2725             West Palm Beach, FL 33401-6350
West Palm Beach
Fri Nov 12 15:47:06 EST 2010

Wells Fargo Securities, LLC             American Infosource Lp As Agent for   Delaware Division of Revenue
Attn: R. Gilbert & F. Chantayan Esqs    T Mobile/T-Mobile USA Inc            8th Floor
525 Okeechobee Blvd #1200               PO Box 248848                        820 N. French Street
West Palm Beach, FL 33401-6350          Oklahoma City, OK  73124-8848         Wilmington, DE 19801-3509


Deloitte Tax LLP                        Habersham Funding, LLC                Internal Revenue Service
Deloitte Tax LLP 200 South Biscayne Blvd Building 11, Piedmont Center          7850 Sw 6th Ct
Miami, FL 33131-2310                    3495 Piedmont Road NE, Suite 910      Plantation, FL 33324-3210
                                        Atlanta, GE 30305


Mayer Brown LLP                         Office of the US Trustee              Q Capital Strategies, LLC
230 South LaSalle Street                51 S.W. 1st Ave.                     5901 Broken Sound Parkway, NW
Chicago, IL 60604-1404                  Suite 1204                           Suite 200
                                        Miami, FL 33130-1614                  Boca Raton, FL 33487-2725


Securities And Exchange Commission      State Of Florida Department Of Revenue Towers Watson Risk Consulting, Inc
3475 Lenox Road N.E. # 1000             Po Box 6668                          901 North Glebe Road
Atlanta, GA 30326-3235                  Tallahassee, FL 32314-6668            Arlington, VA 22203-1853


United States Trustee - Miami           Wells Fargo Bank NorthWest NA         David M Bass
51 SW 1st Ave # 1204                    One Wachovia Center                  25 Main St
Miami, FL 33130-1614                    301 South College Street             Hackensack, NJ 07601-7015
                                        Charlotte, NC 28202-6002


Gerald H Gline                          Glenn D Moses Esq                     Heather L Harmon Esq
25 Main St                              100 SE 2 St #4400                    100 S.E 2 St #4400
Court Plaza N                           Miami, FL 33131-2118                  Miami, FL 33131-2118
Hackensack, NJ 07601-7015
```

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

```
(u)West Palm Beach                      End of Label Matrix
                                        Mailable recipients    20
                                        Bypassed recipients     1
                                        Total                  21
```

## **EXHIBIT 1**

(Settlement Agreement, w/o List of Policies)

**EXECUTION COPY**

SETTLEMENT AND SALE AGREEMENT

dated as of November 8, 2010

by and among

QOC I LLC, as debtor,
Q OPPORTUNITY COMPANY LLC, as equity contributor,
Q CAPITAL STRATEGIES, LLC, as servicer and as loan manager,
LSE HOLDINGS LLC,
FOURTH THIRD LLC,
MEDLEY OPPORTUNITY FUND, LTD.,
MEDLEY OPPORTUNITY FUND, LP,

WELLS FARGO SECURITIES LLC,
as administrative agent

and

WELLS FARGO BANK, N.A., in its capacities as custodian,
lender, securities intermediary and hedge counterparty

TABLE OF CONTENTS

PAGE

1.    RECITALS; DEFINITIONS ............................................................................................ 2

    1.1    Recitals.......................................................................................................... 2
    1.2    Certain Definitions ........................................................................................ 2
    1.3    Loan Agreement Definitions.......................................................................... 9
    1.4    Interpretation ................................................................................................. 9

2.    SALE OF SALE ASSETS ............................................................................................ 10

3.    RELEASES .................................................................................................................. 11

4.    EFFECTIVENESS; CLOSING OF SALE ..................................................................... 11

    4.1    Conditions Precedent to Effectiveness.......................................................... 11
    4.2    Time and Place of Sale; Extension ............................................................... 13
    4.3    Conditions Precedent .................................................................................... 13
    4.4    Closing Costs ................................................................................................ 14

5.    REPRESENTATIONS AND WARRANTIES................................................................... 14

    5.1    Representations of the Q Parties ................................................................... 14
    5.2    Representations of the Lender Parties............................................................ 16

6.    PERFORMANCE OF OBLIGATIONS PRIOR TO CLOSING ...................................... 17

    6.1    Maintenance of Property................................................................................ 17
    6.2    Contracts; Protective Advance....................................................................... 17
    6.3    Sales .............................................................................................................. 17
    6.4    Personal Property .......................................................................................... 17
    6.5    Reporting....................................................................................................... 17
    6.6    Bankruptcy Actions ...................................................................................... 17
    6.7    Implementing Agreement; Filings and Consents; Cooperation.......................... 18
    6.8    Suspension of Litigation on Contested Proceedings....................................... 18
    6.9    Extension of Interim Cash Collateral Order ................................................. 19

7.    INDEMNIFICATION..................................................................................................... 19

    7.1    Indemnification of Lender Parties ................................................................. 19

8.    NATURE OF TRANSACTION ...................................................................................... 19

    8.1    Unconditional and Absolute Transfer............................................................ 19
    8.2    Rights and Remedies Reserved...................................................................... 20
    8.3    No Assumption of Obligations ...................................................................... 20
    8.4    Equivalent Value ........................................................................................... 20
    8.5    Consideration ................................................................................................ 20

9.    ADDITIONAL OBLIGATIONS...................................................................................... 21

    9.1    Generally....................................................................................................... 21
    9.2    Books and Records ........................................................................................ 21

10.   RIGHT TO DISPOSE OF THE SALE ASSETS .......................................................... 21

11.   NET PROCEEDS ......................................................................................................... 22

TABLE OF CONTENTS
(cont'd)

PAGE

| | | | |
|---|---|---|---|
| | 11.1 | Net Proceeds | 22 |
| | 11.2 | Clawback | 23 |
| | 11.3 | Reports | 23 |
| | 11.4 | Triggering Events | 23 |
| | 11.5 | No Partnership | 24 |
| | 11.6 | Assignment | 24 |
| | 11.7 | Survival | 24 |
| 12. | | EFFECTIVENESS OF THIS AGREEMENT; TERMINATION | 24 |
| | 12.1 | Termination Events | 24 |
| | 12.2 | Remedies | 25 |
| | 12.3 | Effects of Termination | 25 |
| | 12.4 | No Prejudice | 26 |
| 13. | | MISCELLANEOUS | 26 |
| | 13.1 | Successors and Assigns | 26 |
| | 13.2 | Counterparts; Electronic Delivery | 26 |
| | 13.3 | Governing Law; Consent to Jurisdiction; Waiver of Objection to Venue; Service of Process | 26 |
| | 13.4 | Entire Agreement | 27 |
| | 13.5 | Amendments; Survival | 27 |
| | 13.6 | No Assumption of Liabilities | 28 |
| | 13.7 | Further Assurances | 28 |
| | 13.8 | Remedies; No Waiver | 28 |
| | 13.9 | Notices | 28 |
| | 13.10 | Captions | 30 |
| | 13.11 | Severability | 30 |
| | 13.12 | Business Day | 30 |
| | 13.13 | Settlement | 30 |
| | 13.14 | Confidentiality | 30 |
| | 13.15 | Waiver of Right to Jury Trial | 31 |

EXHIBITS:

| | |
|---|---|
| Exhibit A | Bill of Sale |
| Exhibit B | Form of General Assignment of Rights |
| Exhibit C | Form of Approval Order |
| Exhibit D | List of Policies to be Transferred as Part of Sale Assets |

## SETTLEMENT AND SALE AGREEMENT

This SETTLEMENT AND SALE AGREEMENT (this "Agreement") is entered into as of the 8 day of November, 2010 by and among: (1) QOC I LLC, a Delaware limited liability company (the "Debtor"); (2) Q OPPORTUNITY COMPANY LLC, a Delaware limited liability company, as the equity contributor (the "Equity Contributor"); (3) Q CAPITAL STRATEGIES, LLC, a Delaware limited liability company, as the servicer (the "Servicer"); (4) Q CAPITAL STRATEGIES, LLC, a Delaware limited liability company, as the loan manager (the "Loan Manager"); (5) LSE HOLDINGS LLC, a Delaware limited liability company ("LSE Holdings"); (6) FOURTH THIRD LLC, a Delaware limited liability company ("Fourth Third"); (7) MEDLEY OPPORTUNITY FUND, LTD., a Cayman Islands limited company ("MOF Cayman"); (8) MEDLEY OPPORTUNITY FUND, LP, a Delaware limited partnership ("MOF US"); (9) WELLS FARGO SECURITIES LLC, as the administrative agent (together with its successors and assigns in such capacity, the "Administrative Agent"); (10) WELLS FARGO BANK, N.A., as the custodian (together with its successors and assigns in such capacity, the "Custodian") and securities intermediary (together with its successors and assigns in such capacity, the "Securities Intermediary"); and (11) WELLS FARGO BANK, N.A., as the lender and hedge counterparty (together with its successors and assigns in such capacities, the "Lender" and "Hedge Counterparty", respectively).

## RECITALS

A.      Pursuant to the terms of that certain Loan and Security Agreement dated as of May 9, 2008 (as from time to time amended, supplemented or otherwise modified, the "Loan Agreement") made by and among the Debtor, the Equity Contributor, the Servicer, the Loan Manager, the Administrative Agent, the Custodian and the Lender, the Lender extended loans and other financial accommodations to the Debtor, secured by perfected security interests in substantially all of the assets of the Debtor (as more fully described and defined in the Loan Agreement, the "Collateral").

B.      The Debtor's obligations under the Loan Agreement and the other Transaction Documents are secured by, among other things, a valid, perfected and first priority security interest in and lien upon the Collateral.

C.      Certain Termination Events have occurred and are continuing.

D.      On October 1, 2010 (the "Petition Date"), the Debtor filed its voluntary petition for relief, commencing a case (Case No. 10-40153) (the "Case"), under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "Bankruptcy Court").

E.      As of the Petition Date, pursuant to the Loan Agreement and the other Transaction Documents, the Debtor was indebted to the Lender Parties in the aggregate amount of at least $138,381,710.60.

F.      The Debtor has moved for authority to use the Lender's cash collateral (the "Cash Collateral").

G.       Pursuant to the provisions of an Interim Order Authorizing the Debtor's Use of Cash Collateral Pursuant to 11 U.S.C. § 362(c)(2) and Fed. R. Bankr. P. 4001 and Scheduling Final Hearing Date (the "Interim Cash Collateral Order"), entered in the Case on October 8, 2010, the Bankruptcy Court authorized, on an interim basis, the Debtor's use of Cash Collateral for the period through October 31, 2010.

H.       The Administrative Agent and the Lender have moved the Bankruptcy Court for entry of orders (a) granting relief from the automatic stay pursuant to Sections 362(d)(1) and 362(d)(2) of the Bankruptcy Code in order to permit the Administrative Agent to exercise remedies in, to, and against the Collateral and (b) dismissing the Case.

I.       The final hearing on the Debtor's motion for authority to use cash collateral, as well as hearings on the Administrative Agent and Lender's motions for relief from the automatic stay and to dismiss the Case are currently scheduled before the Bankruptcy Court on November 8, 2010 at 9:30 a.m.

J.       As the parties prepare for such hearings, they have engaged in settlement negotiations in an attempt not only to resolve the pending motions, but also various matters as to the existing relationship between the parties.

K.       As a result of such negotiations, the parties have tentatively agreed to settle all such matters primarily through the transfer of the Collateral, free and clear of all claims, liens, and encumbrances under Sections 363(b) and (f) and Section 365 of the Bankruptcy Code, to a designee of the Administrative Agent and the Lender in return for a defined contingent payment right, but only upon and subject to the terms and conditions set forth herein, including appropriate Bankruptcy Court authorization and approval thereof.

**AGREEMENT**

In consideration of the mutual promises, agreements, covenants and undertakings contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**1.       RECITALS; DEFINITIONS.**

**1.1       Recitals**

The recitals set forth hereinabove are incorporated herein and form an integral part of this Agreement.

**1.2       Certain Definitions**

As used in this Agreement, the terms set forth below shall have the following meanings:

"Acquirer" shall mean the Person designated in writing by the Administrative Agent to the Debtor prior to the Closing Date as the Person to which the Sale Assets are to be transferred.

2

"Administrative Agent" shall have the meaning set forth in the introduction.

"Agreement" shall have the meaning set forth in the introduction.

"Approval Order" shall have the meaning set forth in Section 4.1(c).

"Assigned Contracts" shall have the meaning set forth in Section 6.6(c).

"Assignment Notice" shall have the meaning set forth in Section 4.1(b)(i).

"Bankruptcy Code" shall have the meaning set forth in the recitals.

"Bankruptcy Court" shall have the meaning set forth in the recitals.

"Bill of Sale" means that certain Bill of Sale in the form attached hereto as Exhibit A.

"Binding Sale Commitment" shall have the meaning set forth in Section 11.1.

"Borrowing Parties" shall mean the Debtor, the Equity Contributor, the Servicer, and the Loan Manager.

"Case" shall have the meaning set forth in the recitals.

"Cash Collateral" shall have the meaning set forth in the recitals.

"Claim" shall have the meaning set forth in Section 3(a).

"Closing" means the closing of the transfer of the Sale Assets to the Acquirer pursuant to the Sale.

"Closing Date" shall have the meaning set forth in Section 4.2.

"Contingent Payment" shall have the meaning set forth in Section 11.1.

"Custodian" shall have the meaning set forth in the introduction.

"Debtor" shall have the meaning set forth in the introduction.

"Debtor Designee" means the Person who is a Q Party or an affiliate of a Q Party designated by the Debtor in writing to the Administrative Agent prior the Closing Date as the recipient of any Contingent Payment.

"Derivative/Successor Person" shall mean, with respect to any Person, its directors, officers, employees, agents, representatives, attorneys, board member, shareholder, member, partner, parent, subsidiary, partnerships, joint venture, other affiliate, predecessors, successors and assigns.

"Effective Date" shall have the meaning set forth in Section 4.1.

1523918 07155624

"Effectiveness Deadline" shall have the meaning set forth in Section 4.1.

"End Date" shall mean December 20, 2012.

"Equity Contributor" shall have the meaning set forth in the introduction.

"Excepted Persons" shall have the meaning set forth in Section 13.14.

"Existing Privacy Policies" shall have the meaning assigned thereto in Section 5.1(n).

"Fourth Third" shall have the meaning set forth in the introduction.

"General Assignment" means that certain General Assignment of Rights in the form attached hereto as Exhibit B.

"Hedge Counterparty" shall have the meaning set forth in the introduction.

"Increased Costs" shall mean such additional amount or amounts as will compensate any Lender Party for:

(a) additional or increased cost incurred or any reduction suffered if either (i) the introduction of or any change (including, without limitation, any change by way of imposition or increase of reserve requirements) in or in the interpretation of any Applicable Law or (ii) the compliance by any Lender Party with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), shall (x) subject any Lender Party to any Tax, duty or other charge with respect to any interest in the Sale Assets, or any right or obligation to make advances or payments with respect thereto, (y) impose, modify or deem applicable any reserve requirement (including, without limitation, any reserve requirement imposed by the Board of Governors of the Federal Reserve System), special deposit or similar requirement against assets of, deposits with or for the amount of, or credit extended by, any Lender Party in connection with the Sale Assets or (z) impose any other condition affecting the ownership of the Sale Assets conveyed to or for the benefit of the Lender Parties under the Settlement Documents or any Lender Party's rights under the Settlement Documents, the result of which is to increase the cost to any Lender Party or to reduce the amount of any sum received or receivable by any Lender Party in respect of the Policies, the other Sale Assets or any Subsequent Sale;

(b) additional or increased cost incurred or any reduction suffered if either (i) the introduction of or any change in or in the interpretation of any law, guideline, rule, regulation, directive or request or (ii) compliance by any Lender Party with any Applicable Law, guideline, rule, regulation, directive or request from any central bank or other Governmental Authority or agency (whether or not having the force of law), including, without limitation, compliance by any Lender Party with any request or directive regarding capital adequacy, has or would have the effect of reducing the rate of return on the capital of any Lender Party as a consequence of its obligations under the Settlement Documents or arising in connection with the Sale Assets or the Settlement

4

Documents to a level below that which any such Lender Party could have achieved but for such introduction, change or compliance (taking into consideration the policies of such Lender Party with respect to capital adequacy);

(c) if as a result of any event or circumstance similar to those described in clause (a) or (b) of this definition, any Lender Party is required to compensate a bank or other financial institution providing liquidity support, credit enhancement or other similar support to such Lender Party in connection with the funding or maintenance of the Policies or the other Sale Assets hereunder;

it being understood and agreed that, in determining any amount provided for in this definition, a Lender Party may use averaging and attribution methods.

"Indemnified Parties" shall have the meaning set forth in Section 7.1.

"Interim Cash Collateral Order" shall have the meaning set forth in the recitals

"Lender" shall have the meaning set forth in the introduction.

"Lender Parties" means the Administrative Agent, the Lender, the Funding Agents, the Hedge Counterparty, the Custodian, the Securities Intermediary and the Acquirer.

"Lender Party Basis" shall mean, at any time, the sum of the Lender Party Claims, the Lender Party Expenses and the Lender Party Yield.

"Lender Party Claims" means the sum, determined as of any point in time and without duplication, of (i) the aggregate unpaid principal of Advances, (ii) amounts payable under the Hedging Agreements, including Hedge Breakage Costs, (iii) costs and expenses of the Lender Parties, including fees and expenses of attorneys and consultants, required to be reimbursed under the Transaction Documents, (v) interest (including default interest) accrued on all of the foregoing and (vi) all other amounts required to be paid to the Lender Parties under the Transaction Documents.

"Lender Party Expenses" shall mean all reasonable fees, costs and expenses in connection with the ownership, maintenance, servicing and administration of the Policies and the other Sale Assets incurred by the Lender Parties or paid out of the Accounts on or after the Petition Date, including, without limitation, the sum of the following:

(i)     Premium and any other amounts paid to the Issuing Insurance Companies;

(ii)     the Servicing Fees, fees, indemnities and expenses paid to the Servicer or any successor servicer pursuant to the Loan Agreement, Servicing Agreement or any servicing agreement with a successor servicer;

(iii)     Backup Servicing Fees, fees, indemnities and expenses paid to the Backup Servicer or any successor Backup Servicer under the Backup Servicing Agreement or any backup servicing agreement with a successor backup servicer;

5

(iv)    Custodian Fees, fees, indemnities and expenses paid to the Custodian or any successor custodian pursuant to the Custody Agreement or any custody agreement with a successor custodian;

(v)    the cost to obtain Life Expectancy reports, medical information or market valuations of any Policies or other Sale Assets, to communicate with Insureds, Policy sellers or their representatives, to track the death of Insureds, to obtain and prepare documents in connection with making claims for Death Benefits, and any other costs, fees and expenses in connection with the maintenance, servicing and administration of the Policies or other Sale Assets;

(vi)    Valuation Agent fees, fees, indemnities and expenses paid to the Valuation Agent or any successor valuation agent pursuant to the Valuation Agent Agreement or any agreement with a successor valuation agent;

(vii)    accounting expenses in respect of the Policies, the other Sale Assets or the Acquirer;

(viii)    broker, advisor and/or investment banker fees, commissions, indemnities and expenses (including fees, commissions and expenses to Wells Fargo Securities, LLC or any Affiliate of the Lender Parties), including, without limitation, advertising, printer costs, attorneys' fees and due diligence expenses, paid in connection with any sale or any other potential sale, participation, or securities offering of, involving or secured by the Policies or any of the other Sale Assets (regardless of whether such sale participation or securities offering was completed and regardless of whether other policies are included in the sale, participation or securities offering);

(ix)    attorneys' fees and expenses, including fees attributable to in-house counsel to any Lender Party, with respect to:

(A)    negotiation of (i) the Settlement Documents and (ii) the extension and amendment of the Loan Agreement and the other Transaction Documents, whether or not consummated;

(B)    the occurrence of the  Termination Event under the Loan Agreement and the exercise or potential exercise of remedies with respect thereto;

(C)    the Case, including without limitation costs and expenses of all appearances, motions, pleadings, depositions, expert witness fees, including fees to Towers Watson Risk Consulting, Inc. and FTI Consulting, Inc.;

(D)    negotiation of any potential sale of all or any portion of the Policies or other Sale Assets (regardless of whether closed and regardless of whether other life insurance policies are included in the sale);

(E)    any proceeding, claim or challenge with respect to any Policy or life settlement/viatical agreement or agreement delivered pursuant thereof or in connection therewith by any Insured, Policy seller, Issuing Insurance Company,

6

the estate or any heir of any Insured, any Governmental Authority or any other Person;

(F)    any negotiation, proceeding or claim by, with respect to or involving the Servicer, Backup Servicer, Valuation Agent, Custodian, any successor thereto, or any other servicer provider involved with the servicing, maintenance or management of the Policies, other Sale Assets or the Acquirer;

(G)    any proceeding with respect to the Loan Agreement, any other Transaction Document or any Settlement Document;

(H)    any personal injury or property damage suit or other similar or related claim or action of whatever sort arising out of or in connection with the Sale Assets or services that are the subject of any Sale Assets;

(I)    any financing transaction to fund Premium and/or expenses in connection with the maintenance, servicing or administration of the Policies or other Sale Assets;

(J)    the enforcement of the Loan Agreement, this Agreement or any agreement with the Servicer, a successor servicer, Backup Servicer, successor Backup Servicer, Custodian, successor custodian, Valuation Agent, successor valuation agent, or any other service provider with respect to the maintenance, servicing or administration of the Policies or the other Sale Assets;

(x)    any Adverse Regulatory Determination with respect to any Lender Party;

(xi)    any proceeding, claim or challenge with respect to any Policy or life settlement/viatical agreement or agreement delivered pursuant thereof or in connection therewith by any Insured, Policy seller, Issuing Insurance Company, the estate or any heir of any Insured, any Governmental Authority or any other Person;

(xi)    any proceeding or claim with respect to or involving the Servicer, Backup Servicer, Valuation Agent, Custodian, any successor thereto, or any other servicer provider involved with the servicing of the Policies or other Sale Assets;

(xii)    any products liability claim or personal injury or property damage suit or other similar or related claim or action of whatever sort arising out of or in connection with the Sale Assets or services that are the subject of any Sale Assets;

(xiii)    interest, fees, and expenses paid to any other lender or financing party or service provider in any financing transaction to fund Premium and/or expenses in connection with the maintenance of the Policies or other Sale Assets;

(xiv)    Taxes incurred by any Lender Party in connection with ownership, maintenance or sale of the Sale Assets; and

(xv)    Increased Costs.

7

"Lender Party Yield" shall mean yield on all Lender Party Claims and Lender Party Expenses, commencing as of the Petition Date and determined at the rate of 14% per annum on the basis of actual days and a 360-day year, compounded quarterly.

"Loan Agreement" shall have the meaning set forth in the recitals.

"Loan Manager" shall have the meaning set forth in the introduction.

"LSE Holdings" shall have the meaning set forth in the introduction.

"Medley Parties" means MOF Cayman, MOF US, Fourth Third, the Equity Contributor and LSE Holdings.

"MOF Cayman" shall have the meaning set forth in the introduction.

"MOF US" shall have the meaning set forth in the introduction.

"Net Proceeds" shall mean an amount equal to:

(a) the aggregate cash purchase price actually received by the Lender Parties on or after the date hereof through the date of the last Subsequent Sale occurring prior to the End Date in connection with all Subsequent Sales, minus

(b) the sum of (i) the Lender Party Claims, (ii) the Lender Party Expenses and (iii) the Lender Party Yield, as reduced by the aggregate Death Benefits in respect of the Policies actually received by the Lender Parties on or after the date hereof through the date of the last Subsequent Sale occurring prior to the End Date.

The amount of the Net Proceeds, Lender Party Claims, Lender Party Expenses, Lender Party Yield and Death Benefits shall be determined by the Lender in its sole discretion, and shall be binding on the parties hereto absent manifest error. Any objection by the Debtor Designee to such calculation for any calendar quarter must be delivered to the Lender Parties in writing within 30 days of receipt by the Debtor Designee of the Quarterly Report for such quarter.

"Person" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

"Petition Date" shall have the meaning set forth in the recitals.

"Process Agent" shall have the meaning set forth in Section 13.3.

"Q Parties" shall mean the Debtor, the Equity Contributor, the Servicer, the Loan Manager, LSE Holdings, Fourth Third, MOF Cayman, MOF US and the Debtor Designee.

"Quarterly Report" shall have the meaning set forth in Section 11.3.

"Released Party" shall have the meaning set forth in Section 3(a).

"Sale" shall have the meaning set forth in Section 2.

"Sale Assets" shall have the meaning set forth in Section 2.

"Sale Assets Servicer" shall mean Q Capital Strategies, LLC or another servicing firm acceptable to the Lender Parties in their sole and absolute discretion.

"Sale Assets Servicing Agreement" shall mean the agreement relating to the servicing of the Sale Assets after the Closing Date between the Sale Assets Servicer and the Acquirer, in form and substance acceptable to the Lender Parties in their sole and absolute discretion.

"Securities Intermediary" shall have the meaning set forth in the introduction.

"Servicer" shall have the meaning set forth in the introduction.

"Settlement and Sale Motion" shall have the meaning set forth in Section 6.6(a).

"Settlement Documents" means this Agreement, the Bill of Sale, the General Assignment, the Assignment Notices, and the other documents required to be executed by the Q Parties and the Lender Parties, as applicable, in connection herewith.

"Subsequent Sale" shall have the meaning set forth in Section 11.1.

"Termination Event" shall have the meaning set forth in Section 12.1.

"Third Party Buyer" shall mean a Person that (i) is not an Affiliate of Wells Fargo Bank, N.A., and (ii) acquires ownership of all or part of the Sale Assets in a Subsequent Sale occurring prior to the End Date.

"Triggering Events" shall have the meaning set forth in Section 11.4.

**1.3    Loan Agreement Definitions**

Capitalized terms used but not otherwise defined herein have the respective meanings assigned thereto in the Loan Agreement.

**1.4    Interpretation**

The use of the masculine, feminine or neuter gender or the singular or plural form of words herein shall not limit any provision of this Agreement. The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively. Reference to any Person includes such Person's successors and assigns to the extent such successors and assigns are permitted by the terms of this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually. Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof. Reference to

9

any law means such law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect on the date hereof, including rules, regulations, enforcement procedures and any interpretations promulgated thereunder. Underscored references to Sections, clauses, Exhibits or Schedules shall refer to those portions of this Agreement, and any underscored references to a clause shall, unless otherwise identified, refer to the appropriate clause within the same Section in which such reference occurs. The use of the terms "hereunder", "hereof", "hereto" and words of similar import shall refer to this Agreement as a whole and not to any particular Section or clause of or Exhibit or Schedule to this Agreement. All terms defined in this Agreement shall have the above-defined meanings when used in any certificate, report or other document made or delivered pursuant to this Agreement, unless the context therein shall clearly otherwise require. In the computation of periods of time in this Agreement from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to, but not through". This Agreement and the other documents relating to this Agreement are the result of negotiations among and have been reviewed by counsel to the parties, and are the products of all parties. Accordingly, they shall not be construed against (or in favor of) any party merely because of such party's involvement (or non-involvement, as the case may be) in their preparation.

## 2.     SALE OF SALE ASSETS.

On the Closing Date, and effective upon the timely satisfaction of the conditions precedent set forth in Section 4.2, (i) the Debtor hereby agrees to sell, convey, transfer and assign all of its right, title and interest in and to the Collateral (the "Sale Assets") to the Acquirer, for the benefit of the Lender Parties, and the Acquirer (for the benefit of the Lender Parties) shall purchase the Sale Assets from the Debtor, free and clear of all "claims" (as defined in the Bankruptcy Code) and Liens (other solely than the Lien of the Administrative Agent for the benefit of the Lender Parties in and to the Sale Assets), pursuant to Sections 363(b) and (f) and 365 of the Bankruptcy Code (the "Sale"), (ii) the Servicer agrees that it will terminate its activities as Servicer under the Transaction Documents in a manner that the Administrative Agent believes will facilitate the transition of the performance of such activities to a successor servicer, and the Servicer shall use its reasonable best efforts to assist the successor servicer in assuming the servicing of the Sale Assets and (iii) the Loan Manager agrees that it will terminate its activities as Loan Manager under the Loan Agreement in a manner that the Administrative Agent believes will facilitate the transition of the performance of such activities to an administrator for the Acquirer, and the Loan Manager shall use its reasonable best efforts to assist the administrator for the Acquirer in assuming such activities. The Q Parties shall cooperate with the Administrative Agent and the other Lender Parties in taking all steps and executing or furnishing all documents reasonably necessary for the conduct of the Sale, the transition of such servicing and management functions and the prompt and peaceful turnover and surrender of possession, custody and control of Servicing Files, Records and other Sale Assets including the submission of affidavits or other documentation, or the furnishing of consents thereto.

With the understanding that the Existing Privacy Policies are not intended to limit the possible marketing of the Sale Assets after the Closing Date by the Acquirer to potential Third Party Buyers, financing sources, or joint venture members pursuant to confidentiality agreements, the Lender Parties, after the Closing Date, will hereby undertake to cause the

10

Acquirer to implement and adhere to privacy policies with respect to the Sale Assets substantially similar to the Existing Privacy Policies.

3.    **RELEASES**.

      (a)    Effective upon the Effective Date, and in consideration of the Lender Parties' entering into this Agreement, each of the Q Parties, on behalf of itself and its Derivative/Successor Persons, hereby knowingly and voluntarily, irrevocably and unconditionally releases, acquits and forever discharges the Lender Parties and all of their respective former, current and future officers, directors, employees, agents, representatives, attorneys, subsidiaries, parents, partnerships, joint ventures, other affiliates, predecessors, successors and assigns (collectively, the "Released Parties") from any and against any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred) of any nature, kind or character whatsoever, whether known or unknown, suspected or unsuspected, asserted or unasserted, direct or indirect, at law or in equity relating in any way to the Transaction Documents, the Settlement Documents, the Sale, the Case or the Collateral from the beginning of time through the Closing Date (each a "Claim"). Without limiting the generality of the foregoing, each of the Q Parties, on behalf of itself and its Derivative/Successor Persons, specifically releases any and all Claims it has or may have with respect to any action (or omission) any Released Party engaged in with respect to the Transaction Documents, the Settlement Documents, the Sale, the Case and the Collateral. Notwithstanding the foregoing, nothing contained herein shall release or be deemed to release any Claim (i) relating to the breach by the Released Parties of their obligations under this Agreement after the Closing Date or (ii) of any Q Party that is wholly unrelated to the Transaction Documents, the Settlement Documents, the Sale, the Case, or the Collateral.

      (b)    Each Q Party hereby represents and warrants, on behalf of itself and its Derivative/Successor Persons, that, as of the date hereof, it has no Claims against any Released Party, except such Claims as may exist under this Agreement after the Closing Date or as may be wholly unrelated to the Transaction Documents, the Sale, the Case, or the Collateral.

      (c)    Each Q Party, on behalf of itself and its Derivative/Successor Persons, hereby acknowledges and agrees that the release, representations and warranties and acknowledgments contained in this Agreement are material inducements for the entry into the Settlement Documents by each of the Lender Parties, without which none of the Lender Parties would be willing to enter into this Agreement.

      (d)    Effective upon and as of the consummation of the transactions contemplated hereby (including the consummation of the Sale) prior to the Effectiveness Deadline, and in consideration of the Q Parties' entering into this Agreement, each of the Lender Parties hereby knowingly and voluntarily, irrevocably and unconditionally releases MOF Cayman and MOF US from their obligations under the September 14, 2009 Policy Purchase Agreement among them, the Debtor and the Administrative Agent pertaining to certain policies issued by Phoenix Life Insurance Company.

4.    **EFFECTIVENESS; CLOSING OF SALE**.

1523918 07155624

**4.1    Conditions Precedent to Effectiveness.** Notwithstanding any other provision of this Agreement to the contrary, the provisions of Sections 2 and 3 of this Agreement shall become effective only upon the date (the "Effective Date") when all of the following conditions precedent have been satisfied in full (or expressly waived in writing by the Lender Parties) so long as such satisfaction or waiver occurs on or before 5:00 p.m., prevailing Eastern time, on December 20, 2010 (the "Effectiveness Deadline"):

(a)    This Agreement. Each party hereto shall have received a counterpart of this Agreement, which has been executed by each Lender Party and each Q Party on or prior to November 7, 2010.

(b)    Closing Documents. The Administrative Agent shall have received all of the following documents, instruments and items, each in form and substance satisfactory to the Administrative Agent and its counsel:

(i)    notices to each Issuing Insurance Company of the Acquirer's ownership in each Policy transferred to the Acquirer hereunder, in the form required by each Issuing Insurance Company or such other form as shall have been approved in writing by the Administrative Agent (such notice being an "Assignment Notice"), and executed and delivered by the Debtor;

(ii)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of officers of each Q Party (other than the Debtor) as the Administrative Agent may require evidencing the identity, authority and capacity of each officer thereof authorized to act in connection with this Agreement and the other Settlement Documents to which such Q Party is a party;

(iii)    such documents and certifications as the Administrative Agent may reasonably require to evidence that each Q Party is duly organized or formed, and that each Q Party is validly existing and in good standing in its jurisdiction of organization;

(iv)    a favorable opinion of external counsel to the Q Parties (other than the Debtor), addressed to each Lender Party, as to the due authorization and enforceability of the Settlement Documents and such similar matters as the Administrative Agent may reasonably request;

(v)    evidence that the Process Agent has accepted its appointment as service of process agent on behalf of the Q Parties;

(vi)    evidence that the Debtor shall have obtained all necessary consents, if any, with respect to the transfer of the Sale Assets; and

(vii)    such other assurances, certificates, documents, consents or opinions as the Administrative Agent or any other Lender Party may reasonably require.

(c)    Bankruptcy Court Order Approving this Agreement. The Bankruptcy Court, upon appropriate notice and opportunity for hearing, shall have entered an order (the

"Approval Order"), in the form of Exhibit C or otherwise in form and substance satisfactory to the Lender Parties and their counsel,  under Sections 105(a), 363(b) and (f) and 365 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 9019, 2002, 6004 and 6006, authorizing, approving or directing (as the case may be) (i) the settlement set forth herein (including the form and content of the Settlement Documents) and the transactions contemplated hereby (including the Sale of the Sale Assets free and clear of claims, Liens and encumbrances other than solely the Lien of the Administrative Agent for the benefit of the Lender Parties), (ii) the voluntary dismissal of the Case by the Debtor within thirty days following the Closing, and (iii) the issuance of an injunction (as part of such dismissal order) prohibiting the Debtor and the Q Parties from commencing any subsequent bankruptcy proceedings involving the Debtor under any chapter of the Bankruptcy Code without the prior, express written consent of the Lender for a period of at least twelve (12) months following the date of the dismissal of the Case; and such Approval Order shall have been entered no later than December 10, 2010 and shall have then become final and nonappealable unless such nonappealability requirement is expressly waived and shall not have otherwise been stayed by any order of the Bankruptcy Court or of any other court.  For the avoidance of doubt, the parties hereto acknowledge and agree that all Death Benefits that may become payable or are paid on or after the date hereof are Collateral (and specifically, Cash Collateral) and as a result are Sale Assets, and are required to be conveyed to the Acquirer along with all other funds in the Accounts, unless the Lender Parties shall agree in writing that any portion of such funds may be used to pay Premiums due in November or December 2010.

4.2    **Time and Place of Sale; Extension**.  The Sale shall take place no later than December 20, 2010 (such date, as may be extended as provided herein is herein referred to as the "Closing Date").  The Administrative Agent and the other Lender Parties shall also have the right to extend such date, in their sole and absolute discretion.  Time is of the essence with respect to the Q Parties' performance of their obligations hereunder.

4.3    **Conditions Precedent**.

(a)    Conditions Precedent to Obligations of the Lender Parties.  It shall be conditions precedent to the obligations of the Administrative Agent and the Lender Parties to consummate the Sale that (A) the Effective Date shall have occurred and the Approval Order shall not otherwise have been stayed by any order of the Bankruptcy Court or by any other court and (B) the Administrative Agent shall have received all of the following documents, instruments and items, each in form and substance satisfactory to the Administrative Agent and its counsel:

(i)    the Bill of Sale duly executed by the Debtor;

(ii)    the General Assignment duly executed by the Debtor;

(iii)    the Sale Assets Servicing Agreement executed by the Sale Assets Servicer; and

13

(iv)    subject to <u>Section 9.1</u>, such further documents and information as may be reasonably requested by the Administrative Agent from the Q Parties with respect to the Q Parties and/or the Sale Assets.

(b)    <u>Administrative Agent's Closing Deliveries</u>.  At or prior to the Closing, the Administrative Agent shall deliver (or cause to be delivered by the Acquirer) to the Q Parties all of the following documents, instruments and items, each in form and substance satisfactory to the Administrative Agent and its legal counsel:

(i)    the Bill of Sale duly executed by the Acquirer; and

(ii)    the General Assignment duly executed by the Acquirer.

**4.4    Closing Costs.**  Each party shall pay all of its own costs, expenses and fees (including legal fees and disbursements) associated or in any way pertaining to this Agreement, including the consummation of the transactions contemplated by this Agreement; it being understood that the expenses of the Lender Parties are included in the Lender Party Basis.

## 5.    <u>REPRESENTATIONS AND WARRANTIES</u>.

**5.1    Representations of the Q Parties.**  Each Borrowing Party (and where specifically referenced, each Q Party) hereby represents and warrants to the Lender Parties that all of the matters set forth in this <u>Section 5.1</u> are true and correct in all material respects as of the date hereof and will be true and correct as of the Closing.  Each Borrowing Party (and where specifically referenced, each Q Party) acknowledges that all of the representations and warranties set forth in this <u>Section 5.1</u> are material and that the Lender Parties will rely upon them as inducements to enter into this Agreement and to perform their obligations hereunder and to close the transactions contemplated hereby.  The representations and warranties of the Q Parties in this Section 5.1 are based solely on its own respective knowledge and with respect to itself and are, therefore, several but not joint representations and warranties.

(a)    <u>Acknowledgment of Debt</u>.  The Q Parties hereby acknowledge that, as of the date of this Agreement, there is due and owing to the Lender Parties under the Transaction Documents, without defense, offset, counterclaim or claim of any kind a total of at least $140,205,454.03, consisting of (i) $120,000,000.00 in principal, (ii) $15,476,250.00 in Hedge Breakage Costs, (iii) $3,581,611.50 in accrued and unpaid interest (consisting of $3,563,793.93 attributable to the $120,000,000.00 in principal through the date hereof and $17,817.57 attributable to Hedge Breakage Costs since termination), and (iv) $1,147,592.53 in out-of-pocket expenses.

(b)    <u>Ratification of Transaction Documents</u>.  Except as to be modified with respect to the Policy Purchase Agreement pursuant to <u>Section 3(d)</u>, the Borrowing Parties hereby ratify, confirm and acknowledge: (i) the validity, binding nature and full force and effect, both at the time of delivery and on the date hereof, of the Transaction Documents, and all of the obligations of the Borrowing Parties and the rights and remedies of the Lender Parties thereunder; and (ii) the obligations, indebtedness and liabilities of the Debtor under the Transaction Documents and under this Agreement are duly and properly secured on a first

14

priority perfected basis, by the Collateral, all without defense, offset, claim or counterclaim of any kind or nature whatsoever.

   (c) <u>Organization</u>.  The Debtor is a limited liability company duly organized and in good standing under the laws of the State of Delaware and each other Q Party is duly organized and in good standing in its jurisdiction of formation.

   (d) <u>Due Authorization; Enforceability</u>.  The execution, delivery and performance of this Agreement and each other Settlement Document by each Q Party (i) have been duly authorized and do not require the consent or approval of any governmental body or other regulatory authority or any other Person that has not been obtained, except in the case of the Debtor (where Bankruptcy Court authorization shall be required) and (ii) are not in contravention of or in conflict with any term or provision of the organizational, formation or other constituent or governing documents of any Q Party.  Each Settlement Document executed by any Q Party constitutes the legal, valid and binding obligation of such Q Party, and is enforceable against such Q Party in accordance with its terms, except in the case of the Debtor (where Bankruptcy Court authorization shall be required).

   (e) <u>No Violation</u>.  The execution, delivery and performance of this Agreement and the other Settlement Documents do not now and hereafter shall not invalidate, cancel, render inoperative, interfere with, constitute a default under, or result in the acceleration of maturity of any contract, agreement, mortgage, promissory note, lease, easement, right or interest to which any Q Party is a party or by which any Q Party or any of its properties or assets, including (in the case of the Debtor) the Sale Assets, is bound.

   (f) <u>Ownership</u>.  The Debtor owns good and valid title to the Sale Assets, free and clear of any Lien other than Liens in favor of the Administrative Agent for the benefit of the Lender Parties.  There are no outstanding options or rights to purchase the Sale Assets or any portion thereof or any interest therein.  The list of Policies attached hereto to be attached as <u>Exhibit D</u> to this Agreement is a complete and accurate list of all insurance policies (and rights in insurance policies) owned by the Debtor as of the date hereof and as of the Closing Date, it being understood that, in order to maintain the confidentiality of certain consumer information, such <u>Exhibit D</u> shall be omitted from any copy of this Agreement filed publicly and shall be sought to be disclosed to the Bankruptcy Court only under seal.  All Death Benefits that to the Q Parties' knowledge have become payable or have been collected in respect of the Collateral have been reported to the Administrative Agent and, to the extent collected, deposited in the Collection Account, all in accordance with the Loan Agreement.

   (g) <u>Litigation</u>.  Except for any actions or notices by the Lender Parties, no Q Party has been served with process in connection with any litigation, nor has any Q Party received notice of any administrative or other governmental proceeding to which such Q Party is a party, or that is pending against or affecting the Sale Assets, or any portion thereof, or which questions or challenges the validity of any Settlement Document or any action taken or to be taken pursuant to any Settlement Document, and no Q Party is aware of any threat to commence such litigation or proceeding.

15

(h)    Other Conditions. Neither the execution of this Agreement nor the transfer of the Debtor's interests in the Sale Assets nor the performance of the other transactions contemplated by this Agreement is being consummated by the Q Parties with any intent to hinder, delay or defraud any present or future creditor of the Q Parties.

(i)    Freely Entered. The Settlement Documents are entered into without force or duress, of the free will of each Q Party and in exchange for the receipt of substantial and adequate consideration. Each Q Party has consulted with counsel regarding the transactions contemplated by the Settlement Documents. The decision of each Q Party to enter into the Settlement Documents is a fully informed decision, and such Q Party is satisfied as to its awareness of the legal and other ramifications of such decisions.

(j)    Employees. The Debtor has no employees.

(k)    No Default. The Q Parties are not in default with respect to any order, writ, injunction, decree or demand of any court or other governmental entity pertaining to the Sale Assets.

(l)    Secured Lending. No Q Party has pledged any interests in the Debtor or the Sale Assets to any third party as collateral or security for any obligation of the Q Parties or any partner or other stakeholder of Q Parties or any third party, except for the security interests and Liens granted to the Administrative Agent for the benefit of the Lender Parties. No consent of any lender of any Q Party or any third party is required in order for any Q Party to enter into and fulfill its respective obligations under the Settlement Documents, other than the consent of the parties hereto.

(m)    Transaction Documents. The Borrowing Parties represent, warrant, acknowledge and agree that: (a) the Transaction Documents are in full force and effect; (b) there have occurred and are continuing certain Termination Events under the Transaction Documents; (c) the Lender Parties have fully performed all of their obligations pursuant to the Transaction Documents and have not waived the performance of any of the obligations of any Borrowing Party; and (d) all indebtedness evidenced by the Transaction Documents is now due and payable. The Q Parties represent, warrant, acknowledge, and agree that: (i) there are no defenses or offsets in favor of any Q Party under the Transaction Documents, at law or in equity; and (ii) no Q Party has assigned or transferred, voluntarily or involuntarily, any of its claims, rights or any other interest arising under or relating to the Transaction Documents.

(n)    No Personally Identifiable Information Policies Except for Those Delivered to Lender Parties on November 5, 2010. As of the Petition Date, the Debtor had no policy in place (and had not disclosed any such policy to any individuals) prohibiting the transfer of personally identifiable information (as such term is defined in the Bankruptcy Code) about individuals to persons who are not affiliated with the Debtor except for the policies of the Servicer to which the Debtor purports to adhere (copies of which the Debtor's counsel distributed to the Lender Parties (through their counsel)) via electronic transmission at approximately 2:59 p.m. CDT on November 5, 2010 (the "Existing Privacy Policies").

16

**5.2      Representations of the Lender Parties**.  Each Lender Party hereby represents and warrants that all of the matters set forth in this Section 5.2 are true and correct in all material respects as of the date hereof and will be true and correct as of the Closing Date.

(a)      Due Authorization, Enforceability.  The execution, delivery and performance of each Settlement Document to which such Lender Party is a party (i) have been duly authorized by such Lender Party and do not require the consent or approval of any governmental body or other regulatory authority or any other Person that has not been obtained and (ii) are not in contravention of or in conflict with any term or provision of the organizational, formation or other constituent or governing documents of such Lender Party.  Each of the Settlement Documents to which such Lender Party is a party constitutes the legal, valid and binding obligation of such Lender Party and is enforceable against such Lender Party in accordance with its terms.

## 6.      PERFORMANCE OF OBLIGATIONS PRIOR TO CLOSING.

**6.1      Maintenance of Property**.  Through the Closing Date, the Borrowing Parties shall service, maintain and protect the Sale Assets in accordance with the terms of the Transaction Documents.

**6.2      Contracts; Protective Advance**.

(a)      Through the Closing Date, the Borrowing Parties shall perform and (in the case of the Debtor) pay all of their obligations under all Policies; provided that, if Death Benefits on the Policies are insufficient to pay and otherwise perform such obligations in December, 2010, the Lender, upon receipt of court authorization satisfactory to it (including as to the priority of any Lien securing such protective advances), will make a protective advance to pay such obligations.

(b)      The Debtor and the other Borrowing Parties shall perform all of their obligations under the Loan Agreement and the other Transaction Documents with respect to the servicing, maintenance and protection of the Collateral.

(c)      The Q Parties shall not enter into any contract or agreement or incur any obligation pertaining to the Sale Assets or any portion thereof without first obtaining the prior written consent of the Administrative Agent.

**6.3      Sales**.  None of the Q Parties shall advertise for sale or market for sale any portion of the Sale Assets or any interest in the Debtor, or enter into any contract pertaining to the same, or accept any deposit for the sale of any portion of or interest therein, other than with the prior written consent of the Administrative Agent.

**6.4      Personal Property**.  None of the Q Parties shall remove or suffer to be removed from any location where now located, any of the Sale Assets, or sell, transfer, assign or encumber any of its rights in the Sale Assets.

**6.5      Reporting**.  The Debtor, the Servicer and the Loan Manager shall cause to be delivered to the Administrative Agent and the Custodian all reports, data tapes and other

1523918 07155624

information required by Articles VI and VII of the Loan Agreement or by the Backup Servicing Agreement, as and when the same are required under such agreements through the Closing Date.

**6.6    Bankruptcy Actions.**

(a)    Promptly, but no later than three (3) business days after the execution of this Agreement, the Debtor shall file a motion or motions in form and substance acceptable to the Lender (collectively, the "Settlement and Sale Motion") (and related notices and proposed orders) with the Bankruptcy Court seeking entry of the Approval Order.

(b)    The Debtor shall use reasonable best efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the settlement set forth herein, including approval of the Sale of the Sale Assets under this Agreement, including serving on all required Persons in the Case (including (i) each Issuing Insurance Company, (ii) all Persons who are known to possess or assert a Lien against any of the Sale Assets, (iii) the Internal Revenue Service, (iv) all applicable state and local governmental entities with taxing authority and (v) all other Persons required by any order of the Bankruptcy Court to receive notice of any matter in the Case), notice of the hearing on the approval of the Settlement and Sale Motion and the objection deadline in accordance with Rules 2002, 6004, 6006, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure, or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

(c)    As soon as practicable after the date hereof, the Debtor shall, pursuant to a motion in form and substance acceptable to the Lender Parties in their sole discretion (which motion may be incorporated into the Settlement and Sale Motion) move to assume and assign to the Acquirer the Policies and other pre-petition contracts included in the Servicing Files (collectively, the "Assigned Contracts") and shall provide notice thereof on accordance with all applicable Bankruptcy Rules as modified by any orders of the Bankruptcy Court. It is expected that, after taking into account the premium transfers and other payments made or to be made under the Interim Cash Collateral Order and, if necessary, as contemplated by Section 6.2(b), there shall be no cure amounts required be paid in order to effect the assumption and assignment of the Assigned Contracts, and, as a result, the assumption and assignment of the Assigned Contracts will be sought to be effected pursuant to the Approval Order without the payment of any additional amounts.

**6.7    Implementing Agreement; Filings and Consents; Cooperation.** Subject to the terms and conditions of this Agreement and to Applicable Law, each party, as promptly as practicable, shall use its commercially reasonable efforts to (i) make, or cause to be made, all notifications, filings, submissions and registrations under laws applicable to it, as may be required for it to consummate the transactions contemplated by this Agreement, (ii) obtain, or cause to be obtained, all actions, nonactions and consents from all governmental entities and other persons necessary to be obtained by it in order for it to consummate the transactions contemplated by this Agreement, (iii) defend any proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other governmental entity vacated or reversed and (iv) take, or cause to be taken,

all other actions necessary, proper or advisable in order for it to fulfill its obligations hereunder and satisfy the conditions to the Closing set forth in <u>Section 4.2</u>; provided, however, that nothing contained in this Agreement shall require any party to waive any condition to its obligation to consummate the Closing.

**6.8    Suspension of Litigation on Contested Proceedings**.  Pending the consummation or termination of this Agreement pursuant to its terms, the prosecution of the litigation relating to the Debtor's motion for authority to use Cash Collateral and the Administrative Agent and the Lender's motions for relief from the automatic stay and to dismiss will be suspended pursuant to mutually acceptable arrangements, and without limiting the generality of the foregoing, the parties will seek to have the hearings currently scheduled for November 8, 2010 at 9:30 a.m. continued to a date no later than December 7, 2010.

**6.9    Extension of Interim Cash Collateral Order**.  Upon the execution and delivery of this Agreement, assuming such execution and delivery occurs on or before November 7, 2010, the Administrative Agent and the Lender will agree to the extension of the Interim Cash Collateral Order to permit the November, 2010 premium payments or transfers and other Eligible Expenses to be made pursuant to a form of order acceptable to the Administrative Agent and the Lender.

7.    **INDEMNIFICATION**.

**7.1    Indemnification of Lender Parties**.  (a) Each Q Party acknowledges and agrees that the Sale of the Sale Assets to the Acquirer does not create any obligations on the part of any Lender Party or any past or present nominee, designee, parent, subsidiary or affiliate of any Lender Party or any of their respective officers, directors, agents, employees, servants, attorneys and representatives or the respective heirs, personal representatives, participants, successors and assigns of any and all of them (separately and collectively, the "<u>Indemnified Parties</u>") to third parties which have claims or liabilities of any kind (known or unknown) whatsoever against (i) any Q Party now or hereafter or (ii) the Sale Assets prior to Closing, unless specifically assumed herein or in any Settlement Document.  Each Q Party further acknowledges and agrees that none of the Indemnified Parties is a venturer, co-venturer, insurer, guarantor or partner of any Q Party in the ownership of the Sale Assets prior to, on, or after, Closing, and that the Indemnified Parties bear and shall bear no liability whatsoever resulting from or arising out of the Debtor's ownership of the Sale Assets or the activities of the other Q Parties with respect to the Sale Assets or the Debtor prior to the Closing.

(b)    Each Q Party hereby agrees to indemnify and hold harmless the Indemnified Parties from and against any and all losses, claims, demands, damages, costs and expenses of whatsoever kind or nature including reasonable attorneys' fees, related to or arising out of such Q Party's: (i) bankruptcy or interference with, objection to, or the taking of steps intended to delay, frustrate, impede, impair or hinder, the Sale or (ii) failure to execute any Settlement Document, including the Bill of Sale or the General Assignment, in the case of each of <u>clauses (i)</u> and <u>(ii)</u>, taken by it, or any of its Affiliates which adversely affects the Acquirer's right to acquire the Sale Assets or the interests of the Lender Parties therein or with respect thereto, in violation of this Agreement.

19

(c)     The obligations of the Q Parties under this <u>Section 7</u> shall survive the Closing and any termination of this Agreement.

(d)     Each Q Party shall indemnify the Indemnified Parties solely for its own acts, omissions, actions and/or inactions.

**8.     <u>NATURE OF TRANSACTION</u>.**

**8.1     Unconditional and Absolute Transfer.**  The Q Parties acknowledge and agree that after the Closing, the Q Parties will not have any further interest or claim in and to the Sale Assets or to the proceeds and profits that may be derived therefrom (except and solely as explicitly set forth in <u>Section 11</u>).  The Settlement Documents and the transaction contemplated thereby are the Q Parties' free and voluntary acts, and no Q Party is acting under duress, undue influence, misapprehension or misrepresentation.  The Lender Parties (and their respective designees, nominees and assignees) expressly disclaim and do not assume, directly or indirectly, any liability, obligation, duty or responsibility whatsoever for the payment, discharge or other resolution of any liability, obligation, indebtedness, lien, security interest, encumbrance, claim or other problem, condition or matter which has been or may hereafter be created or assumed by any Q Party, any party associated with any Q Party or any of their respective predecessors in interest or which may otherwise presently exist with respect to any of the Sale Assets.  After the Closing, the Lender Parties (and their respective designees, nominees and assignees) may at any time sell, transfer, draw policy loans against, encumber, lease, assign, permit to lapse, or abandon the Sale Assets or any portion thereof and may take or omit to take any action which the Lender Parties (and their respective designees, nominees and assignees) may deem to be in their best interest with regard to the Sale Assets.  No Q Party shall have a claim against any Lender Party if any Lender Party shall fail to act in a commercially reasonable manner or in any other manner in the acquisition, operation, management, sale, transfer, encumbrance, lease, assignment, lapse or abandonment of the Sale Assets.  Any consideration or proceeds received by any Lender Party (or its Affiliate, designee, nominee or assignee) in connection with any sale, transfer, encumbrance, lease, assignment or abandonment of the Sale Assets or any part thereof shall be distributed by and among the Acquirer and the Debtor Designee in accordance with <u>Section 11</u>.

**8.2     Rights and Remedies Reserved.**  Except as expressly set forth herein, the Settlement Documents shall not modify or amend any of the Transaction Documents or interfere in any way with the exercise by the Lender Parties of any rights or remedies thereunder.

**8.3     No Assumption of Obligations.**  Each Q Party acknowledges and agrees that the entry into the transactions contemplated by the Settlement Documents shall not create any obligation on the part of the Lender Parties (or their respective designees, nominees or assignees) to third parties that have or may have claims pursuant to such contracts or other agreements or against any Q Party or with respect to the Sale Assets, and that no Lender Party (or any of their respective  designees, nominees or assignees) assumes or agrees to discharge any obligation of any Q Party or any liabilities pertaining to the Sale Assets.  Except as provided in <u>Section 13.1</u>, no Person not a party or successor to a party to this Agreement shall have any rights as third party beneficiary hereof or any other rights hereunder.  Notwithstanding the immediately preceding sentence, except as set forth in <u>Section 11.6</u>, this Agreement shall be enforceable by

each and all of the successors and assigns of the parties hereto by merger, consolidation, distribution upon dissolution or termination.

**8.4     Equivalent Value**.  The Q Parties acknowledge and agree that the Debtor will receive reasonably equivalent value in exchange of the Sale Assets.

**8.5     Consideration**.  Each of the Q Parties acknowledges and agrees that the Lender Parties assert that Debtor has no equity in the Collateral or in the Sale Assets and the current fair market value of the Collateral, commonly known as the "as-is value," is significantly less than the amount of the obligations owing to the Lender Parties that are secured by the Collateral. Each of the Q Parties acknowledges and agrees that the Debtor is receiving, at a minimum, reasonably equivalent value and fair consideration in return for the Sale and the other transactions contemplated by the Settlement Documents and that the Sale and such other transactions are in the best interests of the Debtor, its estate, its creditors, and other parties in interest.

## 9.     <u>ADDITIONAL OBLIGATIONS</u>.

**9.1     Generally**.  Following the Closing Date, each Q Party shall cooperate with the Lender Parties to facilitate and effectuate the orderly transition of ownership, servicing, management and operation of the Sale Assets including delivering to the Administrative Agent all books, records, documents and instruments directly and exclusively pertaining to the Sale Assets or directly and exclusively affecting the Lender Parties.  In addition, and without limiting the foregoing:

(i)  the Debtor shall provide to the Administrative Agent, at the request of the Administrative Agent from time to time, such number of Assignment Notices executed in blank by the Debtor as the Administrative Agent shall request, and the Borrowing Parties hereby authorize the Administrative Agent, the successor servicer or any representative of either of them to deliver completed Assignment Notices with respect to such Policies to the Issuing Insurance Companies and Broker/Providers;

(ii)  if practicably unable to be accomplished prior to the Closing Date, the Borrowing Parties shall cause all Servicing Files and Records relating to the Sale Assets to be transferred to such servicer as the Administrative Agent may designate, including all data tapes and files in such format as is currently provided to the Backup Servicer;

(iii)  if practicably unable to be accomplished prior to the Closing Date, the Borrowing Parties shall cause all Accounts to be transferred to the Acquirer; and

(iv) each Q Party shall provide answers to questions pertaining to the Sale Assets or affecting the Lender Parties to the extent that such information is in the possession or control of such Q Party, or is otherwise reasonably available, shall, as necessary, appear at hearings and other proceedings pertaining to the Sale Assets or affecting the Lender Parties if requested by any Lender Party, and shall execute and deliver such documents and instruments as may be requested by any Lender Party to effectuate the purposes of the Settlement Documents.

Through the Closing Date, the Borrowing Parties shall be responsible for payment of their costs and expenses relating to the transition of ownership, servicing, management and operation of the Sale Assets.

**9.2    Books and Records**.  The Q Parties shall not destroy any Records pertaining to the Sale Assets or affecting the Lender Parties for a period of three years.

**10.    RIGHT TO DISPOSE OF THE SALE ASSETS**.  Each Q Party hereby consents to and shall not, in any way, contest, dispute, challenge, obstruct, hinder, delay, impede, frustrate or otherwise interfere with any efforts by the Lender Parties to market, sell and transfer (prior to the Closing Date) the interest of the Lender Parties in the Transaction Documents (including any interest pursuant to the Transaction Documents in the Collateral), and subsequent to the Closing Date, the Sale Assets, including by filing a declaration of bankruptcy or by seeking in any court or other proceeding the imposition of any injunction or other relief prohibiting or conditioning in any manner any action of the Acquirer with respect to the Sale Assets.

**11.    NET PROCEEDS**.

**11.1    Net Proceeds**.  The Lender will cause the Acquirer to pay to the Debtor Designee a one-time contingent payment (the "Contingent Payment") if the Sale Assets are sold by any Lender Party to Third Party Buyers on or before the End Date (a sale within such time being a "Subsequent Sale").  The Contingent Payment will be 25% of the Net Proceeds of all Subsequent Sales, provided that such Net Proceeds constitute a positive number.

The Contingent Payment will be made within ninety (90) days after the earlier of (i) the End Date and (ii) the last day of the calendar quarter in which the last Subsequent Sale has occurred as determined by the Lender, in each case subject to the remaining sentences of this paragraph.  After the Debtor Designee shall have received the last Quarterly Report, which Quarterly Report will show the amount of the Contingent Payment, the Debtor Designee shall have up to thirty (30) days after its receipt of such Quarterly Report to deliver an objection to such Quarterly Report or the calculation of the Contingent Payment.  In the case of any such objection, the Contingent Payment shall be payable sixty (60) days after resolution of such objection by the Lender and the Debtor Designee and any costs and expenses of the Lender Parties in connection with such objection shall constitute Lender Expenses and shall be deducted from the payment to the Debtor Designee in respect of such Contingent Payment.

The Lender Parties shall be entitled in all respects to evaluate and pursue or not pursue (as the case may be) any potential Subsequent Sale solely from the perspective of their own economic self-interest and shall otherwise have complete discretion and control over every aspect of any Subsequent Sale, including whether the Sale Assets will be sold as a portfolio, on a policy-by-policy basis, or grouped with other assets and the timing, terms and conditions of any such sale.  The Lender Parties may enter into any transaction or arrangement involving all or part of the Sale Assets that does not constitute a Subsequent Sale.  Without limiting the generality of any of foregoing, the Lender Parties shall not be obligated in any way to pursue or not pursue any potential Subsequent Sale or other transaction or arrangement from the perspective as to whether it would result in any Contingent Payment.

If a Subsequent Sale occurs on or prior to the End Date, but does not result in a Contingent Payment, or if no Subsequent Sale occurs on or prior to the End Date, any obligation on the part of the Acquirer, the Lender, or any other Lender Party with respect to a Contingent Payment shall be deemed satisfied and otherwise terminated. If a Third Party Buyer shall have entered into a binding agreement with the Lender Parties to effect a Subsequent Sale on or prior to the End Date, subject only to completion of due diligence (a "Binding Sale Commitment"), and such sale is in fact consummated within 90 days of the End Date, such sale will be deemed to have constituted a Subsequent Sale and to have thus occurred on or prior to the End Date.

Without limiting the generality of the foregoing or of any other provision of this Agreement, (i) no Q Party shall have any interest in the Sale Assets following Closing except solely for and to the extent of the Debtor Designee's contingent right to the Contingent Payment, and the Acquirer shall be entitled to retain as its own property all proceeds from any disposition of the Sale Assets (except solely for and to the extent of the Contingent Payment), (ii) no Third Party Buyer shall be obligated to make any Contingent Payment or deliver any Quarterly Reports, and (iii) this Section 11.1 shall otherwise cease to apply to any Sale Assets that are the subject of a Subsequent Sale after such Subsequent Sale occurs.

**11.2    Clawback.** If and to the extent that the Lender determines, in its reasonable discretion, that the Debtor Designee has received a Contingent Payment to which the Debtor Designee was not entitled, the Medley Parties shall cause the Debtor Designee to return such payment within three Business Days of receipt of written notice from the Acquirer. The Lender's determination pursuant to this Section 11.2 shall be made within ninety (90) days of the payment of the Contingent Payment. In addition, in the event that any Triggering Event shall not occur (or otherwise shall not become known to any of the Lender Parties) until after the payment of the Contingent Payment, for a period of three years after the receipt of the Contingent Payment, the Medley Parties shall be obligated to cause the Debtor Designee to return the entire Contingent Payment, and Debtor Designee shall have no other rights with respect thereto.

**11.3    Reports.** (a) For so long as the Debtor Designee retains the right to receive any Contingent Payment pursuant to this Section 11, within 30 days after the end of each calendar quarter, the Lender Parties shall provide a written report (the "Quarterly Report") to the Debtor Designee showing (i) the aggregate amount of Death Benefits received by the Acquirer with respect to Policies during such quarter, (ii) the aggregate Lender Party Expenses, the aggregate Lender Party Yield and the sum of the Lender Party Expenses, the Lender Party Yield and Lender Party Claims as of the end of such quarter, (iii) a summary of all Lender Party Expenses incurred during such quarter, showing (A) aggregate Premiums, (B) aggregate Lender Party Yield, (C) aggregate servicing fees and (D) other expenses in excess of $10,000 if all other expenses for such quarter exceeded $200,000 and (iv) whether the Lender Parties have completed any Subsequent Sales during such quarter and, if so, the number of Policies included in such disposition and net cash sales price paid to the Lender Parties therefor. In addition, if the Lender Parties enter into a Binding Sale Commitment at any time, the Lender Parties will notify the Debtor Designee of the existence of such commitment, the number of Policies to be sold thereunder and the proposed cash sales price therefor within 30 days of entering into such Binding Sale Commitment. For the avoidance of doubt, the Lender Parties shall not be required to disclose the buyers of any such Policies, the form or terms of any documents or other details regarding a Binding Sale Commitment.

(b)    Only the Debtor Designee (and not any other Person) shall have the right to object to any calculation in a Quarterly Report or the Contingent Payment. Any such objection not timely made pursuant to Sections 11.1 or 11.3(a) shall have no force or effect.

**11.4    Triggering Events**.

(a)    In addition to the provisions of Section 11.2, the rights of the Debtor Designee to receive the Contingent Payment shall terminate and the Debtor Designee shall have no further rights pursuant to this Section 11 upon any Q Party or any Affiliate of a Q Party's bringing a claim, suit, counterclaim, defense or other assertion challenging (or otherwise seeking to prohibit, direct, limit, or otherwise condition) (i) the enforceability or authorization of the Q Parties to enter any Settlement Document or (ii) the conduct, scope, and/or terms and conditions of the Sale or any Subsequent Sale (each, a "Triggering Event"). For avoidance of doubt, should any Q Party become the Sale Assets Servicer, any dispute as to the quality or completeness of such Q Party's performance under the Sale Assets Servicing Agreement shall not be deemed to constitute a Triggering Event.

(b)    Upon the occurrence of any Triggering Event, the Debtor Designee shall no longer be entitled to receive any Contingent Payment, any amounts which would otherwise have been payable to the Debtor Designee as a Contingent Payment shall instead be retained by the Acquirer, and the Lender Parties shall have no further obligations to deliver Quarterly Reports to the Debtor Designee.

**11.5    No Partnership**. The rights of the Debtor Designee under this Section 11 shall be contractual rights only and shall not be deemed to cause any Q Party or any of its Affiliates to own or hold (and each Q Party expressly disclaims that it owns or holds) (a) any membership interest in the Acquirer or any direct or indirect equity interest in the Acquirer or the Sale Assets, (b) any management, control, voting or other rights with respect to the Acquirer or the Sale Assets, (c) any obligation to make capital contributions, loans or otherwise provide funds to the Acquirer or the Sale Assets; however the foregoing shall not affect the obligations of any Q Party pursuant to Section 11.2 or (d) any direct or indirect right, power or authority to direct or cause the direction of the management or policies of the Acquirer or otherwise with respect to the Sale Assets, including as to the disposition of the Sale Assets. Each Q Party acknowledges and agrees that none of Lender Parties owes any express or implied contractual obligation to any Q Party beyond what is explicitly set forth in the provisions of this Agreement or any fiduciary duty of any kind or nature whatsoever to any Q Party. Each Q Party agrees that the foregoing acknowledgement is a material inducement to the Lender Parties to enter into this Agreement and the other Settlement Documents.

**11.6    Assignment**. The Debtor Designee may not assign its rights pursuant to this Section 11 to any person other than an affiliate of the Debtor Designee without the prior written consent of the Lender, which consent may be withheld by the Lender in its sole and absolute discretion. The obligations of the Acquirer under this Section 11 are personal to the Acquirer and upon the direct or indirect transfer of the Sale Assets by the Acquirer to a Third Party Buyer the rights of the Debtor Designee to receive a Contingent Payment shall cease if and when the Acquirer's right to receive any payments or proceeds from or with respect to the Sale Assets or any transfer thereof (other than amounts received by the Acquirer, any other Lender Party or any

24

Affiliate thereof on account of any financing provided in connection with a transfer of the Sale Assets) cease.

**11.7    Survival**. The provisions of this Section 11 shall survive the Closing.

## 12.    EFFECTIVENESS OF THIS AGREEMENT; TERMINATION.

**12.1    Termination Events**. Each of the following occurrences is hereby defined as a "Termination Event" under this Agreement:

(a)    Pursuing any Action regarding this Agreement other than an Approval Order. Any Q Party, any trustee therefor or their respective successors or assigns (including any Chapter 7 or Chapter 11 trustee appointed in the Case, and/or any other representative of the Debtor's bankruptcy estate) directly or indirectly files, supports, seeks or purports to seek any action with regard to the Settlement Documents other than the Approval Order.

(b)    Impairment. Any Q Party or any trustee or any other representative of the Debtor's bankruptcy estate, whether directly or indirectly, files or supports the filing of any motion or the initiation of any proceeding which could reasonably be expected to result in material impairment of the Lender Parties' existing rights in the Case, including under the Settlement Documents, in whatever capacity; or a final determination by the Bankruptcy Court (or any other court of competent jurisdiction) with respect to any motion or proceeding, however arising, which results in any material impairment of the Lender Parties' rights in the Case, including under the Settlement Documents.

(c)    Failure of Effectiveness. This Agreement shall not become effective pursuant to Section 4.1 prior to the Effectiveness Deadline unless otherwise extended by the Lender Parties in their sole discretion.

**12.2    Remedies**. Upon the occurrence of any Termination Event, and without in any manner whatsoever limiting the provisions of Section 13.8 (including the right to seek specific performance of this Agreement), the Lender Parties hereto shall be entitled to and may terminate the Settlement Documents, whereupon the Settlement Documents shall be null and void (other than for the provisions of this Section 12 and those provisions hereof that expressly survive any termination of this Agreement), as if the parties hereto had never entered into the Settlement Documents. The Lender Parties shall promptly give the other parties notice of any such declaration, but failure to do so shall not impair the effect of such declaration. Alternatively, and in the sole discretion of the Lender Parties, the Lender Parties in such an event may instead elect to seek specific performance of the obligations of the Q Parties under the Settlement Documents.

**12.3    Effects of Termination**. The termination of the Settlement Documents for any reason whatsoever shall not limit or diminish any rights and remedies under the Transaction Documents of any Q Party or any Lender Party. If the Settlement Documents are terminated for any reason whatsoever, each Lender Party and the Q Parties shall have all of its rights and remedies set forth under the Transaction Documents, including the right of Lender Parties to proceed with their opposition to the Debtor's motion for authority to use Cash Collateral and their prosecution of their motions for relief from the automatic stay and to dismiss the Case and, assuming they are granted relief on such motions, to realize upon the Collateral and to collect the

1523918 07155624

full amount of the Lender Party Claims pursuant to the Transaction Documents. Each Q Party hereby stipulates that it does not have any defenses of any kind or nature whatsoever to the validity, effectiveness or enforceability of the Settlement Documents or in respect of any Lender Party's rights under the Settlement Documents. Neither the Lender Parties nor the Q Parties shall undertake any act to challenge: (a) the validity, effectiveness or enforceability of the Settlement Documents or any transactions contemplated thereby or (b) any right, payment or benefit provided to any party under the Settlement Documents. No Q Party shall take any steps to interfere with, impede, delay or prevent the implementation of the Settlement Documents, the transactions contemplated by the Settlement Documents, or ownership, enjoyment, disposition or abandonment by the Lender Parties of the Sale Assets following the Sale. The provisions of this Section 12 shall survive the Effective Date, Closing, and any termination of this Agreement.

**12.4    No Prejudice**. None of the terms, conditions or provisions contained in this Agreement is intended to be interpreted, or shall be construed, against any of the parties hereto in the event that the conditions precedent set forth in Section 4.1 are not satisfied or this Agreement is otherwise terminated pursuant to Section 12.2; in such event, this Agreement shall be null and void (other than for the provisions of this Section 12 and those provisions hereof that expressly survive any termination of this Agreement), and each of the parties in all respects shall be returned to the respective positions each occupied prior to the execution of this Agreement, as if this Agreement had never been executed and delivered.

**13.    MISCELLANEOUS**.

**13.1    Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that no Q Party shall directly or indirectly assign or otherwise transfer any of its rights and/or obligations under this Agreement in whole or in part, and any such assignment or other transfer shall be void and of no effect; and further provided, that each Lender Party at any time or from time to time, may assign or otherwise transfer any or all of its rights and/or obligations under this Agreement to one or more assignees, designees, nominees or transferees of its choosing and each Q Party hereby consents and agrees to be bound by any such assignment or transfer; provided, further, however, any such transfer shall not release the Lender Parties from their obligations to cause the Acquirer to make the Contingent Payment in accordance with Section 11. Without limiting the preceding sentence, but subject to the last proviso thereof, the Administrative Agent may designate, in its sole and absolute discretion, that title or rights to any or all of the Sale Assets shall be transferred directly to the Acquirer or an assignee, designee, nominee or transferee of the Acquirer, and the Acquirer (as well as any such assignee, designee, nominee, or transferee) shall in all respects be an express third party beneficiary of this Agreement. In any event, all representations, warranties and covenants of the Q Parties shall be deemed to have also been made for the benefit of the Acquirer and each such assignee, designee, nominee or transferee, as well as to the Lender Parties and their respective successors and assigns, and the Acquirer and each such assignee, designee, nominee or transferee may enforce any and all rights and remedies available to the Lender Parties under the Settlement Documents.

**13.2    Counterparts; Electronic Delivery**. This Agreement may be executed in any number of counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute one and the same instrument. Any telecopied or electronically mailed

26

facsimile of this Agreement and any telecopied or electronically mailed facsimile of any signatures of the parties executing this Agreement shall be as effective as an original.

**13.3    Governing Law; Consent to Jurisdiction; Waiver of Objection to Venue; Service of Process.**

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW PROVISIONS THEREOF (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK). EACH OF THE PARTIES HERETO HEREBY AGREES (I) AT ALL TIMES PRIOR TO THE DISMISSAL OF THE CASE, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND (II) AT ALL TIMES THEREAFTER, TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE CITY OF NEW YORK, IN CONNECTION WITH ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER SETTLEMENT DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT. EACH OF THE PARTIES HERETO HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER IN ANY OF THE AFOREMENTIONED COURTS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

EACH Q PARTY IRREVOCABLY APPOINTS CT CORPORATION SYSTEM (THE "PROCESS AGENT"), WITH AN OFFICE ON THE DATE HEREOF AT 111 EIGHTH AVENUE, NEW YORK, NEW YORK 10011, UNITED STATES OF AMERICA, AS ITS AGENT TO RECEIVE ON BEHALF OF IT AND ITS PROPERTY SERVICE OF COPIES OF THE SUMMONS AND COMPLAINT AND ANY OTHER PROCESS THAT MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING. SUCH SERVICE MAY BE MADE BY MAILING OR DELIVERING A COPY OF SUCH PROCESS IN CARE OF THE PROCESS AGENT AT THE PROCESS AGENT'S ABOVE ADDRESS, AND EACH SUCH PARTY HERETO HEREBY IRREVOCABLY AUTHORIZES AND DIRECTS THE PROCESS AGENT TO ACCEPT SUCH SERVICE ON ITS BEHALF. EACH Q PARTY AGREES TO ENTER INTO ANY AGREEMENT RELATING TO SUCH APPOINTMENT THAT THE PROCESS AGENT MAY CUSTOMARILY REQUIRE AND TO PAY THE PROCESS AGENT'S CUSTOMARY FEES UPON DEMAND. AS AN ALTERNATIVE METHOD OF SERVICE, EACH Q PARTY ALSO IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES OF SUCH PROCESS TO SUCH PARTY AT ITS ADDRESS SPECIFIED PURSUANT TO SECTION 13.9. NOTHING IN THIS SECTION 13.3 SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**13.4    Entire Agreement**. This Agreement and the Settlement Documents contain the entire agreement between the Lender Parties and the Q Parties with respect to the Sale Assets and the parties' obligations under the Transaction Documents, and any prior representations, negotiations or agreements among the parties hereto are superseded by and merged into this

27

Agreement.  There are no other agreements by or among the parties except as expressly contemplated herein.

**13.5    Amendments; Survival**.  This Agreement may not be amended except by an amendment in writing signed by all parties hereto.  This Agreement and the covenants, representations and warranties contained herein shall survive the Closing Date and the consummation of the transactions contemplated hereby.  The provisions of this <u>Section 13.5</u> shall expressly survive the Closing.  Without limiting the generality of the foregoing, the releases in favor of the Lender Parties set forth in <u>Section 3</u> shall become effective on the Effective Date and shall survive any breach, termination, or purported termination of this Agreement after such date.

**13.6    No Assumption of Liabilities**.  Nothing in the Settlement Documents shall constitute an assumption by any Lender Party of any liabilities or obligations of any Q Party, regardless of whether such Lender Party is aware of such liabilities or obligations at the time this Agreement is executed or any time thereafter.

**13.7    Further Assurances**.  Upon request from time to time, the Q Parties shall execute all such additional documents and instruments and shall do such additional acts and things as any Lender Party may reasonably request to fully effectuate the purposes of the Settlement Documents.  The Debtor agrees to cooperate fully with the Lender Parties to secure to the Lender Parties all benefits of the Sale Assets.

**13.8    Remedies; No Waiver**.  All remedies provided to the Lender Parties in the Settlement Documents are cumulative and nonexclusive and shall be in addition to any and all other rights and remedies provided under contract, by law or in equity.  No waiver of any default shall be implied from any omission by any Lender Party to take action on account of such default, even if such default persists or is repeated.  No waiver of any default shall affect any default other than the default expressly waived, and any such waiver shall be operative only for the time and to the extent stated.  No waiver of compliance with any provision of any of the Settlement Documents shall be construed as a waiver of any future compliance with the same provision.  No consent to or approval by any Lender Party of any act by any Q Party requiring further consent or approval shall be deemed to waive or render unnecessary a Lender Party's consent to or approval of any subsequent act.  Each party hereby waives any claims for special, incidental, consequential or punitive damages arising from any Lender Party's breach of the Settlement Documents.  No failure or delay on the part of the one party in exercising any power or right under the Settlement Documents or any other power or right of any Lender Party (including in declaring or not declaring any Termination Event) or any right of any Q Party shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.  No notice to or demand on any of the Q Parties hereto in any case shall entitle them to any notice or demand in similar or other circumstances.  No waiver or approval by any party under any Settlement Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions.  No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

28

**13.9    Notices**.  All notices required hereunder or pertaining hereto shall be in writing and shall be deemed delivered and effective upon the earliest of delivery, refusal of the addressee to accept delivery or failure of delivery after at least one attempt, in each case as such events are recorded in the ordinary business records of the delivery entity if such notice is sent by a nationally recognized express courier service, with all charges prepaid or charged to the sender's account, or by United States Mail, certified or registered, return receipt requested, and with all postage and other charges prepaid, in either case to the applicable addressee as follows:

| | |
|---|---|
| To the Debtor: | QOC I LLC<br>5901 Broken Sound Parkway, NW<br>Boca Raton, FL 33487<br>Attention: Q Capital Strategies, LLC<br>Facsimile No: (561) 886-4601<br>Confirmation No.: (561) 886-4600 |
| To the Servicer: | Q Capital Strategies, LLC<br>950 Third Avenue, 23rd Floor<br>New York, NY 10022<br>Attention: Steven M. Shapiro<br>Facsimile No: (212) 980-6654<br>Confirmation No.:  (212) 418-3270 |
| To the Loan Manager: | Q Capital Strategies, LLC<br>950 Third Avenue, 23rd Floor<br>New York, NY 10022<br>Attention: Steven M. Shapiro<br>Facsimile No: (212) 980-6654<br>Confirmation No.:  (212) 418-3270 |
| To the Equity Contributor: | Q Opportunity Company LLC<br>5901 Broken Sound Parkway, NW<br>Boca Raton, FL 33487<br>Attention: Q Capital Strategies, LLC<br>Facsimile No: (561) 886-4601<br>Confirmation No.: (561) 886-4600 |
| To LSE Holdings: | LSE Holdings LLC<br>c/o Medley Capital LLC<br>600 Montgomery St., Suite 3900<br>San Francisco, CA 94111<br>Attention:  Jon Schroeder<br>Facsimile No.: (415) 358-5514<br>Confirmation No.: (415) 568-2760 |

1523918 07155624

| To Fourth Third: | Fourth Third LLC |
| | c/o Medley Capital LLC |
| | 600 Montgomery St., Suite 3900 |
| | San Francisco, CA 94111 |
| | Attention: Jon Schroeder |
| | Facsimile No.: (415) 358-5514 |
| | Confirmation No.: (415) 568-2760 |
| | |
| To the Lender or the Hedge | Wells Fargo Bank, N.A. |
| Counterparty: | One Wachovia Center |
| | Mail Code: D1053-151 |
| | 301 South College Street |
| | Charlotte, NC 28202 |
| | Attention: Ron Ferguson |
| | Facsimile: (704) 383-6249 |
| | |
| To the Administrative Agent: | Wells Fargo Securities, LLC |
| | One Wachovia Center |
| | Mail Code D1053-060 |
| | 301 South College St |
| | Charlotte, NC 28202 |
| | Attention: Michael Kolosowsky |
| | Facsimile: (704) 383-9165 |
| | |
| To the Securities Intermediary | Wells Fargo Bank, N.A., |
| and/or Custodian: | as Securities Intermediary/Custodian |
| | Corporate Trust Services |
| | 299 So Main Street, 12th Floor |
| | MAC U1228-120 |
| | Salt Lake City, UT 84111 |
| | Attention: Rebecca Chapman |
| | Telephone No.: (801) 246-2667 |
| | Facsimile No.: (801) 246-5053 |

**13.10  Captions**. The titles and captions in this Agreement are for convenience only, and shall not be used to construe or interpret this Agreement.

**13.11  Severability**. If any term, covenant, condition or provision of this Agreement or the application thereof to any Person or circumstance shall, at any time or to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to Persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and shall be enforced to the fullest extent permitted by law.

**13.12  Business Day**. In the event performance is due hereunder on a day that is not a Business Day, performance shall be postponed to the next Business Day.

1523918 07155624

**13.13    Settlement**. The Settlement Documents are intended to evidence settlement among the parties hereto, and, until executed, shall not be admissible in any lawsuit or other legal proceeding, and are without prejudice to the rights of any party.

**13.14    Confidentiality**.

(a)        Each of the Lender Parties and the Q Parties shall maintain and shall cause each of its employees and officers to maintain the confidentiality of the Settlement Documents and all information with respect to the other parties, except that (A) each such party and its directors, officers and employees may (i) disclose such information to its external accountants, attorneys, or agents or in the Sale Assets and the agents and advisors of such Persons ("Excepted Persons"), provided, however, that each Excepted Person shall be advised by the party disclosing such information of the confidential nature of the information being disclosed, (ii) disclose such information as is required by Applicable Law and (iii) disclose this Agreement and such information in any suit, action, proceeding or investigation (whether in law or in equity or pursuant to arbitration) involving any of the Settlement Documents for the purpose of defending itself, reducing its liability or protecting or exercising any of its claims, rights, remedies or interests under or in connection with any of the Transaction Documents and (B) the Settlement Documents (but not any information provided by any Lender Party) will cease to be confidential once they are filed with the Bankruptcy Court unless filed under seal.

(b)        Anything herein to the contrary notwithstanding, each Q Party hereby consents to the disclosure of any nonpublic information with respect to it (i) to the Lender Parties by each other, (ii) by the Lender Parties to any prospective or actual assignee or participant of any of them or (iii) by the Lender Parties to any rating agency, any provider of financing to any Lender Party, any such actual or prospective assignee or any Person providing financing for, or holding equity interests in, any Sale Assets, as applicable, and to any officers, directors, employees, outside accountants, advisors and attorneys of any of the foregoing, provided each such Person in the case of clauses (ii) and (iii) is informed of the confidential nature of such information. In addition, the Lender Parties may disclose any such nonpublic information as required pursuant to any law, rule, regulation, direction, request or order of any judicial, administrative or regulatory authority or proceedings (whether or not having the force or effect of law).

(c)        Notwithstanding anything herein to the contrary, the foregoing shall not be construed to prohibit (i) disclosure of any and all information that is or becomes publicly known, (ii) disclosure of any and all information (A) if required to do so by any applicable statute, law, rule or regulation, (B) to any government agency or regulatory body having or claiming authority to regulate or oversee any respects of the Lender Parties' or the Q Parties' business or that of their Affiliates, (C) pursuant to any subpoena, civil investigative demand or similar demand or request of any court, regulatory authority, arbitrator or arbitration to which the Lender Parties, the Q Parties or an officer, director, employer, shareholder or affiliate of any of the foregoing is a party or (D) to any affiliate, independent or internal auditor, agent, employee or attorney of any Lender Party or the backup servicer of the Sale Assets; or (iii) any other disclosure authorized by any Q Party.

31

(d)     Each of the Q Parties agrees that, to the extent the provisions of the Settlement Documents require the disclosure of information in a manner that is inconsistent with any confidentiality agreement or arrangement between or binding upon any Q Parties, the Settlement Documents shall control and the Q Parties shall cause such other confidentiality agreement or arrangement to be modified accordingly.

**13.15   Waiver of Right to Jury Trial**. EACH OF THE PARTIES IRREVOCABLY HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY AND ALL SUITS, ACTIONS OR OTHER PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH.

[balance of page intentionally left blank]

1523918 07155624

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**DEBTOR:**

**QOC I LLC,**
as the Debtor

By:   Q Opportunity Company LLC,
      its sole member

By:   Q Capital Strategies, LLC,
      its Managing Member

By: _____
Name:  Steven M. Shapiro
Title:    President

**SERVICER:**

**Q CAPITAL STRATEGIES, LLC,**
as the Servicer

By: _____
Name:  Steven M. Shapiro
Title:    President

**THE LOAN MANAGER:**

**Q CAPITAL STRATEGIES, LLC,**
as Loan Manager

By: _____
Name:  Steven M. Shapiro
Title:    President

**THE EQUITY CONTRIBUTOR:**

**Q OPPORTUNITY COMPANY LLC,**
as Equity Contributor

By:   Q Capital Strategies, LLC,
      its Managing Member

By: _____
Name:  Steven M. Shapiro
Title:    President

33

LSE HOLDINGS:

LSE HOLDINGS LLC

By:_____
Name: Seth Taube
Title: Managing Member

FOURTH THIRD:

FOURTH THIRD LLC

By:_____
Name: Seth Taube
Title: Managing Member

MOF CAYMAN:

MEDLEY OPPORTUNITY FUND, LTD.

By:_____
Name:
Title:

MOF US:

MEDLEY OPPORTUNITY FUND, LP

By:_____
Name:
Title:

LENDER:

WELLS FARGO BANK, N.A., as Lender

By:_____
Name:
Title:

THE ADMINISTRATIVE AGENT:

WELLS FARGO SECURITIES, LLC,
as Administrative Agent

By:_____
Name:
Title:

34

LSE HOLDINGS:                       **LSE HOLDINGS LLC**

                                    By:_____
                                    Name:
                                    Title:

FOURTH THIRD:                       **FOURTH THIRD LLC**

                                    By:_____
                                    Name:
                                    Title:

MOF CAYMAN:                         **MEDLEY OPPORTUNITY FUND, LTD.**

                                    By:_____
                                    Name: Brook Taube
                                    Title: Director

MOF US:                             **MEDLEY OPPORTUNITY FUND, LP**

                                    By:_____
                                    Name: Brook Taube
                                    Title: Director

LENDER:                             **WELLS FARGO BANK, N.A., as Lender**

                                    By:_____
                                    Name:
                                    Title:

THE ADMINISTRATIVE AGENT:           **WELLS FARGO SECURITIES, LLC,**
                                    as Administrative Agent

                                    By:_____
                                    Name:
                                    Title:

1523918.13 07155624

LSE HOLDINGS:

LSE HOLDINGS LLC

By: _____
Name:
Title:

FOURTH THIRD:

FOURTH THIRD LLC

By: _____
Name:
Title:

MOF CAYMAN:

MEDLEY OPPORTUNITY FUND, LTD.

By: _____
Name:
Title:

MOF US:

MEDLEY OPPORTUNITY FUND, LP

By: _____
Name:
Title:

LENDER:

WELLS FARGO BANK, N.A., as Lender

By: _____
Name:  Ron R. Ferguson
Title:  Managing Director

THE ADMINISTRATIVE AGENT:

WELLS FARGO SECURITIES, LLC,
as Administrative Agent

By: _____
Name:            Mike Kolosowsky
Title:           Managing Director

34

1523918

HEDGE COUNTERPARTY:                WELLS FARGO BANK, N.A.,
                                   as Hedge Counterparty

                                   By: _____
                                   Name:
                                   Title:        John Miechkowski
                                                 Authorized Signatory


THE CUSTODIAN:                     WELLS FARGO BANK, N.A.,
                                   as Custodian

                                   By: _____
                                   Name:
                                   Title:

35

By: _____
Name:
Title:

THE CUSTODIAN:                    WELLS FARGO BANK, N.A.,
                                  as Custodian

                                  By: _____
                                  Name:
                                  Title:                Elizabeth A. Walker
                                                        Vice President

35

THE SECURITIES INTERMEDIARY:     **WELLS FARGO BANK, N.A.,**
as Securities Intermediary

By: _____

Name:

Title:        Elizabeth A. Walker
              Vice President

36

## Exhibit A

Bill of Sale

This BILL OF SALE (this "Bill of Sale") is made as of _____, 2010 by QOC I LLC, a Delaware limited liability company (the "Transferor"), in favor of [INSERT NAME OF ACQUIRER] (the "Transferee").

## R E C I T A L S:

A.     The Transferor, the Transferee and certain other parties have entered into that certain Settlement and Sale Agreement dated as of November [7], 2010 (as the same may be amended, supplemented or otherwise modified from time to time, the "Settlement Agreement"), pursuant to which the Transferor has consented to the sale to the Transferee of certain property. Capitalized terms used but not otherwise defined herein have the respective meanings assigned thereto in Schedule I hereto or, if not defined in such Schedule, in the Loan Agreement (as defined in the Settlement Agreement).

B.     Pursuant to the Settlement Agreement, the Transferor has agreed to transfer all of the Transferor's right, title and interest in all Sale Assets (as defined in the Settlement Agreement) to the Transferee.

C.     This Bill of Sale is made, executed and delivered to implement such provisions of the Settlement Agreement.

## AGREEMENTS

NOW, THEREFORE, based upon the foregoing recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Transferor and the Transferee agree as follows:

1.     Transfer.  The Transferor hereby transfers to the Transferee all of the Transferor's right, title and interest in and to all assets and property of the Transferor (wherever located), including, without limitation, all of the Transferor's right, title and interest in the property identified in clauses (i) - (x) below:

(i)     All insurance policies listed on Schedule II hereto and all other insurance policies (collectively, the "Policies") owned or acquired by the Transferor, and all monies due or to become due in payment under such Policies, including, but not limited to, all Collections;

(ii)    all Related Security with respect to the Policies referred to in clause (i);

(iii)   all Accounts and all funds, investments, Policies and other property or rights credited or attributable thereto;

(iv)   the right to proceed against any state guarantee fund and other property and interest in property related thereto;

Exh. A-1

(v)    all the right, title and interest (but none of the obligations) of the Transferor under the Transaction Documents (other than the Loan Agreement);

(vi)    the Hedge Collateral;

(vii)    to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Initial Purchaser in its capacity as the provider under the life/viatical settlement agreement against any person, whether known or unknown, arising under or in connection with the life/viatical settlement agreement, any other documents or instruments delivered pursuant thereto or the life settlement transaction governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, statutory claims and all other claims at law or in equity related to the rights and obligations transferred and assigned in connection with a Policy;

(viii)    in connection with a Policy, any Change Form and any UCC financing statements filed in connection therewith;

(ix)    all accounts, cash and currency, chattel paper, copyrights, copyright licenses, equipment, fixtures, contract rights, general intangibles, instruments, certificates of deposit, certificated securities, uncertificated securities, financial assets, securities entitlements, commercial tort claims, deposit accounts, inventory, investment property, letter-of-credit rights, software, supporting obligations, accessions, and other property consisting of, arising out of or related to any of the foregoing; and

(x)    all income and Proceeds of the foregoing.

2.    <u>Absolute Conveyance</u>.  This Bill of Sale is an absolute conveyance of title given in consideration of the Transferee's covenant not to enforce against the Transferor, solely with respect to the Collateral, the obligations of the Transferor under the Transaction Documents. This Bill of Sale shall not operate to discharge the obligations of Debtor or any other party obligated under the Transaction Documents by merger or otherwise, and the lien of such Transaction Documents is hereby preserved in favor of the Transferee, its successors and assigns.

3.    <u>Governing Law</u>.  This Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to any choice of law provisions thereof (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York).

IN WITNESS WHEREOF, the Transferor has executed this Bill of Sale as of the date first above written.

**TRANSFEROR**

QOC I LLC,
as the Debtor

By:    Q Opportunity Company LLC,
       its sole member

By:    Q Capital Strategies, LLC,
       its Managing Member

By:_____
    Name:  Steven M. Shapiro
    Title:   President

**TRANSFEREE**

**[NAME]**

By:_____
Name:
Title:

Exh. A-3

## Schedule I to Bill of Sale– Definitions

"Accounts":   The Prefunding Account, the Collection Account and the Premium Account.

"Assignment Notice":   A notice delivered to an Issuing Insurance Company of the Debtor's ownership interest and Wells Fargo's lien on and security interest in the related Policy.

"Backup Servicer":  Habersham Funding LLC.

"Backup Servicing Agreement":  The Backup Servicing Agreement among the Debtor, the Servicer and the Backup Servicer, as amended, supplemented or modified from time to time.

"Change Form":  With respect to a Policy, the change of ownership form/change of beneficiary form related to such Policy in the form required by the Issuing Insurance Company.

"Clearing Corporation":  The meaning specified in Section 8-102(a)(5) of the UCC.

"Collection Account":  A segregated corporate trust account described as such in the Loan Agreement.

"Collections":  (a) All Death Benefits with respect to the Policies, all proceeds of the sale or other disposition of Policies and all other cash proceeds of any Policy (including the proceeds of all Related Security with respect thereto), (b) interest earnings on Permitted Investments or otherwise in the Accounts, (c) any cash proceeds or other funds received with respect to any Related Security (including from any guarantors), (d) all payments received by or on behalf of the Debtor pursuant to any Hedging Agreement or Hedge Transaction, and (e) all other proceeds of Sale Assets.

"Control Agreement":  With respect to any Account, the Securities Account Control Agreement or any other control agreement with respect thereto with respect to which the Debtor and WFS are parties, as the same are amended or modified.

"Custodian":  Wells Fargo and its successors and assigns.

"Custody Agreement":   The Custodian Agreement among the Debtor, the Servicer, the Loan Manager, the Equity Contributor, the Custodian and Wells Fargo, as the same may be amended or modified.

"Death Benefit":   With respect to any Policy, the amount payable to the policy beneficiary or the policy beneficiaries, as the case may be, upon the death of the Insured(s).

"EC Capital Documents"  (i) the Loan Agreement, dated as of October 25, 2007 and amended February 20, 2008, between the Equity Contributor, as borrower, and Fourth Third, as lender, and (ii) the Second Amended and Restated Limited Liability Company Operating Agreement for the Equity Contributor, dated as of October 25, 2007 and amended and restated as of February 20, 2008, in each case as in effect on May 9, 2008 and in such form as shall have

Sch. I-1

been disclosed to WFS prior to May 9, 2008 and as further amended, supplemented or modified from time to time.

"Equity Contributor":  Q Opportunity Company LLC, a Delaware limited liability company.

"Escrow Documents":  All escrow documentation used in the acquisition of Policies and/or satisfaction of the escrow requirements set forth in the Loan Agreement.

"Fourth Third":  Fourth Third LLC, a Delaware limited liability company, and its successors and assigns.

"Hedge Collateral":  All right, title and interest of the Debtor in each Hedging Agreement, each Hedge Transaction, and all present and future amounts payable by a Hedge Counterparty to Debtor under or in connection with the respective Hedging Agreement and Hedge Transaction(s) with that Hedge Counterparty.

"Hedge Counterparty":  Wells Fargo, including as successor to Wachovia.

"Hedge Transaction":  Each interest rate swap transaction between the Debtor and a Hedge Counterparty that is governed by the Hedging Agreement.

"Hedging Agreement":  Each agreement between the Debtor and the Hedge Counterparty that governs one or more Hedge Transactions entered into by the Debtor and the Hedge Counterparty.

"Initial Purchaser":  Q Capital and its successors and assigns.

"Insured":  With respect to any Policy, the person (or each one of the persons) whose life (lives) is (are) insured by such Policy.

"Issuing Insurance Company":  With respect to any Policy, the insurance company that is obligated to pay the related Death Benefit upon the death of the related Insured by the terms of such Policy (or the successor to such obligation).

"Lender":  Wells Fargo, as successor to Wachovia.

"Lender Fee Letter":  Each fee letter agreement that shall be entered into by and among the Debtor, the Servicer, a funding agent and the Lender in connection with the transactions contemplated by the Loan Agreement, as amended, supplemented or modified from time to time.

"Life Expectancy":  With respect to any Policy, the related Insured's life expectancy determined by a Medical Underwriter, or the related report or other document provided by a Medical Underwriter with respect to the related Insured's life expectancy, as the case may be.

"Loan Agreement":  The Loan and Security Agreement, dated in or around May, 2008, among the Debtor, the Servicer, the Loan Manager, the Equity Contributor, the Lender, the

funding groups party thereto from time to time, WFS and the Custodian, as amended, supplemented or otherwise modified from time to time.

"Loan Manager":  Q Capital Strategies, LLC and each successor and assign thereto.

"LSE Holdings":  LSE Holdings LLC, a Delaware limited liability company and its successors and assigns.

"Medical Underwriter":  The Person identified as such in the Loan Agreement.

"Origination Agreement":  the Life Settlement Origination and Closing Agreement dated as of October 25, 2007 among Q Capital and the Debtor.

"Permitted Investments":  Negotiable instruments or securities or other investments.

"Person":  An individual, partnership, corporation, limited liability company, joint stock company, trust (including a statutory or business trust), unincorporated association, sole proprietorship, joint venture, government (or any agency or political subdivision thereof) or other entity.

"Policy Information":  With respect to each Policy, the following documents and their contents:

          (i)      one of the following: (a) the original life insurance policy, (b) a certificate of insurance or (c) a lost policy form; and

          (ii)     A Change Form executed by the related original seller and, if applicable, the Initial Purchaser.

"Power of Attorney":  Each power of attorney executed by a Related Party in favor of WFS, the Custodian and/or the Backup Servicer in connection with the Transaction Documents.

"Prefunding Account":  A segregated corporate trust account described as such in the Loan Agreement.

"Premium":  With respect to any Policy, as indicated by the context, any past due premium with respect thereto, or any scheduled premium, determined and projected by the Servicer, including, if applicable, premiums or other payments in connection with the conversion of such Policy from a term life policy to a permanent life policy.

"Premium Account":  A segregated corporate trust account described as such in the Loan Agreement.

"Proceeds":  All property that is receivable or received when Policies are collected, sold, liquidated, foreclosed, exchanged, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes all rights to payment with respect to any insurance relating to such Sale Policies.

"Q Capital":  Q Capital Strategies, LLC, a Delaware limited liability company.

"Records":  All documents relating to the Policies, including books, records and other information executed in connection with the origination or acquisition of the Policies and Related Security or maintained with respect to the Policies and Related Security and the related Issuing Insurance Company that a Related Party has generated or in which the Debtor has acquired an interest pursuant to a Sale Agreement or in which a Related Party has otherwise obtained an interest.

"Related Parties":  The Debtor, the Initial Purchaser, the Servicer, the Loan Manager, the Equity Contributor, LSE Holdings and Fourth Third.

"Related Security":  All of the following:

(a)    the Required Asset Documents and the Servicing Files related to any Policy, all related Records, and the documents, agreements, and instruments included in the Required Asset Documents, the Servicing File or Records;

(b)    the Accounts and any escrow accounts, together with all cash and investments in each of the foregoing other than amounts earned on investments therein;

(c)    each Hedging Agreement to which the Debtor is a party and all payments from time to time due to the Debtor thereunder;

(d)    each Sale Agreement (including, without limitation, rights of recovery of the Debtor against the Initial Purchaser under each Sale Agreement);

(e)    each Escrow Document;

(f)    all UCC financing statements (if any) filed by the Debtor against the seller of any Policy under or in connection with any applicable Sale Agreement;

(g)    all records (including computer records) with respect to the foregoing; and

(h)    all collections, income, payments, proceeds and other benefits of each of the foregoing.

"Required Asset Documents":  With respect to a Policy, Policy Information, Assignment Notice, Sale Agreement and escrow agreement, life/viatical settlement agreement and all assignments and other transfer documents with respect thereto.

"Sale Agreement":  The Policy Sale Agreement, dated in or around May, 2008, between the Initial Purchaser and the Debtor, and each agreement pursuant to which the Initial Purchaser acquires Policies from a third party life settlement provider, in each case as amended, supplemented or modified from time to time.

"Securities Account":  The meaning specified in Section 8-501 of the UCC.

"Securities Account Control Agreement": The Account Control Agreement among the Debtor, WFS, the Servicer, the Loan Manager, the Equity Contributor, and the Custodian, as Securities Intermediary, as the same may be amended, supplemented or modified from time to time.

"Securities Intermediary": (i) A Clearing Corporation; or (ii) a Person, including a bank or broker, that in the ordinary course of its business maintains Securities Accounts for others and is acting in that capacity.

"Servicer": Q Capital Strategies, LLC and each successor and assign thereto.

"Servicing Agreement": The Servicing and Tracking Agreement, dated as of October 25, 2007, between Q Capital and the Debtor, as such agreement is in effect as of May 9, 2008, as amended, supplemented or modified from time to time.

"Servicing File": With respect to any Policy, (a) such Policy; (b) escrow agreement/escrow release letter; (c) sale/assignment agreement; (d) life/viatical settlement agreement; (e) verification of coverage; (f) Change Form executed by the Policy seller and acknowledged by the Issuing Insurance Company, and, if applicable, Change Form executed by the Initial Purchaser and acknowledged by the Issuing Insurance Company; (g) Assignment Notice acknowledged by the Issuing Insurance Company; (h) 20 day notice of transfer, if applicable; (i) 20 day notice of transfer (insured), if applicable; (j) acknowledgement of insured; (k) acknowledgement of seller, if applicable; (l) beneficiary waiver, if applicable; (m) disclosure statement; (n) physician statement, if applicable; (o) power of attorney, if applicable; (p) trustee certification, if applicable; (q) corporate resolution, if applicable, or similar document for a limited liability company or partnership, if applicable; (r) life/viatical settlement application, including the medical authorization and medical information; (s) any other document included in the closing package; (t) the initial Life Expectancy delivered in connection with the acquisition of the related Policy by Debtor and any updated Life Expectancy; (u) any updated medical release, power of attorney or consent; (v) change in contact information with respect to the Insured or his/her representative; and (w) the initial illustration of Premiums, in each case related to such Policy.

"Transaction Documents": The Loan Agreement, the Custody Agreement, each Hedging Agreement, each Sale Agreement, each Power of Attorney, each Control Agreement, the Backup Servicing Agreement, the Valuation Agreement, each Variable Funding Note, each Lender Fee Letter, any joinder supplement in connection with the Loan Agreement, the Origination Agreement, the Servicing Agreement, the EC Capital Documents, the Escrow Documents, and each additional certificate, notice, letter, agreement or document executed and delivered in connection with any of the foregoing documents or the transactions contemplated thereby.

"UCC": The Uniform Commercial Code as from time to time in effect in the applicable jurisdiction or jurisdictions.

"Valuation Agent": Towers Watson Risk Consulting, Inc., as successor to Watson Wyatt & Company.

1523918 07155624

"<u>Valuation Agreement</u>":  The engagement letter dated as of March 26, 2008 among the Debtor, Wells Fargo, the Valuation Agent and the Loan Manager, as amended, supplemented or modified from time to time.

"<u>Variable Funding Note</u>":  A variable funding note delivered in connection with the Loan Agreement.

"<u>Wachovia</u>":  Wachovia Bank, National Association, a national banking association, in its individual capacity, and its successors and assigns.

"<u>Wells Fargo</u>":  Wells Fargo Bank, N.A.

"<u>WFS</u>":  Wells Fargo Securities LLC, as Administrator under the Loan Agreement and successor in such capacity to Wachovia Capital Markets, LLC.

## Schedule II

[List of Policies to be Transferred as Part of Sale Assets]

1523918 07155624

**REDACTED**

## Exhibit B

Form of General Assignment of Rights

General Assignment of Rights

This GENERAL ASSIGNMENT (this "Assignment") is made and entered into on _____, 2010 by and between QOC I LLC, a Delaware limited liability company (the "Assignor"), and [INSERT NAME OF ACQUIRER] (the "Assignee").

R E C I T A L S:

This Assignment is entered into with respect to the following facts:

A.    The Assignor, the Assignee and other parties thereto have entered into that certain Settlement and Sale Agreement dated as of November 8, 2010 (as the same may be amended, supplemented or otherwise modified from time to time, the "Settlement Agreement") pursuant to which the Assignor has agreed to the sale by the Assignee of certain property.

B.    Pursuant to the Settlement Agreement, the Assignor has agreed to assign to the Assignee all of the Assignor's right, title and interest in and to all contracts and agreements related to or used in connection with the Sale Assets (as defined in the Settlement Agreement).

C.    This Assignment is intended to implement such provisions of the Settlement Agreement.

### AGREEMENTS

NOW, THEREFORE, based upon the foregoing recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Assignor and the Assignee hereby agree as follows:

1.    Assignment.  The Assignor does hereby unconditionally assign, sell, transfer, grant, convey and set over unto the Assignee all of the Assignor's right, title, and interest in and to all contracts and agreements included in the Sale Assets, including, without limitation, all Policies and all life settlement documents in the Servicing Files and Records.

2.    Further Assurances.  Whenever reasonably requested to do so by the Assignee, the Assignor shall execute, acknowledge, and deliver any further conveyances, assignments, confirmations, satisfactions, releases, instruments of further assurance, approvals, consents, and any further instruments or documents that are reasonably necessary, expedient or proper to complete the conveyances, transfers, sales and assignments contemplated by this Assignment.  In addition, subject to the terms of the preceding sentence, the Assignor shall take such further action and execute, acknowledge, and deliver such additional documents as may reasonably be requested by the Assignee to carry out the intent and purpose of this Assignment and/or the Settlement Agreement.

Exh. B-1

3.    <u>Assignee's Obligations</u>.  The Assignor hereby acknowledges and agrees that the Assignee by accepting the foregoing assignment or taking title to the property or rights assigned hereunder shall not be deemed to have assumed any obligations or liabilities and that all such obligations and liabilities remain solely with the Assignor.

4.    <u>Governing Law</u>.  This Assignment shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to any choice of law provisions thereof (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York).

IN WITNESS WHEREOF, this Assignment is executed and delivered as of the date first above written.

**ASSIGNOR**

QOC I LLC

By:    Q Opportunity Company LLC, its sole member

By:    Q Capital Strategies, LLC, its
managing member


By:_____
Name:
Title:

**ASSIGNEE:**

[NAME]


By:_____
Name:
Title:

Exh. B-2

**Exhibit C**

[Approval Order]

1523918.11 07155624

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QOC I LLC, | ) | Case No. 10-40153 |
| | ) | |
| | ) | Hon. Paul G. Hyman |
| Debtor. | ) | |

**ORDER PURSUANT TO SECTIONS 105(a), 107(c), 363, 365 AND 1112 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULES 9019(a), 2002,
6004, AND 6006 AUTHORIZING AND APPROVING THE SETTLEMENT
AMONG THE DEBTOR, RELATED PARTIES, AND WELLS FARGO, INCLUDING
AUTHORIZING AND APPROVING (A) TRANSFER OF SALE ASSETS TO WELLS
FARGO AFFILIATE FREE AND CLEAR OF OTHER LIENS AND INTERESTS
(B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS,
(C) REJECTION OF SERVICING AND TRACKING AGREEMENT,
AND (D) PROVIDING FOR DISMISSAL OF CASE**

This matter coming before the Court on the Motion of the Debtor Pursuant to

Sections 105(a), 107(c), 363, 365, and 1112 of the Bankruptcy Code and Bankruptcy Rules

9019(a), 2002, 6004, and 6006 for Authorization and Approval of the Settlement Among the

Debtor, Related Parties, and Wells Fargo, including authorizing and approving (a) transfer of

Sale Assets to a Wells Fargo affiliate free and clear of other liens and interests and (b)

assumption and assignment of specified executory contracts, (c) rejection of the Servicing

Agreement, and (d) providing for dismissal of the above-captioned chapter 11 case (the

"Motion") [D.E. ___],[1] filed by QOC I, LLC, the debtor and debtor-in-possession in the above-

captioned chapter 11 case (the "Debtor"); the Court having reviewed the Motion and having

considered the statements of counsel and the evidence adduced with respect to the Motion at a

hearing before the Court (the "Hearing"); and the Court having found and determined the relief

sought in the Motion is in the best interests of the Debtor, its estate, its creditors, and all other

parties in interest and that the legal and factual bases set forth in the Motion and at the Hearing

establish just cause for the relief granted herein; and after due deliberation and good and

sufficient cause appearing therefore, it is

ADJUDGED, FOUND AND DETERMINED:

A.      This Court has jurisdiction over the Motion and the proposed settlement

set forth in the Settlement Documents (the "Settlement") pursuant to 28 U.S.C. §§ 157(b)(1) and

1334(a), and this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (G),

(K), (N), and (O).  Venue of this chapter 11 case (the "Case") and the Motion in this district is

proper under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Motion and granted in

this Order include, without limitation, Sections 105(a), 107(c), 363, 365, and 1112 of the

Bankruptcy Code, and Bankruptcy Rules 9019, 2002, 6004, and 6006.

C.      As evidenced by the affidavits or certificates of service filed with the

Court, the Court finds that:  (1) proper, timely, adequate and sufficient notice of the Motion and

the Settlement, including the Sale of the Sale Assets (including of the assumption and

---

[1]      Capitalized terms not otherwise defined herein have the meanings given to them in the Motion or the
Settlement and Sale Agreement attached as Exhibit A hereto (the "Settlement and Sale Agreement"), as applicable.

-2-

assignment of the Assigned Contracts), has been provided by the Debtor; (2) such notice, and the form and manner thereof, was good, sufficient, reasonable and appropriate under the circumstances prevailing in this Case; and (3) no other or further notice of the Motion or the Settlement, including the Sale of the Sale Assets (including of the assumption and assignment of the Assigned Contracts), is or shall be required.

D.    A reasonable opportunity to object and be heard at the Hearing on the Motion and the relief requested therein has been given as required by the Bankruptcy Code and all Bankruptcy Rules to all persons entitled to notice, including the following: (i) the Office of the United States Trustee, (ii) each Issuing Insurance Company, (iii) counsel for Wells Fargo, (iv) all persons who are known to possess or assert a Lien against any of the Sale Assets, (v) the Internal Revenue Service, (vi) all applicable state and local governmental entities with taxing authority, (vii) all persons who have filed a notice of appearance in this Case, and (viii) all other persons required by any order of the Bankruptcy Court to receive notice of any matter in the Case, including all known creditors and other parties in interest of the Debtor.

E.    Entry into the Settlement, including the Sale of the Sale Assets, is in the best interests of the Debtor and its estate, its creditors, and other parties in interest and represents the fair, reasonable and appropriate exercise of the Debtor's sound business judgment. The relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors, and other parties in interest.

F.    The Settlement and each of the transactions contemplated therein, including the Sale of the Sale Assets (including the assumption and assignment of the Assigned Contracts), were negotiated, proposed and entered into by the Debtor, the other Q Parties and the Lender Parties in good faith, without collusion and from arm's length bargaining positions.

-3-

None of the Lender Parties (including the Acquirer) is an "insider" of the Debtor, as that term is defined in Section 101(31) of the Bankruptcy Code. None of the Debtor, the other Q Parties, or the Lender Parties has engaged in any conduct that would cause or permit the Sale (or any other aspect of the Settlement Documents) to be avoided under Section 363(n) of the Bankruptcy Code. The Acquirer is a good faith transferee of the Sale Assets (including the Assigned Contracts) within the meaning of Section 363(m) of the Bankruptcy Code and is, therefore, entitled to all of the protections afforded thereby.

G.    Without limiting the generality of the foregoing, the Debtor's release of liability in favor of the Lender Parties set forth in Section 3 of the Settlement and Sale Agreement represents an appropriate exercise of its business judgment and shall be fully enforceable pursuant to its terms upon the Effective Date.

H.    No additional marketing or other sale process with respect to the Sale Assets is necessary or advisable or shall otherwise be required. The consideration constitutes, at a minimum, reasonably equivalent value or fair consideration for the Sale Assets, as the case may be (as those terms are defined in each of the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and Section 548 of the Bankruptcy Code). Moreover, the Settlement Documents were not entered into for the purpose (or with the intent) of hindering, delaying, or defrauding any creditor of the Debtor.

I.    The transfer of the Sale Assets (including of the Assigned Contracts) to the Acquirer under the Settlement Documents will be a legal, valid, and effective transfer of the Sale Assets, and vests or will vest the Acquirer with all right, title, and interest of the Debtor in and to the Sale Assets free and clear of all Liens (other solely than the Lien of the Administrative Agent for benefit of the Lender Parties in and to the Sale Assets), claims (as defined in Section

-4-

101(5) of the Bankruptcy Code) (other than the claims of the Lender Parties), or encumbrances (collectively, the "Interests"). Such transfer may and shall be authorized pursuant to Section 363(f) of the Bankruptcy Code because one or more of the standards set forth in Section 363(f)(1)-(5) of the Bankruptcy Code, including that any person asserting a competing claim or interest in or to the Sale Assets could be compelled in a legal or equitable proceeding to accept a money satisfaction of such claim or interest, has been satisfied.

       J.      The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order is integral to the Settlement Documents and is in the best interests of the Debtor and its estate, its creditors, and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor. The Debtor, to the extent necessary, has satisfied the requirements of Section 365 of the Bankruptcy Code for the assumption and assignment of such contracts. Any objections to the assumption and assignment of any of the Assigned Contracts to the Acquirer are hereby overruled.

       K.      With the understanding that the Existing Privacy Policies are not intended to limit the possible marketing of the Sale Assets after the Closing Date by the Acquirer to potential Third Party Buyers, financing sources, or joint venture members pursuant to confidentiality agreements, the Lender Parties, after the Closing Date, have agreed to undertake to cause the Acquirer to implement and adhere to privacy policies with respect to the Sale Assets substantially similar to the Existing Privacy Policies. Accordingly, no Consumer Privacy Ombudsman need be appointed under Section 363(b)(1)(B) of the Bankruptcy Code.

       L.      The Q Parties each have specifically consented to and shall be deemed to be subject to the jurisdiction of the Court for all purposes relating to the entry of this Order, the Settlement and the transactions contemplated therein or thereby.

-5-

M.     The Settlement provides for the disposition of substantially all of the Debtor's assets, and other than those of the Lenders Parties, there will not be material non-insider claims remaining unpaid at the time of the consummation of such disposition. Accordingly, following the Closing Date, it is in the best interests of creditors and the Debtor under such circumstances to dismiss the Case, rather than convert it to Chapter 7. Accordingly, good and sufficient cause exists for the dismissal of the Case after the Closing Date pursuant to Section 1112(b) of the Bankruptcy Code.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.     Any and all objections to the Motion are hereby overruled, and the Motion is GRANTED in its entirety.

2.     The Settlement, including the Sale of the Sale Assets (including the assumption and assignment of the Assigned Contracts), is adopted, approved and ratified in its entirety. The Debtor is authorized and directed to enter into and perform its obligations under the Settlement, including the Sale of the Sale Assets, which Settlement is approved in its entirety as if expressly stated herein pursuant to Bankruptcy Rule 9019 and Sections 105(a), 363, and 365 of the Bankruptcy Code.

3.     The Debtor is authorized to take any and all actions necessary or appropriate to implement the terms of this Order and the Settlement, including the Sale of the Sale Assets (including the assumption and assignment of the Assigned Contracts).

4.     Consistent with (and without limiting the generality of) the foregoing, and pursuant to Bankruptcy Rule 9019 and Sections 105(a), 363, and 365 of the Bankruptcy Code, the Debtor's execution and delivery of the Settlement and Sale Agreement is hereby authorized,

directed, and ratified in all respects, and the Debtor is hereby authorized and directed to enter into each other Settlement Document, each Settlement Document (including the Settlement and Sale Agreement itself) being approved in its entirety as if expressly restated herein. Without limiting the generality of the foregoing, the Debtor is authorized and directed to take all actions required under the terms of the Settlement Documents. Prior or subsequent to the execution and delivery of the Settlement and Sale Agreement (or any of the other Settlement Documents), the parties may revise various provisions of the form of such agreement (or other Settlement Documents) without the necessity of any further court approval so long as any such revision does not materially alter the provisions of this Order or of the form of the Settlement and Sale Agreement attached as Exhibit A hereto (or other Settlement Document). After the Effective Date, the parties shall be entitled to amend Settlement and Sale Agreement pursuant to the provisions of Section 13.5 thereof, and any of the other Settlement Documents pursuant to their pertinent provisions, without the necessity of any further Court approval.

5.    As of the date of the entry of this Order, the allowed amount of Lender Party Claims aggregate at least $_____, secured by a perfected, first priority security interest in the Sale Assets.

6.    The Debtor's release of liability in favor of the Lender Parties set forth in Section 3 of the Settlement and Sale Agreement shall be effective and fully enforceable on the Effective Date as if expressly restated herein.

7.    Pursuant to Section 105(a) and 363(f) of the Bankruptcy Code, the Debtor is authorized and directed to transfer the Sale Assets (including of the Assigned Contracts) to the Acquirer and, as of the Closing Date, the Acquirer shall take title to and possession of the Sale Assets free and clear of all Interests of any kind or nature whatsoever (other solely than the Lien

-7-

of the Administrative Agent for the benefit of the Lender Parties and the claims of the Lender Parties).

8.     As of the Closing Date, (a) the transactions contemplated by the Settlement Documents effect a legal, valid, enforceable and effective sale and transfer of the Sale Assets to Acquirer, and shall vest Acquirer with title to such Sale Assets free and clear of all Interests (other solely than the Lien of the Administrative Agent for the benefit of the Lender Parties and the claims of the Lender Parties) and (b) the Settlement Documents and the transactions and instruments contemplated thereby shall be specifically performable and enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtor or any successor Chapter 11 or Chapter 7 trustee appointed with respect thereto.

9.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtor's interests in the Sale Assets.

10.     This Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Sale Assets prior to the Closing Date (other solely than the Lien of the Administrative Agent for the benefit of the Lender Parties and the claims of the Lender Parties) have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including, without limitation, all Issuing Insurance Companies, filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept,

-8-

file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Sale Assets.

11.    On the Closing Date, each of the Debtor's creditors (other than the Lender Parties) is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Liens in the Sale Assets, if any, as such Interests may have been recorded or may otherwise exist.

12.    Neither the Acquirer nor its affiliates (including the other Lender Parties), successors or assigns shall, as a result of the consummation of the transaction contemplated by the Settlement Documents: (a) be a successor to the Debtor or its estate; (b) have, de facto or otherwise, merged or consolidated with or into the Debtor or its estate; or (c) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor.

13.    In accordance with Sections 363, 365 and 105(a) of the Bankruptcy Code, and subject to the terms of the Settlement Documents and this Order, the Debtor is hereby authorized to assume and assign the Assigned Contracts, including the Policies, to which it is a party (or in which it has the beneficial interest) to the Acquirer.

14.    The requirements of Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with respect to the Assigned Contracts.

15.    Upon the Debtor's assignment of the Assigned Contracts to the Acquirer under the provisions of this Order, no default shall exist under any Assigned Contract, and no counterparty to any Assigned Contract (including any Issuing Insurance Company) shall be permitted to declare a default by the Acquirer under such Assigned Contract or otherwise take

CHDB02 5292600.1 11-Nov-10 16:53

action against the Acquirer as a result of the Debtor's financial condition, bankruptcy or failure to perform prior to the Closing Date any of its obligations under the relevant Assigned Contract.

16.     Except for the Assigned Contracts, no contracts or unexpired leases shall be assumed and assigned as part of the Sale Assets.  Moreover, the Debtor's existing contract with the Servicer, the Servicing and Tracking Agreement dated as of October 25, 2007, shall be deemed rejected and terminated as of the Closing Date.

17.     The terms and provisions of the Settlement Documents and this Order shall be binding in all respects upon the Debtor, its estate, all Issuing Insurance Companies, all creditors of (whether known or unknown) and direct or indirect holders of equity interests in the Debtor, the other Q Parties, the Acquirer and their respective affiliates, successors and assigns, and any third parties, notwithstanding any subsequent appointment of any trustee of the Debtor under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding and notwithstanding any subsequent conversion or dismissal of this Case.  This Order and the Settlement Documents shall inure to the benefit of the Debtor, its estate, its creditors, the other Q Parties, the Acquirer, and their respective successors and assigns of each of the foregoing.

18.     The consideration provided to or by the Acquirer with respect to the Sale Assets under the Settlement Documents is fair and reasonable and may not be avoided under Section 363(n) of the Bankruptcy Code.

19.     The transactions contemplated by the Settlement Documents are undertaken by the Acquirer (and the other Lender Parties) without collusion and in good faith, as that term is used in Section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not

-10-

affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts) to the Acquirer, unless such authorization is duly stayed pending such appeal prior to the Closing Date.  The Acquirer is a good faith transferee of the Sale Assets and, accordingly, is entitled to all of the benefits and protections afforded by Section 363(m) of the Bankruptcy Code.

20.    The Lender Parties, after the Closing Date, will undertake to cause the Acquirer to implement and adhere to privacy policies with respect to the Sale Assets substantially similar to the Existing Privacy Policies.

21.    There shall be no Consumer Privacy Ombudsman appointed under Section 363(b)(1)(B) of the Bankruptcy Code.

22.    Nothing contained in any other Order in this Case (including in any Order converting or dismissing this Case) shall alter, conflict with, or derogate from, the provisions of the Settlement Documents or this Order.

23.    The failure specifically to include any particular provisions of the Settlement Documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Settlement Documents be authorized and approved in their entirety; provided, however, that this Order shall govern if there is any inconsistency between any of the Settlement Documents and this Order.  Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

24.    Pursuant to Section 107(c) of the Bankruptcy, the parties shall not be required to file Exhibit D to the Settlement and Sale Agreement in the docket of this Court and in this Case in order to prevent the undue risk of identity theft.

25.    Within 30 days following the Closing Date, and pursuant to Section 1112(b) of the Bankruptcy Code, this Court shall enter an Order dismissing this Case, which Order shall expressly include the issuance of an injunction prohibiting the Debtor and the Q Parties from commencing any subsequent bankruptcy proceeding involving the Debtor under any Chapter of the Bankruptcy Code without the prior, express written consent of the Lender for a period of at least twelve (12) months following the date of the entry of such dismissal Order (the "Dismissal Order").  No further notice or hearing shall be required prior to the entry of the Dismissal Order, which Dismissal Order shall be entered upon the filing of a certification of counsel for the Debtor that the Settlement has closed pursuant to its terms.

26.    Pending dismissal of this chapter 11 case, this Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Settlement Documents, all amendments thereto and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Sale Assets to Acquirer; (b) interpret, implement and enforce the provisions of this Order; (c) protect Acquirer against any Interests in or claims against the Debtor or the Sale Assets of any kind or nature whatsoever, and (d) enter any orders under Sections 363 and 365 of the Bankruptcy Code with respect to the Assigned Contracts.  After the dismissal of this case, this Court shall no longer retain or have any jurisdiction over such matters.

27.    Notwithstanding the provisions of Bankruptcy Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry. Time is of the essence in closing the transactions referenced herein, and the Debtor and the

-12-

Acquirer intend to close the Sale as soon as practicable.  Any party objecting to this Order must

exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed

as moot.

###

**Submitted by:**

Glenn D. Moses, Esq.
Florida Bar No. 174556
Heather L. Harmon, Esq.
Florida Bar No. 013192
GENOVESE JOBLOVE & BATTISTA, P.A.
4400 Miami Tower
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310
gmoses@gjb-law.com
hharmon@gjb-law.com

and

Gerald H. Gline, Esq.
(admission *pro hac vice*)
ggline@coleschotz.com
David M. Bass, Esq.
(admission *pro hac vice*)
dbass@coleschotz.com
COLE, SCHOTZ, MEISEL, FORMAN &
LEONARD, P.A.
25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Facsimile:  (201) 489-1536

Co-Counsel for *QOC I LLC*, Debtor and
Debtor-in-Possession

Copy to:  Glenn D. Moses, Esq., who shall serve a copy of this order on all interested parties and
file a certificate of service  conforming with Local Rule 2002-1(F).

CHDB02 5292600.1 11-Nov-10 16:53

## Exhibit D

[List of Policies to be Transferred as Part of Sale Assets]

**REDACTED**

**EXHIBIT 2**

(Form of Proposed Approval Order)

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QOC I LLC, | ) | Case No. 10-40153 |
| | ) | |
| | ) | Hon. Paul G. Hyman |
| Debtor. | ) | |

**ORDER PURSUANT TO SECTIONS 105(a), 107(c), 363, 365 AND 1112 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULES 9019(a), 2002,
6004, AND 6006 AUTHORIZING AND APPROVING THE SETTLEMENT
AMONG THE DEBTOR, RELATED PARTIES, AND WELLS FARGO, INCLUDING
AUTHORIZING AND APPROVING (A) TRANSFER OF SALE ASSETS TO WELLS
FARGO AFFILIATE FREE AND CLEAR OF OTHER LIENS AND INTERESTS
(B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS,
(C) REJECTION OF SERVICING AND TRACKING AGREEMENT,
AND (D) PROVIDING FOR DISMISSAL OF CASE**

This matter coming before the Court on the Motion of the Debtor Pursuant to

Sections 105(a), 107(c), 363, 365, and 1112 of the Bankruptcy Code and Bankruptcy Rules

9019(a), 2002, 6004, and 6006 for Authorization and Approval of the Settlement Among the

Debtor, Related Parties, and Wells Fargo, including authorizing and approving (a) transfer of

Sale Assets to a Wells Fargo affiliate free and clear of other liens and interests and (b)

assumption and assignment of specified executory contracts, (c) rejection of the Servicing

Agreement, and (d) providing for dismissal of the above-captioned chapter 11 case (the

"Motion") [D.E. ___],[1] filed by QOC I, LLC, the debtor and debtor-in-possession in the above-

captioned chapter 11 case (the "Debtor"); the Court having reviewed the Motion and having

considered the statements of counsel and the evidence adduced with respect to the Motion at a

hearing before the Court (the "Hearing"); and the Court having found and determined the relief

sought in the Motion is in the best interests of the Debtor, its estate, its creditors, and all other

parties in interest and that the legal and factual bases set forth in the Motion and at the Hearing

establish just cause for the relief granted herein; and after due deliberation and good and

sufficient cause appearing therefore, it is

ADJUDGED, FOUND AND DETERMINED:

A.    This Court has jurisdiction over the Motion and the proposed settlement

set forth in the Settlement Documents (the "Settlement") pursuant to 28 U.S.C. §§ 157(b)(1) and

1334(a), and this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (G),

(K), (N), and (O).  Venue of this chapter 11 case (the "Case") and the Motion in this district is

proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief sought in the Motion and granted in

this Order include, without limitation, Sections 105(a), 107(c), 363, 365, and 1112 of the

Bankruptcy Code, and Bankruptcy Rules 9019, 2002, 6004, and 6006.

C.    As evidenced by the affidavits or certificates of service filed with the

Court, the Court finds that:  (1) proper, timely, adequate and sufficient notice of the Motion and

the Settlement, including the Sale of the Sale Assets (including of the assumption and

---

[1]      Capitalized terms not otherwise defined herein have the meanings given to them in the Motion or the
Settlement and Sale Agreement attached as Exhibit A hereto (the "Settlement and Sale Agreement"), as applicable.

assignment of the Assigned Contracts), has been provided by the Debtor; (2) such notice, and the form and manner thereof, was good, sufficient, reasonable and appropriate under the circumstances prevailing in this Case; and (3) no other or further notice of the Motion or the Settlement, including the Sale of the Sale Assets (including of the assumption and assignment of the Assigned Contracts), is or shall be required.

D.     A reasonable opportunity to object and be heard at the Hearing on the Motion and the relief requested therein has been given as required by the Bankruptcy Code and all Bankruptcy Rules to all persons entitled to notice, including the following: (i) the Office of the United States Trustee, (ii) each Issuing Insurance Company, (iii) counsel for Wells Fargo, (iv) all persons who are known to possess or assert a Lien against any of the Sale Assets, (v) the Internal Revenue Service, (vi) all applicable state and local governmental entities with taxing authority, (vii) all persons who have filed a notice of appearance in this Case, and (viii) all other persons required by any order of the Bankruptcy Court to receive notice of any matter in the Case, including all known creditors and other parties in interest of the Debtor.

E.     Entry into the Settlement, including the Sale of the Sale Assets, is in the best interests of the Debtor and its estate, its creditors, and other parties in interest and represents the fair, reasonable and appropriate exercise of the Debtor's sound business judgment.  The relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors, and other parties in interest.

F.     The Settlement and each of the transactions contemplated therein, including the Sale of the Sale Assets (including the assumption and assignment of the Assigned Contracts), were negotiated, proposed and entered into by the Debtor, the other Q Parties and the Lender Parties in good faith, without collusion and from arm's length bargaining positions.

None of the Lender Parties (including the Acquirer) is an "insider" of the Debtor, as that term is defined in Section 101(31) of the Bankruptcy Code.  None of the Debtor, the other Q Parties, or the Lender Parties has engaged in any conduct that would cause or permit the Sale (or any other aspect of the Settlement Documents) to be avoided under Section 363(n) of the Bankruptcy Code.  The Acquirer is a good faith transferee of the Sale Assets (including the Assigned Contracts) within the meaning of Section 363(m) of the Bankruptcy Code and is, therefore, entitled to all of the protections afforded thereby.

G.    Without limiting the generality of the foregoing, the Debtor's release of liability in favor of the Lender Parties set forth in Section 3 of the Settlement and Sale Agreement represents an appropriate exercise of its business judgment and shall be fully enforceable pursuant to its terms upon the Effective Date.

H.    No additional marketing or other sale process with respect to the Sale Assets is necessary or advisable or shall otherwise be required.  The consideration constitutes, at a minimum, reasonably equivalent value or fair consideration for the Sale Assets, as the case may be (as those terms are defined in each of the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and Section 548 of the Bankruptcy Code).  Moreover, the Settlement Documents were not entered into for the purpose (or with the intent) of hindering, delaying, or defrauding any creditor of the Debtor.

I.    The transfer of the Sale Assets (including of the Assigned Contracts) to the Acquirer under the Settlement Documents will be a legal, valid, and effective transfer of the Sale Assets, and vests or will vest the Acquirer with all right, title, and interest of the Debtor in and to the Sale Assets free and clear of all Liens (other solely than the Lien of the Administrative Agent for benefit of the Lender Parties in and to the Sale Assets), claims (as defined in Section

101(5) of the Bankruptcy Code) (other than the claims of the Lender Parties), or encumbrances (collectively, the "Interests"). Such transfer may and shall be authorized pursuant to Section 363(f) of the Bankruptcy Code because one or more of the standards set forth in Section 363(f)(1)-(5) of the Bankruptcy Code, including that any person asserting a competing claim or interest in or to the Sale Assets could be compelled in a legal or equitable proceeding to accept a money satisfaction of such claim or interest, has been satisfied.

        J.      The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order is integral to the Settlement Documents and is in the best interests of the Debtor and its estate, its creditors, and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor. The Debtor, to the extent necessary, has satisfied the requirements of Section 365 of the Bankruptcy Code for the assumption and assignment of such contracts. Any objections to the assumption and assignment of any of the Assigned Contracts to the Acquirer are hereby overruled.

        K.      With the understanding that the Existing Privacy Policies are not intended to limit the possible marketing of the Sale Assets after the Closing Date by the Acquirer to potential Third Party Buyers, financing sources, or joint venture members pursuant to confidentiality agreements, the Lender Parties, after the Closing Date, have agreed to undertake to cause the Acquirer to implement and adhere to privacy policies with respect to the Sale Assets substantially similar to the Existing Privacy Policies. Accordingly, no Consumer Privacy Ombudsman need be appointed under Section 363(b)(1)(B) of the Bankruptcy Code.

        L.      The Q Parties each have specifically consented to and shall be deemed to be subject to the jurisdiction of the Court for all purposes relating to the entry of this Order, the Settlement and the transactions contemplated therein or thereby.

M.      The Settlement provides for the disposition of substantially all of the Debtor's assets, and other than those of the Lenders Parties, there will not be material non-insider claims remaining unpaid at the time of the consummation of such disposition. Accordingly, following the Closing Date, it is in the best interests of creditors and the Debtor under such circumstances to dismiss the Case, rather than convert it to Chapter 7.  Accordingly, good and sufficient cause exists for the dismissal of the Case after the Closing Date pursuant to Section 1112(b) of the Bankruptcy Code.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      Any and all objections to the Motion are hereby overruled, and the Motion is GRANTED in its entirety.

2.      The Settlement, including the Sale of the Sale Assets (including the assumption and assignment of the Assigned Contracts), is adopted, approved and ratified in its entirety.  The Debtor is authorized and directed to enter into and perform its obligations under the Settlement, including the Sale of the Sale Assets, which Settlement is approved in its entirety as if expressly stated herein pursuant to Bankruptcy Rule 9019 and Sections 105(a), 363, and 365 of the Bankruptcy Code.

3.      The Debtor is authorized to take any and all actions necessary or appropriate to implement the terms of this Order and the Settlement, including the Sale of the Sale Assets (including the assumption and assignment of the Assigned Contracts).

4.      Consistent with (and without limiting the generality of) the foregoing, and pursuant to Bankruptcy Rule 9019 and Sections 105(a), 363, and 365 of the Bankruptcy Code, the Debtor's execution and delivery of the Settlement and Sale Agreement is hereby authorized,

directed, and ratified in all respects, and the Debtor is hereby authorized and directed to enter

into each other Settlement Document, each Settlement Document (including the Settlement and

Sale Agreement itself) being approved in its entirety as if expressly restated herein.  Without

limiting the generality of the foregoing, the Debtor is authorized and directed to take all actions

required under the terms of the Settlement Documents.  Prior or subsequent to the execution and

delivery of the Settlement and Sale Agreement (or any of the other Settlement Documents), the

parties may revise various provisions of the form of such agreement (or other Settlement

Documents) without the necessity of any further court approval so long as any such revision does

not materially alter the provisions of this Order or of the form of the Settlement and Sale

Agreement attached as Exhibit A hereto (or other Settlement Document).  After the Effective

Date, the parties shall be entitled to amend Settlement and Sale Agreement pursuant to the

provisions of Section 13.5 thereof, and any of the other Settlement Documents pursuant to their

pertinent provisions, without the necessity of any further Court approval.

     5.     As of the date of the entry of this Order, the allowed amount of Lender

Party Claims aggregate at least $_____, secured by a perfected, first priority security

interest in the Sale Assets.

     6.     The Debtor's release of liability in favor of the Lender Parties set forth in

Section 3 of the Settlement and Sale Agreement shall be effective and fully enforceable on the

Effective Date as if expressly restated herein.

     7.     Pursuant to Section 105(a) and 363(f) of the Bankruptcy Code, the Debtor

is authorized and directed to transfer the Sale Assets (including of the Assigned Contracts) to the

Acquirer and, as of the Closing Date, the Acquirer shall take title to and possession of the Sale

Assets free and clear of all Interests of any kind or nature whatsoever (other solely than the Lien

of the Administrative Agent for the benefit of the Lender Parties and the claims of the Lender Parties).

8.      As of the Closing Date, (a) the transactions contemplated by the Settlement Documents effect a legal, valid, enforceable and effective sale and transfer of the Sale Assets to Acquirer, and shall vest Acquirer with title to such Sale Assets free and clear of all Interests (other solely than the Lien of the Administrative Agent for the benefit of the Lender Parties and the claims of the Lender Parties) and (b) the Settlement Documents and the transactions and instruments contemplated thereby shall be specifically performable and enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtor or any successor Chapter 11 or Chapter 7 trustee appointed with respect thereto.

9.      On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtor's interests in the Sale Assets.

10.      This Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Sale Assets prior to the Closing Date (other solely than the Lien of the Administrative Agent for the benefit of the Lender Parties and the claims of the Lender Parties) have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including, without limitation, all Issuing Insurance Companies, filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept,

file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Sale Assets.

11.    On the Closing Date, each of the Debtor's creditors (other than the Lender Parties) is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Liens in the Sale Assets, if any, as such Interests may have been recorded or may otherwise exist.

12.    Neither the Acquirer nor its affiliates (including the other Lender Parties), successors or assigns shall, as a result of the consummation of the transaction contemplated by the Settlement Documents: (a) be a successor to the Debtor or its estate; (b) have, de facto or otherwise, merged or consolidated with or into the Debtor or its estate; or (c) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor.

13.    In accordance with Sections 363, 365 and 105(a) of the Bankruptcy Code, and subject to the terms of the Settlement Documents and this Order, the Debtor is hereby authorized to assume and assign the Assigned Contracts, including the Policies, to which it is a party (or in which it has the beneficial interest) to the Acquirer.

14.    The requirements of Sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with respect to the Assigned Contracts.

15.    Upon the Debtor's assignment of the Assigned Contracts to the Acquirer under the provisions of this Order, no default shall exist under any Assigned Contract, and no counterparty to any Assigned Contract (including any Issuing Insurance Company) shall be permitted to declare a default by the Acquirer under such Assigned Contract or otherwise take

action against the Acquirer as a result of the Debtor's financial condition, bankruptcy or failure to perform prior to the Closing Date any of its obligations under the relevant Assigned Contract.

16.     Except for the Assigned Contracts, no contracts or unexpired leases shall be assumed and assigned as part of the Sale Assets.  Moreover, the Debtor's existing contract with the Servicer, the Servicing and Tracking Agreement dated as of October 25, 2007, shall be deemed rejected and terminated as of the Closing Date.

17.     The terms and provisions of the Settlement Documents and this Order shall be binding in all respects upon the Debtor, its estate, all Issuing Insurance Companies, all creditors of (whether known or unknown) and direct or indirect holders of equity interests in the Debtor, the other Q Parties, the Acquirer and their respective affiliates, successors and assigns, and any third parties, notwithstanding any subsequent appointment of any trustee of the Debtor under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding and notwithstanding any subsequent conversion or dismissal of this Case.  This Order and the Settlement Documents shall inure to the benefit of the Debtor, its estate, its creditors, the other Q Parties, the Acquirer, and their respective successors and assigns of each of the foregoing.

18.     The consideration provided to or by the Acquirer with respect to the Sale Assets under the Settlement Documents is fair and reasonable and may not be avoided under Section 363(n) of the Bankruptcy Code.

19.     The transactions contemplated by the Settlement Documents are undertaken by the Acquirer (and the other Lender Parties) without collusion and in good faith, as that term is used in Section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not

affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts) to the Acquirer, unless such authorization is duly stayed pending such appeal prior to the Closing Date.  The Acquirer is a good faith transferee of the Sale Assets and, accordingly, is entitled to all of the benefits and protections afforded by Section 363(m) of the Bankruptcy Code.

20.     The Lender Parties, after the Closing Date, will undertake to cause the Acquirer to implement and adhere to privacy policies with respect to the Sale Assets substantially similar to the Existing Privacy Policies.

21.     There shall be no Consumer Privacy Ombudsman appointed under Section 363(b)(1)(B) of the Bankruptcy Code.

22.     Nothing contained in any other Order in this Case (including in any Order converting or dismissing this Case) shall alter, conflict with, or derogate from, the provisions of the Settlement Documents or this Order.

23.     The failure specifically to include any particular provisions of the Settlement Documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Settlement Documents be authorized and approved in their entirety; provided, however, that this Order shall govern if there is any inconsistency between any of the Settlement Documents and this Order.  Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

24.     Pursuant to Section 107(c) of the Bankruptcy, the parties shall not be required to file Exhibit D to the Settlement and Sale Agreement in the docket of this Court and in this Case in order to prevent the undue risk of identity theft.

25. Within 30 days following the Closing Date, and pursuant to Section 1112(b) of the Bankruptcy Code, this Court shall enter an Order dismissing this Case, which Order shall expressly include the issuance of an injunction prohibiting the Debtor and the Q Parties from commencing any subsequent bankruptcy proceeding involving the Debtor under any Chapter of the Bankruptcy Code without the prior, express written consent of the Lender for a period of at least twelve (12) months following the date of the entry of such dismissal Order (the "Dismissal Order"). No further notice or hearing shall be required prior to the entry of the Dismissal Order, which Dismissal Order shall be entered upon the filing of a certification of counsel for the Debtor that the Settlement has closed pursuant to its terms.

26. Pending dismissal of this chapter 11 case, this Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Settlement Documents, all amendments thereto and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Sale Assets to Acquirer; (b) interpret, implement and enforce the provisions of this Order; (c) protect Acquirer against any Interests in or claims against the Debtor or the Sale Assets of any kind or nature whatsoever, and (d) enter any orders under Sections 363 and 365 of the Bankruptcy Code with respect to the Assigned Contracts. After the dismissal of this case, this Court shall no longer retain or have any jurisdiction over such matters.

27. Notwithstanding the provisions of Bankruptcy Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry. Time is of the essence in closing the transactions referenced herein, and the Debtor and the

-12-

Acquirer intend to close the Sale as soon as practicable.  Any party objecting to this Order must

exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed

as moot.

###

**Submitted by:**

Glenn D. Moses, Esq.
Florida Bar No. 174556
Heather L. Harmon, Esq.
Florida Bar No. 013192
GENOVESE JOBLOVE & BATTISTA, P.A.
4400 Miami Tower
100 Southeast Second Street
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310
gmoses@gjb-law.com
hharmon@gjb-law.com

and

Gerald H. Gline, Esq.
(admission *pro hac vice*)
ggline@coleschotz.com
David M. Bass, Esq.
(admission *pro hac vice*)
dbass@coleschotz.com
COLE,  SCHOTZ,  MEISEL,  FORMAN  &
LEONARD, P.A.
25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Facsimile:  (201) 489-1536

Co-Counsel  for  *QOC  I  LLC*,  Debtor  and
Debtor-in-Possession

Copy to:  Glenn D. Moses, Esq., who shall serve a copy of this order on all interested parties and
file a certificate of service  conforming with Local Rule 2002-1(F).