UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division
www.flsb.uscourts.gov

In re:

Case No. 10-40153-BKC-PGH

QOC I LLC,

Chapter 11

Debtor.

_____/

**DECLARATION OF PAUL SHAPIRO IN CONNECTION WITH DEBTOR'S
MOTION TO APPROVE (A) SETTLEMENT AGREEMENT, (B) SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (C) ASSUMPTION AND
ASSIGNMENT OF CONTRACTS, (D) REJECTION OF SERVICING AND
TRACKING AGREEMENT, (E) DISMISSAL OF THE DEBTOR'S CHAPTER 11
CASE AND (F) RELATED RELIEF**

I, Paul E. Shapiro, hereby declare under penalty of perjury:

1.      I am Chairman of Q Capital Strategies, LLC ("Q Capital"), the "Servicer" and the "Loan Manager" under the Loan and Security Agreement (as defined below).  I have continuously served as Chairman of Q Capital since the inception of QOC I LLC ("QOC" or the "Debtor").  I am familiar with the Debtor's operations, business and financial affairs.

2.      I have personal knowledge of the facts set forth herein, except as otherwise noted, and submit this Declaration in support of the Debtor's motion pursuant to 11 U.S.C. §§ 105(a), 305(a), 349, 363, 365 and 1112(b) and Rules 9019, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure for entry of an order:  (A) approving a global settlement agreement by and between the Debtor, Wells Fargo Securities, LLC and Wells Fargo Bank, N.A. (collectively, "Wells Fargo") and certain related parties, (B) approving the sale of substantially all of the Debtor's assets, (C) authorizing the assumption and assignment of contracts, (D) authorizing the rejection of the current servicing and tracking agreement, (E) authorizing the dismissal of the Debtor's chapter 11 case, and (F) for related relief, filed November 12, 2010 [D.E. 72] (the

"Motion").[1] The hearing on the Motion has been scheduled for December 7, 2010, at 10:00 a.m. If called to testify at the hearing on the Motion, I would state that:

## RELEVANT BACKGROUND

3.      On October 1, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

4.      Since that time, the Debtor has remained in possession of its assets and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No request has been made for the appointment of a trustee or examiner, and no official committee(s) has been appointed in this case.

A.      **QOC's Business and Chapter 11 Filing**

6.      QOC is a Delaware limited liability company, and was formed and exists to own and hold previously issued life insurance policies (the "Policies") issued by leading insurance companies (the "Issuing Insurance Companies") upon individuals (the "Insureds") and sold in the life settlement market. As of the Petition Date, QOC owned 283 policies on 223 lives with a face value of approximately $550 million.[2] The Policies comprising QOC's life settlement portfolio are QOC's primary asset and the principal collateral securing the obligations to Wells Fargo.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[2] Since the Petition Date, three maturities with death benefits aggregating $4 million have occurred. With respect to those maturities, the Debtor has received payment of $2 million and expects payment of the additional $2 million within the next 30 days or so.

7.    The Debtor's acquisition of the Policies, and its contractual and other rights of payment related thereto, are based upon, among other things, a series of agreements providing for the purchase, financing, servicing and management of the Policies.

8.    The Policies insure the lives of individuals, who may or may not be the original Policy owner, and who, at the time of the purchase of each such Policy in the life settlement market, was at least 60 years of age.  The Insured (or the Policy's owner) desired to sell their Policies and the related benefits in the life settlement market rather than surrender them to the Issuing Insurance Company for less value.  The Policies were purchased from the Policy owner by QOC, or on behalf of QOC and subsequently assigned to QOC.[3]  The Debtor purchased the Policies at prices expected to yield a profit to the Debtor's investors upon the payment of the death benefit to QOC.

## B.    The Debtor's Pre-Petition Relationship With Wells Fargo

9.    On or about May 9, 2008, the Debtor, as "Borrower," along with its parent, Q Opportunity Company LLC, as "Equity Contributor," and Q Capital Strategies, LLC, as the "Servicer" and "Loan Manager," entered into that certain Loan and Security Agreement (as amended, the "Loan and Security Agreement"), with Wachovia Capital Markets, Inc., as administrative agent, and Wells Fargo, as custodian, pursuant to which Wells Fargo's predecessor, Wachovia Bank, National Association ("Wachovia"), agreed to advance $120 million to QOC for the purchase of the Policies (the "Loan").

10.    Under the Loan and Security Agreement, Wells Fargo has a security interest in all of the Policies (and, together with any ancillary collateral relating to the Polices and all cash

---

[3] Policies are often held not by individuals but by a trust, *e.g.*, an Irrevocable Life Insurance Trust, or by business entities seeking to dispose of unneeded "key-man" insurance or other business-owned insurance.

proceeds generated thereby or derived from the Policies, the "Collateral"). Pursuant to the terms of the Loan and Security Agreement, and as set forth in that certain Custodian Agreement dated May 9, 2008, Wells Fargo, as Custodian, holds the original Policies, which have been collaterally assigned to the Custodian to secure the indebtedness due Wells Fargo.

11.    QOC and Wells Fargo (as successor to Wachovia) were also parties to that certain Hedging Agreement (as defined in the Loan and Security Agreement) dated as of May 9, 2008, consistent with the terms of a "Master Agreement" in a form published by the International Swaps and Derivatives Association, Inc., together with a "Schedule" thereto, and each "Confirmation" thereunder confirming the specific terms of a Hedge Transaction (as defined in the Loan and Security Agreement), pursuant to which QOC sought to hedge against variable interest rates.[4] The Hedging Agreement was terminated shortly after the Petition Date.

12.    Wells Fargo, as the Hedge Counterparty, also is a beneficiary of a lien on the Collateral. Wells Fargo's interests in the Collateral securing QOC's obligations under the Hedging Agreement are on a *pari passu* basis with the Collateral securing QOC's obligations under the Loan and Security Agreement.

13.    As of the Petition Date, the Debtor was indebted to Wells Fargo in the total amount of at least $138,381,710.60. Through December 7, 2010, the Debtor will be indebted to Wells Fargo in the total amount of at least $141,190,354.35, consisting of (i) $120,000,000.00 in principal, (ii) $15,476,250.00 in Hedge Breakage Costs, (iii) $4,442,596.51 in accrued and unpaid interest, comprised of (a) $4,409,627.27 in accrued and unpaid interest attributable to the $120,000,000.00 in principal (of which $845,833.34 has accrued post-petition through December

---

[4] QOC entered into interest rate swap transactions with Wachovia under reference numbers 2678252, 2696278, 2737537, 2808136, 2859192, 2899574 and 2949890, as evidenced and confirmed by letter agreements between Wachovia and QOC dated August 7, 2009.

7, 2010) and (b) $32,969.24 attributable to Hedge Breakage Costs from termination through December 6, 2010, and (iv) $1,271,507.84 in out-of-pocket expenses.

14.    Other than the substantial indebtedness due and owing to Wells Fargo (and certain obligations the Debtor may have with respect to its insiders), the Debtor has no known pre-petition creditors.    The only claims that remain against the Debtor consist of accrued restructuring and other fees owed to professionals and other entities, which shall be satisfied through the retainers on hand or pursuant to the Settlement (as defined below). The Debtor has no other creditors or outstanding claims against it.[5]

C.    **Significant Filings in the Bankruptcy Case**

15.    On the Petition Date, the Debtor filed its Emergency Motion for an Order (A) Authorizing the Debtor's Interim and Final Use of Cash Collateral Pursuant to 11 U.S.C. § 361 and 363 and Granting Adequate Protection, (B) Scheduling a Final Hearing and (C) for Other Related Relief (the "Cash Collateral Motion") [D.E. 7].

16.    Thereafter, Wells Fargo filed an Objection to the Cash Collateral Motion [D.E. 6]. Upon the agreement of Wells Fargo, on October 8, 2010 this Court entered the Interim Cash Collateral Order, granting the Cash Collateral Motion on an interim basis and setting a final hearing for November 10, 2010.

---

[5] As reflected on the Debtor's schedules of liabilities filed with the Court on October 15, 2010 [D.E. 49], the Debtor, a single-purpose entity, listed few non-insider unsecured creditors with obligations due as of the Petition Date.    But for the bankruptcy filing, each of the obligations thereon would have been budgeted and paid in the ordinary course in October 2010, with Wells Fargo's consent.    The payment of each of the obligations was necessary in order to assure protection and proper administration of the Portfolio during the post-Petition Date period. Payment of these obligations was made pursuant to the Interim Order Authorizing the Debtor's Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2) and Fed. R. Bankr. P. 4001 and Scheduling Final Hearing Date, entered October 8, 2010 [D.E. 39] (the "Interim Cash Collateral Order").

17.     On October 6, 2010, Wells Fargo filed a Motion for an Order Dismissing Case (the "Dismissal Motion") [D.E. 25]. On the next day, Wells Fargo filed a Motion for Relief from the Automatic Stay (the "Stay Relief Motion") [D.E. 7].

18.     Pursuant to this Court's Order dated October 12, 2010, a final evidentiary hearing on the Dismissal Motion and the Stay Relief Motion was initially set for November 8, 2010 [D.E 43]. The hearing on each of the Dismissal Motion and the Stay Relief Motion, along with the final hearing on the Cash Collateral Motion, have been continued to December 7, 2010.

## SETTLEMENT AGREEMENT

19.     After extensive negotiations, the Debtor, Wells Fargo and certain related parties entered into a settlement (the "Settlement"), subject to this Court's approval, which is embodied in a Settlement and Sale Agreement (the "Settlement Agreement"), a copy of which is attached to the Motion as Exhibit "1". The terms of the Settlement were summarized in paragraph 18 of the Motion.

20.     Without limiting the terms of the Settlement or otherwise modifying the Settlement Agreement, and as more particularly described in the Motion, the Settlement calls for the sale of the Policies to Wells Fargo's designee, *i.e.*, the Debtor Transfer to the Acquirer, free and clear of all liens, claims and encumbrances, other than those of Wells Fargo, and for the Debtor's designee's right to a Contingent Payment in the event various conditions are met as set forth in the Settlement Agreement.

21.     The Settlement Agreement has not been amended or otherwise modified and there have been no material changes in the terms of the Settlement from those disclosed in the Motion.

**A.    Approval of Settlement Agreement is in the Best Interests of the Estate**

22.     I submit, on behalf of the Debtor, that the Settlement Agreement is in the best interest of the estate and should be approved. The Settlement Agreement resolves a number of

contested matter including the Cash Collateral Motion, the Dismissal Motion and the Stay Relief Motion. I believe, based on discussions with counsel, that if the disputes with Wells Fargo are not resolved now, future proceedings would be protracted and expensive, involve complex issues, and subject the Debtor, its estate, and its creditors to substantial uncertainties and risk. Due to the complexity and range of disputed issues, the litigation risk attendant to the merits of legal issues in dispute and the absence of any unencumbered estate funds that could be utilized by the Debtor to fund its continued prosecution of such litigation with Wells Fargo, the Debtor, after discussion with counsel, sought to find a means for resolving the litigation consensually with Wells Fargo.

23.    After examining all alternatives, the Debtor, in its business judgment, considered the benefit – and certainty – to the Debtor's estate and creditors that will be received as a result of the Settlement, particularly in light of the costs, uncertainties, delay and risks of further litigation, and, as set forth in the Motion, has concluded that the Settlement is fair and equitable and in the best interest of the Debtor, its estate, stakeholders and other parties-in-interest. The Settlement provides not only for a prompt, effective resolution of all matters in controversy between it and its primary secured creditor – Wells Fargo – but also enables a potential recovery for the Debtor's stakeholders. In addition, the Settlement, if authorized by the Court, enables an efficient resolution of this case with a definitive outcome, thereby avoiding the uncertainties, and possible harsh realities, that would result if instead further litigation with Wells Fargo became necessary.

24.    Accordingly, I submit, on behalf of the Debtor, after consultation with counsel, that the Settlement is: (a) fair, reasonable and equitable under the circumstances; (b) falls well within the range of reasonableness with respect to potential litigation outcomes; (c) obviates the

expense, delay, inconvenience and uncertainty that would attend the litigation of these disputed issues; and (d) advances the paramount interests of the Debtor's estate by adding potential value, as a matter of certainty, while simultaneously providing a critical element of finality to the estate's largest creditor, Wells Fargo.

**B.**     **The Debtor Should be Permitted to Sell the Assets to the Acquirer**

25.     As set forth in detail in the Motion, the Settlement Agreement calls for the transfer of the Collateral to a designee of Wells Fargo, free and clear of all liens, claims and encumbrances with the exception of Wells Fargo's liens.

26.     As detailed in the Motion, I submit, on behalf of the Debtor, that the Debtor has established sound business judgment which justifies the proposed sale, *i.e.*, the Debtor Transfer, outside of a plan of reorganization and without the need for any further marketing of the Collateral or additional sale procedures. As set in the Motion, the sale contemplated by the Settlement Agreement resolves the Debtor's dispute with Wells Fargo, which is by far the largest, if not sole non-insider stakeholder in this bankruptcy proceeding, and avoids litigation fraught with risk, delay and significant expense. Further, by creating a Contingent Payment right in the event various conditions are met as set forth in the Settlement Agreement, the Settlement enables the Debtor (through the Debtor Designee) to realize fair and adequate consideration from the sale of its assets.

27.     Indeed, the Settlement Agreement and the transactions contemplated therein were the product of good faith, arms' length negotiations between the Debtor and Wells Fargo. I am informed by the Debtor's counsel that Wells Fargo is not an insider of the Debtor within the meaning of section 101(31) of the Bankruptcy Code, and does not control or act on behalf of any insider of the Debtor. Therefore, I submit that the sale, *i.e.*, the Debtor Transfer, has been proposed in good faith.

**C.**    **The Debtor Should be Permitted to Assume and Assign the Policies**

28.    As set forth in the Motion, pursuant to the Settlement Agreement, the Debtor is to assume and assign the Policies and other pre-petition contracts included in the Servicing Files to the Acquirer.

29.    I submit that the Debtor is exercising sound business judgment in moving to assume the Policies, and such assumption will clearly benefit the estate as it is part of the consideration of the Settlement Agreement.  This shall confirm, as was stated in the Motion, that the Debtor is not in default under any of the Policies and there is no "cure" due with respect to any of the Policies or any of the Servicing Files.  With the entry of a second extension of the cash collateral order, the Debtor will have the funds to pay all premiums due through the anticipated Closing of the Debtor Transfer.

**D.**    **The Debtor Should be Permitted to Reject the Servicing Agreement**

30.    As set forth in the Motion, the Debtor and Q Capital are parties to that certain Servicing and Tracking Agreement dated as of October 25, 2007, pursuant to which Q Capital manages and services the Policies (the "Servicing Agreement").  If the Debtor Transfer is approved, the Debtor will no longer own the Policies.  Accordingly, the Debtor will no longer require the services provided under the Servicing Agreement and rejection, therefore, is in the best interest of the Debtor's estate.  Q Capital consents to the rejection of the Servicing Agreement effective upon the Closing and payment of all servicing fees incurred through the Closing.

31.    It is my understanding that the Acquirer intends to retain Q Capital to continue to manage and service the Policies and perform other tasks associated with keeping the Policies in place.  In that regard, and for purposes of providing full disclosure, if the Motion is approved and a closing occurs on the terms set forth in the Settlement Agreement, it is my understanding that

the Acquirer intends to enter into a new servicing agreement with Q Capital. The Debtor (with the consent of counsel) and its equity investors have each expressly consented to Wells Fargo and the Acquirer entering into negotiations with representatives of Q Capital regarding such potential new servicing agreement. No agreement has yet been finalized, however.

E.    **The Debtor Transfer Will Not Require the Appointment of a Consumer Privacy Ombudsman**

32.    As described in the Motion, Q Capital has certain privacy policies in place that it implements on behalf of the Debtor, *i.e.*, the Existing Privacy Policies. It is my understanding from discussions with counsel that under certain circumstances the Court is required to appoint a consumer privacy ombudsman in connection with a sale of personally identifiable information.

33.    However, as was noted in the Motion, because the information obtained by the Debtor that may be considered "personally identifiable information" was not provided to the Debtor "in connection with [any individual] obtaining a product or service from the debtor for personal, family, or household purposes", I submit that the section requiring the appointment of a consumer privacy ombudsman does not even apply. Nevertheless, in light of the sensitivity of the information associated with the transfer of the Policies (though much of it is already known to Wells Fargo), the Debtor and Wells Fargo have proceeded, out of an abundance of caution (but without waiving any rights or claims to contend that such section does not apply) as if that section may apply to the sale and other transactions contemplated by the Settlement.

34.    With the understanding that the Existing Privacy Policies are not intended to limit the possible marketing of the Sale Assets after the Closing Date by the Acquirer to potential Third Party Buyers, financing sources, or joint venture members pursuant to confidentiality agreements, Wells Fargo, after the Closing Date, has agreed in the Settlement Agreement (and the Order submitted with the Motion so requires) to undertake to cause the Acquirer to

implement and adhere to privacy policies with respect to the Sale Assets substantially similar to the Existing Privacy Policies.

35.    Thus, to the extent that the information being transferred includes "personally identifiable information", it is my understanding that the Settlement Agreement requires that Wells Fargo will continue to utilize any such "personally identifiable information" in exactly the same fashion as the Debtor may under its Existing Privacy Policy.  To the extent that Q Capital enters into a new servicing agreement with the Acquirer, it will continue to adhere to the Existing Privacy Policies.

**G.    Dismissal of this Case is Warranted**

36.    Wells Fargo has moved for dismissal of the Debtor's chapter 11 case.  Further, the Settlement Agreement obligates Debtor to request entry of an order dismissing the case by December 20, 2011 (and further enjoining the Debtor from re-filing for bankruptcy for at least another year thereafter).

37.    I submit, on behalf of the Debtor, that this Court should dismiss the Debtor's chapter 11 case and dismissal is in the best interests of the Debtor, the Debtor's estate and its creditors.

38.    As was noted in the Motion, upon the consummation of the Debtor Transfer, the Debtor will have transferred all of its assets to the Acquirer, Wells Fargo's designee.  Moreover, as noted above, there are no material non-insider claims remaining against the Debtor.  Indeed, besides Wells Fargo, the Debtor is not aware of there being any other claims in this bankruptcy besides, at most, one potential, disputed *de minimis* claim for $293.[6]  Therefore, I submit that no

---

[6] Although an entity known as American Infosource Lp As Agent for T Mobile/T-Mobile USA Inc. has filed a claim against the Debtor (in the amount of $293.03), the Debtor has no record of ever doing business with such entity and observes that its claim is allegedly based upon (continued...)

prejudice to third parties will result from dismissing the Debtor's chapter 11 case after Closing in accordance with the terms of the Settlement Agreement.

**H.**      **Dismissal is in the Best Interests of the Creditors and of this Estate**

39.      As noted above, upon the consummation of the Debtor Transfer, the Debtor will have nothing left with which to pursue reorganization nor any material, non-insider claims in need of administration.  Thus, I submit, that it is in the best interests of the Debtor's estate to dismiss the Debtor's chapter 11 proceeding because, upon the consummation of the Settlement, the Debtor's operations will cease, all of its assets will have been sold, there will be no funds available to finance a plan and nothing further to pursue.  Upon consummation of the Settlement, the Debtor no longer needs to utilize the bankruptcy process for any of its intended purposes.

40.      Here, through the Debtor Transfer, the Debtor will have maximized the value of the Debtor's assets.  I am confident that the most significant assets have been liquidated, and that there is nothing further to pursue.

41.      The Settlement and dismissal of this case represents the parties' negotiated resolution of this chapter 11 case.  Authorizing the terms of the Settlement contemplated herein and allowing the dismissal of this chapter 11 case furthers the efficient administration of the Debtor's estate and the maximization of value for stakeholders.   Once the transactions contemplated by the Settlement are consummated, there is no reason for these proceedings to continue.

42.      For these reasons, I submit that the Debtor has demonstrated that the Debtor's creditors and estate will be better served if the Debtor's case is dismissed.

---

(…continued)
an account that according to the claimant was opened on December 24, 2006, which was ***before*** the Debtor was even formed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: December 6, 2010

_____
Paul E. Shapiro